United States District Court
Middle District of Florida
Jacksonville Division

**T.V., AS EXECUTOR DE SON TORT OF
THE ESTATE OF A.V., A MINOR, AND
ON BEHALF OF THE ESTATE OF A.V. AND
THE SURVIVORS OF THE ESTATE,**

       *Plaintiff,*

**v.**                                                    **No. 3:22-cv-864-MMH-PDB**

**GRINDR, LLC,**

       *Defendant.*

---

## Report and Recommendation on Motion to Dismiss (D22)[1]

### I.    Background

    T.V. sues Grindr, LLC, on behalf of the estate of A.V.[2] While a minor,[3] A.V. allegedly used Grindr's services marketed to gay, bisexual, transgender, and queer people and, through that use, was exposed to, and engaged in, sexual activities and relationships with adult users, resulting in severe emotional distress and bodily injuries culminating in death from a self-inflicted gunshot wound.

---

[1]Citations to page numbers are to page numbers generated by CM/ECF.

[2]R.V. was the original executor and plaintiff. D1. R.V. died on August 13, 2023. D43. Without opposition from Grindr, D49, the Court permitted the new executor, T.V., to become the plaintiff. D50. The undersigned replaces most references to "R.V." with "T.V."

Without opposition from Grindr, the Court permitted the identification of A.V., T.V., and R.V. by initials in papers on the public docket. D16 at 4. Grindr knows the full names, D14 at 2, which are disclosed in a sealed paper, SD10 at 1–2. All other information is on the public docket.

[3]In this report and recommendation, "minor" means a person under 18.

T.V. brings eight claims for relief, one based on 18 U.S.C. § 1595—the civil remedy provision of the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), Pub. L. No. 108-193—and seven based on Florida common law torts. D9 ¶¶49–161. The Court has jurisdiction.[4]

Grindr moves to dismiss the claims under Rule 12(b)(6), Federal Rules of Civil Procedure.[5] D22. For most claims, Grindr argues that an affirmative defense clearly appears on the face of the operative pleading; specifically, the defense under 47 U.S.C. § 230(c)(1)—part of the "Good Samaritan" provision of the "Online Family Empowerment" section of the Communications Decency Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, § 501. *Id.* at 13–20. Grindr also argues that T.V. fails to allege facts making the claims plausible or otherwise fails to state a claim on which relief can

---

[4]T.V. contends that the Court has both federal question jurisdiction and diversity jurisdiction. D9 ¶¶6, 8. But she also contends that the only federal law involved—the TVPRA—is brought under the Florida Wrongful Death Act, codified at Fla. Stat. §§ 768.16–768.26. *See* D41 at 1; *see also* footnote 17, *infra* (explaining that the survival of a federal cause of action is a question of federal common law). Grindr does not contest jurisdiction. *See* D22. In the interest of judicial economy, the undersigned analyzes only diversity jurisdiction.

A federal court has diversity jurisdiction over a claim if the amount in controversy exceeds $75,000 and the action is between citizens of different states. 28 U.S.C. § 1332. "[T]he legal representative of the estate of a decedent [is] a citizen only of the same State as the decedent[.]" *Id.* § 1332(c)(2). "[A] limited liability company is a citizen of any state of which a member of the company is a citizen." *Rolling Greens MHP, L.P. v. Comcast SCH Holdings, LLC*, 374 F.3d 1020, 1022 (11th Cir. 2004).

When he died, A.V. was a Florida citizen. D54 ¶2. T.V. thus is considered a Florida citizen. *See* 28 U.S.C. § 1332(c)(2). Grindr LLC's sole member is Grindr Holdings, LLC. D9 ¶3. Grindr Holdings LLC's sole member is Grindr Capital LLC. D38 ¶1. Grindr Capital LLC's sole member is Grindr Gap LLC. *Id.* ¶2. Grindr Gap LLC's sole member is Grindr Group LLC. *Id.* ¶3. Grindr Group LLC's sole member is Grindr Inc., a Delaware corporation with its principal place of business in California. *Id.* ¶4. The amount in controversy exceeds $75,000. D9 ¶6. With Florida on one side and Delaware and California on the other and an amount in controversy exceeding $75,000, the Court has diversity jurisdiction.

[5]A motion must be "no longer than twenty-five pages inclusive of all parts." Local Rule 3.01(a). Grindr's motion is 36 pages, presumably because Grindr interprets "parts" to exclude the heading, title, table of contents, table of authorities, signature block, and certificate of service. *See* D22. "All parts" means "all parts," not "one part" or "some parts." The undersigned did not strike the noncompliant motion in the interest of efficiency.

be granted. *Id*. at 20–34. T.V. opposes dismissal and asks the Court to lift the stay.[6] D32.

The motion to dismiss was referred to the undersigned to prepare a report and recommendation. D36. At the undersigned's direction, D39, T.V. supplemented the response to the motion to dismiss, D41, and Grindr replied to the supplemented response, D42.[7] Grindr also twice supplemented its authority. D53, D60.

## II.    Operative Pleading (D9)[8]

### A.    *Factual Allegations*

#### 1.    *General*

When deciding a motion to dismiss a complaint for failure to state a claim on which relief can be granted, a court considers the complaint's factual allegations,

---

[6]When T.V. asked the Court to lift the stay, D32 at 19, no stay had been in place. The parties agreed to refrain from conducting discovery beyond initial disclosures until a ruling on the motion to dismiss. D27 at 5. The Court entered a case management and scheduling order requiring the completion of discovery by February 8, 2024, observing that the agreement binds the parties but not the Court and explaining that the parties must move to extend the deadline if they want that relief. D28 at 2 n.1. After the order directing supplemental briefing on the response to the motion to dismiss and a reply to the supplemented response, D39, the Court vacated the case management and scheduling order and stayed the case pending a decision on the motion to dismiss. D40. The case has remained stayed to allow time to substitute T.V. for R.V. as the plaintiff and, at the parties' request, to allow the parties time to try to settle. D55, D56, D57, D58, D61.

[7]In the reply to the supplemented response to the motion to dismiss, Grindr raises new arguments concerning duty and reliance. D42 at 21–22, 25. Raising new arguments in a reply is too late because the Court lacks adversarial briefing on them. The undersigned does not address the arguments raised for the first time in the reply. *See* section IV.A.4, *infra* (analyzing the original arguments concerning duty, D22 at 30–31 & 31 n.5); section IV.A.7, *infra* (analyzing the original arguments concerning negligent misrepresentation, D22 at 33–34 & 34 n.7).

[8]The operative pleading is the "Second Corrected Complaint." D9. The Court struck the original complaint, D1, because it was an impermissible "shotgun pleading" and failed to comply with Local Rule 1.08's typography requirements. D5. R.V. filed an "Amended Complaint," D6, and, at the Court's direction during a status conference, D8, the second corrected complaint, D9.

3

accepts them as true, construes them in the light most favorable to the plaintiff, and draws all reasonable inferences from them in the plaintiff's favor. *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1319 (11th Cir. 2021).

In the operative pleading, T.V. alleges the following facts. Under the law just stated, to decide the motion to dismiss, the Court must consider them, accept them as true, construe them in the light most favorable to T.V., and draw all reasonable inferences from them in T.V.'s favor.

2.    *Grindr*

Grindr, launched in 2009, is a "geo-social networking application ["app"] for smartphones designed to facilitate the coupling of gay and bisexual men in their geographic area." D9 ¶¶10, 11. Grindr claims to be "the largest social networking app[] for gay, bi, trans, and queer people." *Id.* ¶12.

Grindr "runs on the iOS and Android mobile operating systems" and "is available for download at the Apple App Store and Google Play." *Id.* ¶10. "Grindr Services" include Grindr's "mobile device, software app[], website, and any other mobile or web service or app[]s owned, controlled, or offered by [Grindr.]" *Id.* ¶15.

Grindr "publicizes the location of users of Grindr Services on its platform." *Id.* ¶48(a). Grindr's "user interface shows images of men arranged from [geographically] nearest to [geographically] farthest away." *Id.* ¶13. "Users can see profiles of other users by tapping their image" and "can chat with one another on the interface." *Id.* "Users interact [intending] that the chat may … lead to a date or sexual encounter." *Id.* On a website page—https://www.grindr.com/about/—Grindr represents "that the platform has millions of daily users who use their location-based technology in almost every country in every corner of the planet." *Id.* ¶12 (emphasis omitted).

3.     *Grindr's User Policy and User Agreement*

Grindr has a "Privacy and Cookie Policy" on a website page—
https://www.grindr.com/privacy-policy/?lang=en-US—and separately has a "Terms
and Conditions of Service Agreement." *Id*. ¶¶25, 27(b).

The policy "states that the Grindr App allows users to share sensitive
information, including their sexual orientation and precise location, with [Grindr], the
service providers who assist in running [Grindr]'s services, and other Grindr users."
*Id*. ¶27(b). The policy "states that user profile and distance information is shared with
the Grindr Community." *Id*. ¶34.

The agreement states that "users shall refrain from adding offensive, harassing,
and pornographic material," *id*. ¶27(e); "users are prohibited from including material
on a personal profile page that contains video, audio, photographs, or images of any
person under … eighteen," *id*. ¶27(f); and Grindr reserves the right to remove user
content and material from Grindr's platform, *id*. ¶¶42(b), 44.

The policy states that Grindr "provides a safe space where users can discover,
navigate, and interact with others in the Grindr Community." *Id*. ¶42(a). But the
agreement states that Grindr "does not conduct criminal or other background
screenings of its users," *id*. ¶27(a); "denies any obligation to monitor any user's
registration for Grindr Services," *id*. ¶25; and "does not verify the information
provided by the users with respect to users' identity, health, physical condition, or
otherwise," *id*. ¶27(d).

The policy states that Grindr "uses Personal Data from its users to access their
camera, photo roll, and microphone to allow a user to share with other users, conduct
partner promotions, communicate with the user for promotions, and for Automated
Decision Making—such as removing non-compliant images[.]" *Id*. ¶27(c).

4.    *Grindr's Revenue Sources*

Grindr "has several revenue sources including … its Grindr Xtra paid for subscription and advertising—especially for businesses making use of the app[]'s geo-location features to target their advertisements to a particular neighborhood or locality." *Id.* ¶41. Grindr "profits from third party advertisements to users of Grindr Services." *Id.* ¶41(d).

The policy states that Grindr "shares user information with Ad Partners," *id.* ¶41(a), and "during the past twelve months, [Grindr] shared the following categories of Personal Data with [Grindr]'s third-party advertising partners who provided payment for ad placement: cookie or device IDs (such as advertising ID), connection information (such as type, carrier, speed), [and] opt-out status and technographics (such as device model, brand, [and] OS version)," *id.* ¶41(b). The policy "states that [Grindr] may promote programs and events with partners to offer discounts, early access, or other information or incentives to [Grindr]'s users." *Id.* ¶41(c). The agreement states that "Grindr Services may include links to other [websites] or services, whether through advertising or otherwise," *id.* ¶41(e); "[p]arties other than [Grindr] may provide services or sell products via … Grindr Services," *id.* ¶41(f); and Grindr "and its licensees may publicly display advertisement and other information adjacent to user content, but the user is not entitled to any compensation for such advertisements," *id.* ¶41(g).

5.    *Grindr's Introduction of "Daddy" and "Twink" "Tribes"*

Grindr "introduced 'Grindr Tribes,' allowing users of Grindr Services to identify themselves with a niche group and filter their searches to better find their

type." *Id*. ¶31. "Grindr Tribes include 'Daddy'[9] and 'Twink.[10]'" *Id*. "The creation of the Twink Tribe made persons under … eighteen … feel welcome to access, download, use, purchase, and/or subscribe to Grindr Services." *Id*. ¶32. "Users of Grindr Services can more efficiently identify persons under … eighteen … by narrowing the search results to the Twink Tribe." *Id*. ¶33.

6.      *Grindr's "Niche" Market*

"[T]he presence of persons under … eighteen … on Grindr Services created a niche market—separating [Grindr] from its competitors—and increasing [Grindr's] market share and profitability." *Id*. ¶36. Grindr "knew that users of Grindr Services— especially persons under … eighteen … are exposed to physical danger because of their access, download, use, purchase, and/or subscription to Grindr Services." *Id*. ¶30. An example of a publication describing the problem is, "Grindr's new owners are straight. They say that's OK," written by Sam Dean and published in the *Los Angeles Times* on July 2, 2020. *Id*. ¶¶30, 30(a).

---

[9]A definition of the slang term "daddy" is "a masculine older man; [specifically] one who is romantically or sexually interested in younger partners." *See* OED | Oxford English Dictionary, "daddy," available at https://www.oed.com/dictionary/daddy_n? (last visited on Aug. 13, 2024).

[10]Definitions of the slang term "twink" include "a gay man, [especially] one considered to be affected, flamboyant, or feminine"; "a young, attractive gay man with a slim, boyish appearance"; and "[a] gay or effeminate man, or a young man regarded as an object of homosexual desire." *See* OED | Oxford English Dictionary, "twink," available at https://oed.com/dictionary/twink_n3 (last visited on Aug. 13, 2024); Dictionary.com, "twink," available at https://www.dictionary.com/browse/twink (last visited on Aug. 13, 2024); Urban Dictionary, "twink," available at https://www.urbandictionary.com/define.php?term=twink (last visited on Aug. 13, 2024).

7.    *Criticism of Grindr*

Grindr "faced criticism for the physical and mental harm suffered by persons under … eighteen … from their access, download, use, purchase, and/or subscription to Grindr Services," including in these publications:

> a. Smith, S.E. "The Real Problem with Children Using Hookup Apps." *The Daily Dot*, 2 Sept. 2014, https://www.dailydot.com/.

> b. McKim, Jenifer B., et al. "Unseen, Part 3: Popular Gay Dating App Grindr Poses Exploitation Risk to Minors." *News, GBH*, 26 Jan. 2022, https://www.wgbh.org/news/national-news/2021/07/12/popular-gay-dating-app-grindr-poses-exploitation-risk-to-minors.

> c. Mendez II, Moises. "The Teens Slipping Through the Cracks on Dating Apps." *The Atlantic*, Atlantic Media Company, 6 June 2022, https://www.theatlantic.com/family/archive/2022/06/teens-minors-using-dating-apps-grindr/661187/.

> d. Suto, Daniel J., et al. "Geosocial Networking Application Use among Sexual Minority Adolescents." *J. of the Am. Acad. of Child & Adolescent Psychiatry*, vol. 60, no. 4, 2021, pp. 429–431., https://doi.org/10.1016/j.jaac.2020.11.018.

> e. "Texas Teacher Who Committed Suicide After Being Snagged in Underage Grindr Sex Sting Was Unfairly Set Up by Cops, Family Says." *Criminal Legal News*, 20 Aug. 2021, https://www.criminallegalnews.org/news/2021/aug/20/texas-teacher-who-committed-suicide-after-being-snagged-underage-grindr-sex-sting-was-unfairly-set-cops-family-says/.

> f. "There Are a Lot of Child Sexual Assaults on Grindr. Here's Why." *Protect Children from Meeting Strangers Online with SaferKid™*, https://www.saferkid.com/blog/there-are-a-lot-of-child-sexual-assaults-on-grindr-here-s-why.

> …

> h. Taylor, Samuel Hardman, et al. "Social Consequences of Grindr Use." *Proceedings of the 2017 CHI Conference on Human Factors in Computing Systems, 2017*, https://doi.org/10.1145/3025453.3025775.

*Id.* ¶¶29, 29(a)–(f), 29(h) (citations reformatted).

Grindr also "faced criticism for failing to implement reasonable precautions to prevent persons under … eighteen … from accessing, downloading, using, purchasing, and/or subscribing to Grindr Services," including in the publications just described in (a), (b), (c), and (f) and these publications:

> a. "Child Molesters Moving to Grindr to Find Underage Victims." *Queerty* …, 28 Apr. 2010, https://www.queerty.com/child-molesters-moving-to-grindr-to-find-underage-victims-20100428.
>
> b. Jozsa, Kyle, et al. "'Safe behind My Screen': Adolescent Sexual Minority Males' Perceptions of Safety and Trustworthiness on Geosocial and Social Networking Apps." *Archives of Sexual Behavior*, vol. 50, no. 7, 2021, pp. 2965–2980, https://doi.org/10.1007/s10508-021-01962-5.
>
> c. Macapagal, Kathryn, et al. "Hookup App Use, Sexual Behavior, and Sexual Health among Adolescent Men Who Have Sex with Men in the United States." *J. of Adolescent Health*, vol. 62, no. 6, 2018, pp. 708–715., https://doi.org/10.1016/j.jadohealth.2018.01.001.

*Id.* ¶¶28, 28(a)–(c) (citations reformatted).

8.    *Grindr's Ability to Prevent Minors From Accessing Grindr Services*

Grindr could have prevented minors "from accessing, downloading, using, purchasing, and/or subscribing to Grindr Services," evidenced by detection tools available through the website "sightengine," https://sightengine.com/detect-minor-children. *Id.* ¶20. But Grindr "allowed users under … eighteen … to access, download, use, purchase, and/or subscribe to Grindr Services." *Id.* ¶35. "In turn, [Grindr] served them up on a silver platter to the adult users of Grindr Services intentionally seeking to sexually groom or engage in sexual activity with persons under … eighteen[.]" *Id.*

9.    *A.V., T.V., and R.V.*

While a minor, A.V. "accessed, downloaded, used, purchased, and/or subscribed to Grindr Services." *Id.* ¶¶17, 18. As a result, A.V. was "exposed to and engaged in sexual relationships and activities with adult users of Grindr Services." *Id.*

9

¶18. "A.V.'s access, download, use, purchase, and/or subscription to Grindr Services resulted in severe emotional distress and bodily injuries culminating in A.V.'s death from a self-inflicted gunshot wound" on August 11, 2020, when he was still a minor. *Id*. ¶¶16, 17, 19.

A.V. was survived by his parents, T.V. and the now late R.V. *Id*. ¶¶64(b), 64(c); *see* footnote 2, *supra* (explaining that R.V. died on August 13, 2023). They "lost the support, love, affection, comfort, and companionship of A.V., and … experienced mental pain and suffering in the past and [T.V.] will continue to suffer such losses in the future." *Id*. ¶65.

## B.    *Other Allegations*

When deciding a motion to dismiss for failure to state a claim on which relief can be granted, a court does not consider factual an allegation that is a bare recitation of the elements of a claim or is otherwise conclusory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

T.V. includes conclusory allegations in the operative pleading. Under the law just stated, the Court must not consider these allegations to decide the motion to dismiss.

According to T.V., Grindr "undertook inadequate action … to remove content and material from [its] platform that posed a threat to the health, safety, and wellbeing of A.V. and other" minors. D9 ¶45. Grindr "undertook inadequate action … to screen [minors] … attempting to access, download, use, purchase, and/or subscribe to Grindr Services[,] even though Grindr Services [are products] for adults and adults only." *Id*. ¶24. "Grindr made no reasonable attempt to verify whether A.V. [had] attained the age of eighteen." *Id*. ¶23. Grindr "undertook inadequate action … to prevent A.V.

10

from engaging in sexual relationships and activities with adult users of Grindr Services." *Id.* ¶26.

Grindr "failed to implement adequate safeguards to prevent minors from accessing Grindr [S]ervices because such action is not in [Grindr]'s financial interest." *Id.* ¶37. Grindr "knowingly benefited—financially or by receiving something of value—by participating in a venture which, in or affecting interstate commerce, recruited, enticed, harbored, transported, provided, or obtained by other means persons under … eighteen … that are caused to engage in commercial sex acts in violation of … § 1595." *Id.* ¶40. Grindr "received valuable consideration from A.V. and other [minors who] accessed, downloaded, used, purchased, and/or subscribed to Grindr Services to engage in sexual relationships and activity [with] adult users of Grindr Services." *Id.* ¶38. "A.V. [also] received valuable consideration in exchange for the sexual relationships and activities with the adult users of Grindr Services." *Id.* ¶39. "A.V. was a victim" of a "venture" that "recruited, enticed, harbored, transported, provided, or obtained by other means persons under … eighteen … caused to engage in commercial sex acts." *Id.* ¶40. "A.V.'s emotional distress, bodily injuries, and death are a direct result of such activity." *Id.*

According to T.V., Grindr "knew or should have known" that A.V. was a minor "accessing, downloading, using, purchasing, and/or subscribing to Grindr Services," *id.* ¶21; that "A.V. was a minor incapable of consenting to" the policy and any agreement, *id.* ¶46; that A.V.'s "access, download, use, purchase, and/or subscription to Grindr Services endangered his health, safety, and wellbeing," *id.* ¶27; and that "A.V. was engaging in sexual relationships and activity [with] adult users of Grindr Services," *id.* ¶22.

## C.  *Claims for Relief*[11]

T.V. brings four of the eight claims for relief under the Florida Wrongful Death Act, codified at Fla. Stat. §§ 768.16–768.26. D9 ¶¶49–105.[12] In count one, T.V. sues Grindr for wrongful death based on the TVPRA. *Id.* ¶¶49–67. In count two, T.V. sues

---

[11]A federal court sitting in diversity applies the substantive law of the forum state to state law claims. *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1020 (11th Cir. 2014). The court also applies the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). If the parties fail to consider the choice of law, the court presumes the substantive law of the forum state controls. *Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989).

Both Grindr and T.V. apply Florida law without considering the choice of law. *See* D22, D32. The undersigned, therefore, presumes Florida's substantive law applies to the state law claims. *See id*.

[12]The Florida Wrongful Death Act creates a "[r]ight of action":

> When the death of a person is caused by the wrongful act [or] negligence … of any person … and the event would have entitled the person injured to maintain an action and recover damages if death had not ensued, the person … that would have been liable in damages if death had not ensued shall be liable for damages … notwithstanding the death of the person injured[.]

Fla. Stat. § 768.19; *see Sheffield v. R.J. Reynolds Tob. Co.*, 329 So. 3d 114, 120–21 (Fla. 2021) (explaining that the law creates an "independent cause of action").

In a wrongful death action, the injury "is to the decedent's statutory beneficiaries, not the decedent." *Coates v. R.J. Reynolds Tob. Co.*, 375 So. 3d 168, 173 (Fla. 2023). Thus, "although there must be a tort underlying the wrongful death action, it is more appropriate to say that a personal representative brings a wrongful death claim … based on alleged negligence … than to say that the personal representative prosecutes the decedent's cause of action." *Sheffield*, 329 So. 3d at 121 (internal quotation marks and quoted authority omitted).

The law specifies who must bring the action and that no action for personal injury of the decedent survives:

> The action shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages … caused by the injury resulting in death. When a personal injury to the decedent results in death, no action for the personal injury shall survive, and any such action pending at the time of death shall abate.

Fla. Stat. § 768.20; *see Martin v. United Sec. Servs., Inc.,* 314 So. 2d 765, 770–771 (Fla. 1975) (explaining that the law both creates a cause of action and limits the availability of other causes of action). The law defines "survivors" to include the decedent's parents, Fla. Stat. § 768.18(1), and specifies the damages the survivors and the estate may recover, *id*. § 768.21.

Grindr for wrongful death based on strict liability for a product design defect. *Id.* ¶¶68–83. In count three, T.V. sues Grindr for wrongful death based on negligence and "negligence per se" for a product design defect. *Id.* ¶¶84–93. In count four, T.V. sues Grindr for wrongful death based on negligence in failing to ensure that Grindr Services were safe for A.V. and other users. *Id.* ¶¶94–105.

In counts five through eight, T.V. brings "survival" claims "[i]n the alternative to the … wrongful death claims[.]"[13] *Id.* ¶¶109, 123, 136, 150. In count five, T.V. sues Grindr for negligence in failing to ensure Grindr Services were safe for A.V. and other users. *Id.* ¶¶106–17. In count six, T.V. sues Grindr for intentional infliction of emotional distress. *Id.* ¶¶118–32. In count seven, T.V. sues Grindr for negligent infliction of emotional distress. *Id.* ¶¶133–45. In count eight, T.V. sues Grindr for negligent misrepresentation. *Id.* ¶¶146–61.

---

[13]Florida has a "survival statute" that provides, "No cause of action dies with the person. All causes of action survive and may be commenced, prosecuted, and defended in the name of the person prescribed by law." Fla. Stat. § 46.021. "[T]he survival statute applies when a person dies while possessing a cause of action against another person, but the harm caused by the other person is not the cause of death." *Sheffield*, 329 So. 3d at 119. The statute "preserves actions the decedent filed or may have filed prior to … death." *Philip Morris USA Inc. v. McCall*, 234 So. 3d 4, 7 n.2 (Fla. 4th DCA 2017).

"Based on th[e] statute, a personal representative may bring and maintain a personal injury action on behalf of the decedent." *Id.* But if "the personal injury was the cause of the decedent's death, the personal injury action 'abates' and becomes a wrongful death cause of action under the Florida Wrongful Death Act." *Id.* (quoting Fla. Stat. § 768.20).

A personal representative may "pursue both a claim for survival damages and an alternative wrongful death claim where the cause of the decedent's death may be disputed by the parties." *Capone v. Philip Morris USA, Inc.*, 116 So. 3d 363, 378 (Fla. 2013); *see also Smith v. Lusk*, 356 So. 2d 1309, 1311 (Fla. 2d DCA 1978) ("Alternative pleading is a time honored practice. [The] complaint classically sets up inconsistent and alternative pleadings; Count I for pain and suffering, for injuries not resulting in plaintiff's death; and in Count II, for those elements of damages allowed by the legislature where the injury resulted in one's death.").

T.V. pleads the claims in this manner. *See* D9 ¶¶49–161.

**D.      *Prayer for Relief***

For all claims, T.V. demands a jury trial; damages for medical, burial, and funeral expenses; damages for past and future pain, suffering, and anguish; damages for the loss of A.V.'s support and services; pre-judgment interest; and costs. D9 ¶¶19–20, 22–25, 28–29, 32–35, 37, 39–40. For the wrongful death claim based on the TVPRA (count one) and the survival claims based on intentional infliction of emotional distress (count six) and negligent misrepresentation (count eight), T.V. also demands punitive damages. *Id.* ¶¶66, 132, 161. For the wrongful death claim based on the TVPRA, T.V. also demands injunctive relief "to bring [Grindr] into compliance with the" law.[14] *Id.* ¶67.

## III.    Motion to Dismiss (D22)

**A.      *Factual Allegations***

"Generally, when considering a motion to dismiss, the district court must limit its consideration to the [complaint] and any exhibits attached to it." *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023). "If the parties present, and the court considers, evidence outside the pleadings, the motion to dismiss generally must be converted into a motion for summary judgment." *Id.*

"There are two exceptions to this conversion rule: (1) the incorporation-by-reference doctrine and (2) judicial notice." *Id.* "Both exceptions permit district courts

---

[14]A plaintiff must show standing for each "form of relief" demanded. *Davis v. Fed. Elec. Comm'n*, 554 U.S. 724, 734 (2008). A plaintiff demanding injunctive relief must prove "a real and immediate threat of future injury" and "a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305–06 (11th Cir. 2004).

The parties do not address whether T.V. has standing for the injunctive relief demanded. *See* D22, D32. Because T.V. does not demand immediate injunctive relief, the Court need not address standing for that relief now.

to consider materials outside a complaint at the motion-to-dismiss stage." *Id*. Under the incorporation-by-reference doctrine, "a court may properly consider a document not referred to or attached to a complaint … if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024). Items satisfying the centrality requirement include product labels in a false-advertising case, *see Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018); a purchase agreement in a fraudulent misrepresentation case, *see Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005); and an allegedly defamatory book in a defamation case, *see Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002). Under the judicial notice rule, at any stage of a case and on its own, a court may judicially notice a fact that cannot be reasonably disputed because it either is generally known or can be readily and accurately determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b)–(d).

In its motion to dismiss, Grindr includes alleged facts about what Grindr calls its "Terms and Conditions of Service," D22 at 11–12, but what the website Grindr cites calls its "Terms of Service," *id*. at 11 (citing https://www.grindr.com/terms-of-service/). According to Grindr, "[t]o create an account, a user must provide their date of birth and accept Grindr's" terms. *Id*. The terms provide that actions by the user constitute a representation that the user is an adult:

> <u>YOU MUST BE A LEGAL ADULT</u>. BY ACCEPTING THIS AGREEMENT, CREATING A USER ACCOUNT (AS DEFINED BELOW), AND ENTERING A DATE OF BIRTH FOR AGE VERIFICATION PURPOSES, YOU AFFIRMATIVELY REPRESENT AND WARRANT THAT … YOU ARE CURRENTLY EIGHTEEN (18) YEARS OF AGE OR OVER (OR TWENTY-ONE (21) YEARS IN PLACES WHERE EIGHTEEN (18) YEARS IS NOT THE AGE OF MAJORITY).

15

*Id.* (citing § 1.2). The terms "prohibit minors from using the platform." *Id.* (citing § 1.1). The terms describe user responsibilities:

> YOU ARE SOLELY RESPONSIBLE FOR YOUR USE OF THE GRINDR SERVICES AND YOUR INTERACTIONS WITH OTHER USERS (WHETHER ON OR OFF THE GRINDR SERVICES). GRINDR MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE CONDUCT, IDENTITY, INTENTIONS, LEGITIMACY, OR VERACITY OF ANY USERS … GRINDR DOES NOT CONDUCT CRIMINAL OR OTHER BACKGROUND SCREENINGS OF OUR USERS … GRINDR DOES NOT INQUIRE INTO THE BACKGROUNDS OF OUR USERS OR ATTEMPT TO VERIFY THE INFORMATION PROVIDED BY OUR USERS IN CONNECTION WITH ACCOUNT CREATION, INCLUDING THE ACCURACY OF THE DATE OF BIRTH REPORTED[.]

*Id.* at 11–12 (citing § 2).

Grindr states, "Grindr takes the facts from the Complaint[] and sources incorporated by reference or otherwise subject to judicial notice." D22 at 11 n.1. Grindr cites *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999), in which the Eleventh Circuit ruled that, when considering a motion to dismiss in a securities fraud case, a court may take judicial notice of what statements are in public documents required to be filed and filed with the Securities and Exchange Commission. *Id.*

T.V. does not respond to Grindr's inclusion of alleged facts in its motion to dismiss. *See* D32. The undersigned directed Grindr to explain why it includes the alleged facts in its motion to dismiss.[15] D39 at 3. Grindr states that the alleged facts

---

[15]The terms on that webpage Grindr cites in its motion to dismiss do not precisely match the terms Grindr quotes in the motion. *Compare* https://www.grindr.com/terms-of-service/ (last visited on Aug. 13, 2024) ("GRINDR DOES NOT **CURRENTLY** CONDUCT CRIMINAL OR OTHER BACKGROUND SCREENINGS OF OUR USERS.") (emphasis added), *with* D22 at 11–12 ("GRINDR DOES NOT CONDUCT CRIMINAL OR OTHER BACKGROUND SCREENINGS OF OUR USERS[.]").

"underscore that Grindr is an app designed for and directed at adults that A.V. accessed without permission" and that "[t]his means, for example," that T.V. "cannot state a product liability claim because the risk that [A.V.] would meet an adult on an adult dating app was known," and that T.V. cannot state a negligent misrepresentation claim "because [the alleged facts show] that any reliance on the alleged representations that Grindr was safe and enforced its age restriction[] was not justifiable." D42 at 26. Grindr no longer references judicial notice as a basis for including the alleged facts, instead arguing that the Court can consider the alleged facts because T.V. references other terms in the pleading. *Id*. Grindr relies on *Baker*, 67 F.4th at 1277, in which the Eleventh Circuit held that, under the incorporation-by-reference doctrine, the district court properly considered video footage from an officer's body-worn camera to decide a motion to dismiss because the plaintiff referenced the footage in the complaint, the footage was filed with the motion, the footage depicted events central to the plaintiff's claims, the footage was clear, and the plaintiff did not challenge the footage's authenticity. *Id*. The Eleventh Circuit cautioned that any ambiguities in the footage must be construed in the plaintiff's favor. *Baker*, 67 F.4th at 1268.

Employing the incorporation-by-reference doctrine to consider the facts alleged in the motion to dismiss is unwarranted. The alleged facts are unlike the video in *Baker*, which captured the very event on which the litigation was based. Grindr provides nothing to support that the terms Grindr quotes were the same on or before August

---

The undersigned directed Grindr to explain the discrepancy. D39 at 3. Grindr responded by providing terms purportedly from December 18, 2022 (five days before Grindr moved to dismiss, D42), D42-1, and terms purportedly from June 29, 2023 (the day after the Court directed supplemental briefing on the response to the motion to dismiss and a reply to the supplemented response), D42-2. Both terms state, "GRINDR DOES NOT **CURRENTLY** CONDUCT CRIMINAL OR OTHER BACKGROUND SCREENINGS OF OUR USERS." D42-1 at 2 (emphasis added); D42-2 at 2 (emphasis added). Despite the Court's direction, Grindr fails to explain why it omitted "CURRENTLY" in its motion to dismiss when purporting to quote the terms. *See* D42 at 26–27. Because consideration of alleged facts outside the pleading is unwarranted, the Court need not address the unexplained discrepancy.

11, 2020, the day A.V. died, *see* D9 ¶16.[16] *See* D22 at 11–12. The terms Grindr quotes do not match the terms T.V. alleges, and whether the parties even intend to reference the same document is unclear. *Compare* D9 ¶¶25, 27(a), 27(d)–(f), 41(e)–(g), 42(b), 46, 48(b), 151 (T.V.'s pleading referencing terms from Grindr's "Terms and Conditions of Service Agreement") *with* D22 at 11–12 (Grindr's motion to dismiss referencing other terms from Grindr's "Terms & Conditions of Service" and citing a webpage titled, "Terms of Service," comprised of 17,645 words). Moreover, contrary to the standard for deciding a motion to dismiss, Grindr appears to ask the Court to infer as a matter of law that A.V., a minor of unspecified age, had read the terms Grindr includes in its motion to dismiss and to place legal significance on that inference at this early stage of the litigation.

The undersigned recommends disregarding the Grindr-introduced terms in deciding to dismiss the motion.

**B.    *Arguments***

A complaint must contain "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). A party can move to dismiss a complaint for failure to state a claim on which relief can be granted. *Id.* at 12(b)(6). "Unless the dismissal order states otherwise," a dismissal on this ground "operates as an adjudication on the merits." *Id.* at 41(b).

The pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements

---

[16]The terms on the website Grindr cites at present include the statement, "Effective Date: The earlier of April 30, 2023, or user acceptance," with no indication of when the terms were last revised. *See* https://www.grindr.com/terms-of-service/ (last visited on Aug. 13, 2024).

of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557; alteration in *Iqbal).*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

"An affirmative defense is generally a defense that, if established, requires judgment for the defendant even if the plaintiff can prove his case by a preponderance of the evidence." *Wright v. Southland Corp.*, 187 F.3d 1287, 1303 (11th Cir. 1999); *see also In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) (explaining that a defense pointing "out a defect in the plaintiff's prima facie case is not an affirmative defense"). "[G]enerally, the existence of an affirmative defense will not support a … motion to dismiss for failure to state a claim." *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993). But a court may dismiss a complaint on a motion to dismiss for failure

to state a claim if the complaint "allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint." *Id.* (quoted authority omitted).

Grindr argues that the Court must dismiss the wrongful death and survival claims based on the Florida common law torts (counts two through eight) because the § 230(c)(1) affirmative defense clearly appears on the face of the operative pleading. D22 at 13–20; D42 at 11–17. Grindr excludes from this argument the wrongful death claim based on the TVPRA (count one) because § 230(c)(1) does not "impair or limit" that claim. *See* 47 U.S.C. § 230(e)(5)(A) (quoted); *see* section IV.B, *infra* (discussing the scope of § 230(c)(1)). Grindr argues that the Court must dismiss all the claims (counts one through eight) because T.V. fails to allege facts to make the claims plausible or otherwise fails to state a claim on which relief can be granted. D22 at 20–34; D42 at 17–25.

## IV.   Law and Analysis

The undersigned addresses first whether T.V. alleges facts to make the claims plausible or otherwise states claims on which relief can be granted and second whether T.V. alleges facts clearly showing the existence of the § 230(c)(1) affirmative defense on the face of the operative pleading. Addressing the issues in that order recognizes that understanding the wrongful death and survival claims based on Florida common law torts (counts two through eight) is important in analyzing whether the § 230(c)(1) defense precludes them.

**A.** ***Whether T.V. Alleges Facts to Make the Claims Plausible or Otherwise States Claims on Which Relief Can be Granted***

1.    *TVPRA (Count One)*

The TVPRA provides a federal civil claim for relief under 18 U.S.C. § 1595 for a violation of the federal criminal offense in 18 U.S.C. § 1591(a).

Section 1591(a) provides:

(a) Whoever knowingly—

(1) in or affecting interstate or foreign commerce … recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1),

knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion … or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years and will be caused to engage in a commercial sex act, shall be punished[.]

18 U.S.C. § 1591(a).

Section 1595(a) provides:

An individual who is a victim of a violation of [the chapter including § 1591(a)] may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

21

To state a "beneficiary" claim under § 1595(a) premised on a violation of § 1591(a), in addition to plausibly alleging that the plaintiff is a sex trafficking victim under § 1591(a), the plaintiff "must plausibly allege that the defendant (1) knowingly benefited, (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that undertaking or enterprise violated the TVPRA as to the plaintiff, and (4) the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 726 (11th Cir. 2021); *accord K. H. v. Riti, Inc.*, No. 23-11682, 2024 WL 505063, at *2 (11th Cir. Feb. 9, 2024); *Doe #1 v. Crowley Mar. Corp.*, No. 3:23-cv-383-MMH-JBT, 2024 WL 1346947, at *10 (M.D. Fla. Mar. 29, 2024); *Treminio v. Crowley Mar. Corp.*, No. 322-cv-174-CRK-PDB, 2023 WL 8627761, at *7 (M.D. Fla. Dec. 13, 2023) (to be published).

For her wrongful death claim based on the TVPRA (count one), T.V. contends that A.V. was a victim of sex trafficking and Grindr "knowingly benefited from participating in a venture involving activities that violated the TVPRA." D9 ¶¶53, 54. T.V. contends that Grindr "knowingly used instrumentalities of interstate commerce"; "knowingly benefited financially from [A.V. and other minors] accessing, downloading, using, purchasing, and/or subscribing to Grindr Services to engage in sexual relationships and activity with adult users of [Grindr]'s services"; and "knowingly benefited financially from adults accessing, downloading, using, purchasing, and/or subscribing to Grindr Services to engage in sexual relationships and activity with underage users of [Grindr]'s services." *Id.* ¶¶58–60. And T.V. contends that Grindr "knowingly, in or affecting interstate commerce, recruited, enticed, harbored, transported, provided, or obtained by other means [minors, including A.V.] to engage in commercial sex acts" and "knowingly benefited, financially or by receiving something of value, from participating in a venture which, in or affecting interstate commerce, recruited, enticed, harbored, transported,

22

provided, or obtained by other means [minors, including A.V.] to engage in commercial sex acts." *Id*. ¶¶61–62.[17]

Grindr argues that T.V. fails to state a wrongful death claim based on the TVPRA—and the claim thus falls outside of a § 230 exception for TVPRA claims—because she fails to allege facts concerning Grindr's participation in a venture.[18] D22 at 20–25; D42 at 17–18. T.V. disagrees, emphasizing pleading allegations and arguing, "It is hard to believe that Congress intended [§] 230 immunity to give internet service providers a safe haven to profit from the sexual trafficking, grooming, and exploitation of persons under … eighteen." D32 at 8–10 (citing D9 ¶¶28, 31–41, 47, 54, 57–62).

---

[17]T.V. describes the "statutory survivors" by referencing the Florida Wrongful Death Act's survivor provision, Fla. Stat. § 768.21. *See* D9 ¶64(a)–(c). In supplemental briefing, she maintains that the claim based on the TVPRA is under the Florida Wrongful Death Act. D41 at 1. Grindr replies, "The TVPRA claim also fails because it cannot be 'based on Florida's Wrongful Death Act,' as [T.V.] states it is." D42 at 18 n.4 (quoting D41 at 1).

"In the absence of an expression of contrary intent, the survival of a federal cause of action is a question of federal common law." *U.S. v. NEC Corp.*, 11 F.3d 136, 137 (11th Cir. 1993), *as amended* (Jan. 12, 1994). Under federal common law, "survivability … depends on whether the recovery is deemed 'remedial' or 'penal.'" *Id*. "A remedial action is one that compensates an individual for specific harm suffered, while a penal action imposes damages upon the defendant for a general wrong to the public." *Id*. To decide "whether a statute is penal or remedial," a court examines "three factors: (1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered." *Id*. (internal quotation marks and quoted authority omitted).

Deciding whether, under federal common law, a TVPRA claim survives death is unnecessary to decide the motion to dismiss because, as explained in this section, T.V. fails to allege facts sufficient to state a TVPRA violation.

[18]Grindr also argues that T.V. fails to state a wrongful death claim based on the TVPRA because she fails to allege facts concerning a "commercial sex act," Grindr's knowledge about A.V.'s sexual interactions with adults, and Grindr's knowledge of a benefit. D22 at 21–25; D42 at 17–18. In the interest of judicial economy, the undersigned addresses only one TVPRA argument, which is both persuasive and dispositive.

For a civil claim under § 1595(a), a "'venture' is an undertaking or enterprise involving risk and potential profit."[19] *Red Roof Inns*, 21 F.4th at 724. "Participation" is taking part in or sharing "with others in common or in an association." *Id*. at 725. "Participation in a venture" is taking "part in a common undertaking or enterprise involving risk and potential profit." *Id*.

If a § 1595(a) civil claim is premised on a § 1591(a) violation, the plaintiff must plausibly allege the venture in which the defendant participated committed a § 1591(a) crime against the plaintiff (i.e., the crime of knowingly recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting a person for a commercial sex act while knowing that the person is not yet 18 years old and will be caused to engage in a commercial sex act; or knowingly benefiting financially or by receiving anything of value from knowingly assisting, supporting, or facilitating a violation). *Id*.

The seminal case on § 1595(a) in the Eleventh Circuit is *Red Roof Inns*, 21 F.4th 714. In *Red Roof Inns*, the plaintiffs sued hotel franchisors, alleging the plaintiffs had been trafficked at hotels the franchisors licensed to franchisees, and the franchisors knowingly benefited from the trafficker's rent. *Red Roof Inns*, 21 F.4th at 719–21. The Eleventh Circuit affirmed dismissal of the complaint, holding that the plaintiffs had failed to plausibly allege that the defendants participated in a venture violating § 1591(a). *Id*. at 726. The Eleventh Circuit emphasized that the plaintiffs framed "the ventures at issue as sex trafficking ventures in their amended complaints" but "provided no plausible allegations that the franchisors took part in the common undertaking of sex trafficking." *Id*. at 727. The Eleventh Circuit explained that the allegations may have suggested that the franchisors financially benefited from renting

---

[19]Section 1591 defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity," 18 U.S.C. § 1591(e)(6), and "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation" of § 1591(a)(1). *Id*. § 1591(e)(4). Those definitions do not apply to a civil claim under § 1595(a). *Red Roof Inns*, 21 F.4th at 724.

rooms to the traffickers but not that the franchisors "participated in a common undertaking involving risk or profit that violated the TVPRA—i.e., the alleged sex trafficking ventures." *Id*. at 727–28. The Eleventh Circuit found insufficient allegations that "the franchisors investigated the individual hotels, took remedial action when revenue was down, read online reviews mentioning prostitution and crime occurring generally at the hotels, and controlled the training of managers and employees who were allegedly involved in facilitating sex trafficking at the hotels." *Id*. at 727. According to the Eleventh Circuit, "None of these allegations suggest that the franchisors participated in an alleged common undertaking or enterprise with the Does' sex traffickers or others at the hotel who violated the statute." *Id*. The Eleventh Circuit emphasized, "[O]bserving something is not the same as participating in it." *Id*.

Accepting the factual allegations as true, construing them in the light most favorable to T.V., drawing all reasonable inferences from them in T.V.'s favor, *see Karantsalis*, 17 F.4th at 1319, and drawing on judicial experience and common sense, *see Ashcroft*, 556 U.S. at 664, T.V., like the plaintiffs in *Red Roof Inns*, fails to allege facts to make Grindr's participation in a sex trafficking venture plausible. T.V. alleges in a conclusory manner that the venture consisted of recruiting, enticing, harboring, transporting, providing, or obtaining by other means minors to engage in sex acts, *see* D9 ¶¶61, 62, without providing plausible factual allegations that Grindr "took part in the common undertaking of sex trafficking." *See Red Roof Inns*, 21 F.4th at 727 (quoted). Like the allegations in *Red Roof Inns*, the allegations indicate that Grindr financially benefits from minors using Grindr, but not that Grindr "participate[s] in a common undertaking involving risk or profit that violate[s] the TVPRA—i.e., the alleged sex-trafficking venture." *See id*. (quoted). Like the allegations in *Red Roof Inns*, the allegations that Grindr knows minors use Grindr, knows adults target minors on Grindr, and knows about the resulting harms are insufficient. *See id*. "None of these allegations suggest that [Grindr] participate[s] in an alleged common undertaking or enterprise with the [adults] who violated the statute." *See id*. (quoted).

The undersigned recommends dismissing the wrongful death claim based on the TVPRA (count one) for failure to allege facts to make Grindr's participation in a sex trafficking venture plausible.

2.      *Causation (Counts Two through Eight)*

Florida law requires proximate causation for strict product liability, negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent misrepresentation. *See* Fla. Std. Jury Instr. (Civ.) Nos. 403.12 (product liability), 401.12 (negligence), 410.6 (outrageous conduct causing severe emotional distress), 420.5 (negligent infliction of emotional distress), 409.6 (negligent misrepresentation).[20]

For her wrongful death and survival claims based on those torts (counts two through eight), T.V. contends that Grindr's conduct was the "direct and proximate" cause of A.V.'s emotional distress and bodily injuries "culminating and causing" his death. D9 ¶¶81, 83, 91, 93, 103, 105, 116, 130, 144, 159.

Grindr argues that the Court must dismiss the claims because T.V. fails to allege facts concerning proximate causation. D22 at 25–27; D42 at 19. T.V. disagrees, emphasizing pleading allegations, including those about publications describing the harm minors suffer from using Grindr Services. D32 at 11–12 (citing D9 ¶¶18, 19, 27, 29, 30, 81, 83, 91, 93, 103, 105, 116, 130, 144, 159).

To determine the existence of proximate cause, courts applying Florida law "employ a foreseeability analysis," requiring "an evaluation of the facts of the actual

---

[20]Florida's standard jury instructions are not "an adjudicative determination" of their legal correctness. *In re Amends. to Fla. Rules of Jud. Admin., Fla. Rules of Civ. Proc., & Fla. Rules of Crim. Proc.-Std. Jury Instrs.*, No. SC20-145, 2020 WL 1593030, at *3 (Fla. Mar. 5, 2020). The undersigned relies on these instructions only as a "shortcut"; each instruction includes notes citing Florida cases for the indisputable proposition that the torts require proximate causation.

occurrence." *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 22–23 (Fla. 4th DCA 2022). The analysis "focuses on whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred." *Id.* at 23 (internal quotation marks and quoted authority omitted). "The court in proximate cause cases must determine … (1) causation in fact, i.e., whether the defendant's conduct was a substantial factor in producing the result, and (2) whether the defendant's responsibility is superseded by an abnormal intervening force." *Id.* (quoted authority omitted).

"[H]arm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992). "[I]t is immaterial that the defendant could not foresee the *precise* manner in which the injury occurred or its *exact* extent." *Id.* "[T]he law does not require an act to be the exclusive or even the primary cause of an injury … for that act to be considered the proximate cause of the injury[.]" *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So. 3d 977, 982 (Fla. 2018). Instead, the act "need only be a substantial cause of the injury." *Id.*

Proximate causation is usually an issue for the factfinder. *Grieco*, 344 So. 3d at 23. But a court may resolve proximate causation "as a matter of law in certain cases such as those involving intervening negligence[.]" *Id.* (internal quotation marks and quoted authority omitted). "Under the doctrine of intervening negligence, the original negligence is not regarded as the 'proximate cause' of the injury, even though the injury might not have occurred but for the original negligence, if an independent efficient cause intervenes between the negligence and the injury and the original negligence does not directly contribute to the force or effectiveness of the intervening cause." *Id.* "The law does not impose liability for freak injuries that were utterly unpredictable in light of common human experience." *McCain*, 593 So. 2d at 503.

27

But "[i]t is only when an intervening cause is completely independent of, and not in any way set in motion by, the tortfeasor's negligence that the intervening cause relieves a tortfeasor from liability." *Grieco*, 344 So. 3d at 23 (quoted authority omitted); *see also Sardell v. Malanio*, 202 So. 2d 746, 747 (Fla. 1967) ("To preclude liability of the initial negligent actor, the alleged intervening cause must be efficient in the sense that it is independent of and not set in motion by the initial wrong."). "The … question is whether the individual's conduct is so unusual, extraordinary or bizarre (*i.e.*, so unforeseeable) that the policy of the law will relieve the [defendant] of any liability for negligently creating this dangerous situation." *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1116 (Fla. 2005) (internal quotation marks and quoted authority omitted; alteration in *Goldberg*).

"It is well-established that if the reasonable possibility of the intervention, criminal or otherwise, of a third party is the avoidable risk of harm which itself causes one to be deemed negligent, the occurrence of that very conduct cannot be a superseding cause of a subsequent misadventure." *Holley v. Mt. Zion Terrace Apts., Inc.*, 382 So. 2d 98, 101 (Fla. 3d DCA 1980). "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." *Id.* (quoting Restatement (Second) of Torts § 449 (1965)).

"[W]here reasonable persons could differ as to whether the facts establish proximate causation—i.e., whether the *specific* injury was genuinely foreseeable or merely an improbable freak—then the resolution of the issue must be left to the fact-finder." *McCain*, 593 So. 2d at 504; *accord Goldberg*, 899 So. 2d at 1116. "The judge is free to take [the determination of proximate cause] from the fact-finder only where the facts are unequivocal, such as where the evidence supports no more than a single reasonable inference." *McCain*, 593 So. 2d at 504; *see also Chirillo v. Granicz*, 199 So. 3d

246, 251–52 (Fla. 2016) ("We find that the [intermediate appellate court] … properly classified the foreseeability of the decedent's suicide as a matter of fact for the jury to decide in determining proximate cause.").

Accepting the factual allegations as true, construing them in the light most favorable to T.V., drawing all reasonable inferences from them in T.V.'s favor, *see Karantsalis*, 17 F.4th at 1319, and drawing on judicial experience and common sense, *see Ashcroft*, 556 U.S. at 664, T.V. alleges sufficient facts for proximate causation; i.e., facts making plausible that Grindr's conduct was a "substantial factor" in producing A.V.'s injuries or suicide or both and that no "abnormal intervening force" superseded Grindr's responsibility, *see Grieco*, 344 So. 3d at 22–23 (quoted). Those allegations include that Grindr "facilitate[d] the coupling of gay and bisexual men," D9 ¶10; showed users the nearest users without criminal-history screening or age detection, *id*. ¶¶10, 20, 27(a), 27(d); introduced the "Twink" "Tribe" making minors feel welcome and allowing users to identify minors "more efficiently," *id*. ¶¶32, 33; created a minor-based "niche market," *id*. ¶36; and served as the meeting place for A.V. and the adults who had sexual relationships with him when he was a minor, resulting in his severe emotional distress, bodily injuries, and ultimate suicide, *id*. ¶¶17–19. At a minimum, reasonable persons could differ on whether Grindr's conduct was a substantial factor in producing A.V.'s injuries or suicide or both and whether the likelihood adults would engage in sexual relations with A.V. and other minors using Grindr was a hazard caused by Grindr's conduct.

Grindr characterizes T.V.'s causation allegations as conclusory and argues that T.V. "alleges no facts linking A.V.'s suicide to his use of Grindr or interactions with adult users[.]" *See* D22 at 26 (quoted). Grindr's argument is unpersuasive because it depends on an unreasonably narrow reading of the allegations and disregards that, at this early stage of the litigation, all reasonable inferences from the allegations are drawn in T.V.'s favor. *See Karantsalis*, 17 F.4th at 1319.

29

Grindr relies on non-binding cases from this Court and the Southern District of Florida. *See* D22 at 25–27 (citing *Rinker v. Carnival Corp.*, 753 F. Supp. 2d 1237, 1242 (S.D. Fla. 2010); *Sparks v. Medtronic, Inc.*, No. 8:20-cv-3074-SCB-TGW, 2021 WL 2649235, at *2 (M.D. Fla. June 28, 2021); *Colon v. Twitter, Inc.*, No. 6:18-cv-515-CEM-JK, 2020 WL 11226013, at *6 (M.D. Fla. Mar. 24, 2020); *Dimieri v. Medicis Pharms. Corp.*, No. 2:14-cv-176-SPC-DNF, 2014 WL 3417364, at *5 (M.D. Fla. July 14, 2014); *Kaufman v. Pfizer Pharms., Inc.*, No. 1:02-cv-22692, 2010 WL 9438673, at *8–9 (S.D. Fla. Nov. 23, 2010); *Bailey v. Janssen Pharm., Inc.*, No. 06-80702, 2006 WL 3665417, at *7 (S.D. Fla. Nov. 14, 2006)). These cases stand for the indisputable proposition that dismissal of a claim is warranted if the plaintiff fails to allege sufficient facts for proximate causation. But T.V.'s factual allegations substantially differ from the factual allegations in those cases. Because "[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense," *see Ashcroft*, 556 U.S. at 679, the cases on which Grindr relies do not materially help Grindr.

The undersigned recommends rejecting Grindr's argument that T.V. fails to allege sufficient facts for proximate causation.

3.    *Strict Liability (Count Two)*

(a)    <u>General</u>

In *West v. Caterpillar Tractor Co.*, the Florida Supreme Court adopted § 402A of the Restatement (Second) of Torts (1965). 336 So. 2d 80, 87 (Fla. 1976); *accord Standard Havens Prods., Inc. v. Benitez*, 648 So. 2d 1192, 1196–97 (Fla. 1994). Through § 402A, Florida law imposes strict liability in tort on the seller of a product under certain circumstances:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

    (a) the seller is engaged in the business of selling such a product, and

    (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

    (a) the seller has exercised all possible care in the preparation and sale of his product, and

    (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

*West*, 336 So. 2d at 84 (quoting § 402A). "Strict liability means negligence as a matter of law or negligence per se, the effect of which is to remove the burden from the user of proving specific acts of negligence." *Id.* at 90.

"[A] product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning." *Ferayorni v. Hyundai Motor Co.*, 711 So. 2d 1167, 1170 (Fla. 4th DCA 1998). "As adopted by [the Florida Supreme] Court, an action sounding in strict liability requires the plaintiff to prove that (1) a product (2) produced by a manufacturer (3) was defective or created an unreasonably dangerous condition (4) that proximately caused (5) injury." *Edward M. Chadbourne, Inc. v. Vaughn*, 491 So. 2d 551, 553 (Fla. 1986). For a design defect—the type of defect T.V. claims, D9 ¶¶68–83—the test focuses on the product's design, not the manufacturer's conduct. *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 506 (Fla. 2015).

For her wrongful death claim based on strict liability (count two), T.V. contends that Grindr "was [the] designer, manufacturer, distributor, importer, seller and/or retailer[] of the Grindr Services it provided to consumers." D9 ¶72. T.V. contends that "Grindr Services [were] unreasonably dangerous to A.V. and the ordinary consumer." *Id.* ¶75. T.V. contends that "A.V. accessed, downloaded, used, purchased, and/or

subscribed to Grindr Services without substantial change affecting the product." *Id*. ¶76. T.V. contends that "Grindr Services failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by" Grindr. *Id*. ¶77. T.V. contends that Grindr "knew or should have known that [minors] including A.V. … accessed, downloaded, used, purchased, and/or subscribed to Grindr Services and that condition was unreasonably dangerous to A.V. and the ordinary consumer." *Id*. ¶78. T.V. contends that "Grindr Services were unreasonably dangerous because the danger in the design outweighed the benefits." *Id*. ¶79. And T.V. contends that Grindr "knew or should have known that [minors] including A.V. … accessed, downloaded, used, purchased, and/or subscribed to Grindr Services and engage in sexual relationships and activity with adult users of Grindr Services." *Id*. ¶80. In supplemental briefing, T.V. clarifies that this claim pertains to the Grindr app. D41 at 2–3; *see* footnote 23, *infra* (explaining the difference between the wrongful death claim based on strict liability (count two) and the wrongful death claim based on "negligence per se product design defect" (count three)).

Grindr argues that the Court must dismiss the claim because, under the facts alleged, the Grindr app is not a product, much less an unreasonably dangerous product. D22 at 27–30; D42 at 22–23. T.V. disagrees, arguing that the Grindr app is "composed of hardware and software" constituting tangible property and emphasizing pleading allegations relating to dangerousness. D32 at 17–19.

(b)     "Product"

When interpreting Florida law, a federal court first determines whether precedent from the Florida Supreme Court exists. *SE Prop. Holdings, LLC v. Welch*, 65 F.4th 1335, 1342 (11th Cir. 2023). If the Florida Supreme Court has not decided the issue, the federal court "must predict" how the Florida Supreme Court would decide the issue. *Id*. (internal quotation marks and quoted authority omitted). In making this

prediction, the federal court must "adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Id.* (internal quotation marks and quoted authority omitted). The absence "of explicit Florida case law on an issue does not absolve [a federal court] of [its] duty to decide what the state courts would hold if faced with it." *Freeman v. First Union Nat'l*, 329 F.3d 1231, 1232 (11th Cir. 2003) (internal quotation marks and quoted authority omitted).

Neither the Florida Supreme Court nor any state intermediary appellate court has decided whether strict liability may be imposed based on an alleged design defect in the Grindr app or any similar app. To predict how the Florida Supreme Court would decide the issue, the undersigned details the reasons for strict liability in Florida, how Florida courts have addressed whether strict liability should apply to a new circumstance, what "product" means and does not mean, and analogous cases from Florida and other jurisdictions applying § 402A and similar law.

The Florida Supreme Court explained in *West* why adopting § 402A is "in line with reason and justice":

> Many products in the hands of the consumer are sophisticated and even mysterious articles, frequently a sealed unit with an alluring exterior rather than a visible assembly of component parts. In today's world it is often only the manufacturer who can fairly be said to know and understand when an article is suitably designed and safely made for its intended purpose.

*West*, 336 So. 2d at 86, 88.

"The manufacturer, by placing on the market a potentially dangerous product for use and consumption and by inducement and promotion encouraging the use of these products, thereby undertakes a certain and special responsibility toward the consuming public who may be injured by it." *Id.* at 86. "The obligation of the manufacturer must become what in justice it ought to be—an enterprise liability … .

The cost of injuries or damages, … to persons or property, resulting from defective products, should be borne by the makers of the products who put them into the channels of trade, rather than by the injured or damaged persons who are ordinarily powerless to protect themselves." *Id.* at 92.

> A comment to § 402A likewise explains the policy for strict liability:

> On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement (Second) of Torts § 402A cmt. c (1965).

Within the last decade, the Florida Supreme Court has reaffirmed its adoption of § 402A. *See Aubin*, 177 So. 3d at 510 ("[I]n approaching design defect claims, we adhere to the consumer expectations test, as set forth in the Second Restatement[.]"). "[T]he original purpose of imposing strict liability for defective and unreasonably dangerous products was to relieve injured consumers from the difficulties of proving negligence on the part of the product's manufacturer[.]" *Id.* at 506–07. "The important aspect of strict products liability that led to [the] adoption … remains true today: the burden of compensating victims of unreasonably dangerous products is placed on the manufacturers, who are most able to protect against the risk of harm, and not on the consumer injured by the product." *Id.* at 510.

In reaffirming its adoption of § 402A, the Florida Supreme Court emphasized the focus on "consumer expectations," requiring consideration of "whether a product

is unreasonably dangerous in design because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a reasonably foreseeable manner." *Id.* at 503. Focusing on consumer expectations "intrinsically recognizes that a manufacturer plays a central role in establishing the consumers' expectations for a particular product, which in turn motivates consumers to purchase the product." *Id.*

The Florida Supreme Court has observed:

> [C]ommon law must keep pace with changes in our society and may be altered … when the change is demanded by public necessity or required to vindicate fundamental rights. … The common law has shown an amazing vitality and capacity for growth and development. This is so largely because the great fundamental object and principle of the common law was the protection of the individual in the enjoyment of all his inherent and essential rights and to afford him a legal remedy for their invasion.

*Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1104 (Fla. 2008) (internal quotation marks and quoted authority omitted).

To determine whether strict liability should apply in circumstances not previously considered, the Florida Supreme Court has considered the purpose of imposing strict liability. *See, e.g.*, *Samuel Friedland Fam. Enters. v. Amoroso*, 630 So. 2d 1067, 1071 (Fla. 1994) (extending strict liability to commercial lease transactions of products because "the rationale justifying the imposition of strict liability on manufacturers and sellers" also applies to commercial lessors); *Easterday v. Masiello*, 518 So. 2d 260, 261 (Fla. 1988) (declining to extend strict liability to a jail facility, explaining that the court is "unwilling to hold that a jail facility is a product that invokes the principles of products liability cases"); *Vaughn*, 491 So. 2d at 553 (declining to extend strict liability to a public road incorporating allegedly defective paving materials because "the ability to reap profits at the expense of the consuming public is not present in a state bid situation" and "public roads are not available for purchase in the sense that they are offered in the stream of commerce in the way that, for instance, soft drinks or automobiles are"); *see also Ford Motor Co. v. Hill*, 404 So. 2d 1049, 1051–

52 (Fla. 1981) (observing that the policy reasons for adopting strict tort liability do not change merely because of the type of defect alleged and holding that the doctrine applies "to all manufactured products without distinction as to whether the defect was caused by the design or the manufacturing"); *Rivera v. Baby Trend, Inc.*, 914 So. 2d 1102, 1105 (Fla. 4th DCA 2005) (extending strict liability to a company that distributed and marketed a product despite that the company had "never possessed the product during its journey through the distribution chain" because the company "clearly was responsible for placing the product in the stream of commerce and had the ability to control the design of the product").

Neither § 402A nor any Florida appellate court has defined "product" for the purpose of strict liability. As examples of products, § 402A describes tangible items:

> The rule … extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer. Thus the rule stated applies to an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair, and an insecticide. It applies also to products which, if they are defective, may be expected to and do cause only "physical harm" in the form of damage to the user's land or chattels, as in the case of animal food or a herbicide.

Restatement (Second) of Torts § 402A cmt. d (1965).

Section 19(a) of the Restatement (Third) of Torts defines a "product" as "tangible personal property distributed commercially for use or consumption." Restatement (Third) of Torts § 19(a) (1998). The definition continues, "Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules stated in th[e] Restatement." *Id.*

Section 19(b) of the Restatement (Third) of Torts emphasizes that "[s]ervices, even when provided commercially, are not products," with a reporter's note observing that "[c]ourts are unanimous in refusing to categorize commercially[] provided

services as products." *Id*. § 19(b), § 19 reporter's note to cmt. f.[21] At least two reasons underlie the refusal to categorize services as products. First, unlike mass-produced goods, services are not marketed widely to the general public, and, accordingly, "parties injured by poor services are in a better position to locate the tortfeasor and identify the defect caused by the tortfeasor's negligence." *Snyder v. ISC Alloys, Ltd.*, 772 F. Supp. 244, 251 (W.D. Pa. 1991). Second, a product defect, even if latent, can be measured, but "a service is no more than direct human action or human performance"; "Whether that performance is defective is judged by what is reasonable under the circumstances and depends upon the actor's skill, judgment, training, knowledge and experience." *Pierson v. Sharp Mem'l Hosp., Inc.*, 216 Cal. App. 3d 340, 345 (Cal. Ct. App. 1989).

Besides services, courts have refused to categorize as products knowledge, ideas, images, information, words, pictures, thoughts, expressions, and concepts and "have been willing to separate the sense in which the tangible containers of those ideas are products from their communicative element for purposes of strict liability." *James v. Meow Media, Inc.*, 300 F.3d 683, 701 (6th Cir. 2002). As one court explained,

> A book containing Shakespeare's sonnets consists of two parts, the material and print therein, and the ideas and expression thereof. The first may be a product, but the second is not. The latter, were Shakespeare alive, would be governed by copyright laws; the laws of libel, to the extent consistent with the First Amendment; and the laws of misrepresentation, negligent misrepresentation, negligence, and mistake. These doctrines applicable to the second part are aimed at the delicate issues that arise with respect to intangibles

---

[21]The Florida Supreme Court has rejected a different aspect of the Restatement (Third) of Torts—specifically, a movement away from consumer expectations. *See Aubin*, 177 So. 3d at 510. In doing so, the court observed the Restatement (Third) of Torts "is not a codification of law or necessarily the consensus on the best policy for courts regarding the proper legal standard for strict liability in products liability cases. In fact, the methodology employed by the American Law Institute in drafting the Third Restatement reflects hurdles in creating a categorical pronouncement in an area of law as complex and fact-driven as strict products liability." *Id.* at 509 (internal footnote omitted). Still, no Florida case suggests that Florida would not follow the unanimous decisions refusing to categorize services as products.

such as ideas and expression. Products liability law is geared to the tangible world.

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991).

"[T]he costs in any comprehensive cost/benefit analysis would be quite different were strict liability concepts applied to words and ideas. We place a high priority on the unfettered exchange of ideas. … The threat of liability without fault (financial responsibility for our words and ideas in the absence of fault or a special undertaking or responsibility) could seriously inhibit those who wish to share thoughts and theories." *Id*. at 1035; *see also Morgan v. W.R. Grace & Co. —Conn.*, 779 So. 2d 503, 505 (Fla. 2d DCA 2000) (acknowledging the First Amendment concerns that would be raised by applying strict liability for ultrahazardous activities to the marketing, promotion, and encouraging of such activities); *cf. Cardozo v. True*, 342 So. 2d 1053, 1056–57 (Fla. 2d DCA 1977) (explaining that the transmission of words is not the same as selling items with physical properties; thus, where a bookseller merely passes on a book without inspection, the thoughts and ideas within the book do not constitute a "good" for the purposes of a breach of implied warranty claim under the Uniform Commercial Code).[22]

---

[22]Distinguishing between strict liability as a tort and breach of warranty under the Uniform Commercial Code, the Florida Supreme Court has explained that the former is based on public policy, the latter on contract, and has recognized "there are two parallel but independent bodies of products liability law." *West*, 336 So. 2d at 88. "An action under the strict liability doctrine eliminates the notice requirement, restricts the effectiveness of disclaimers to situations where it can be reasonably said that the consumer has freely assumed the risk, and abolishes the privity requirement." *Id*.; *see also Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1278 (D. Colo. 2002) ("While computer source codes and programs may be construed as 'tangible property' for tax purposes and as 'goods' for commercial purposes, these classifications do not establish that intangible thoughts, ideas, and messages contained in computer video games or movies should be treated as products for purposes of strict liability."). Because of the different rationales for strict liability and breach of warranty, cases analyzing the latter type of claim provide little guidance in this action.

Courts applying state law incorporating § 402A or similar law thus hold that strict liability claims cannot proceed based on content-based defects in written publications, training materials, manuals, and other media. *See, e.g.*, *Winter*, 938 F.2d at 1034–36 (an encyclopedia explaining which mushrooms are edible); *Rodgers v. Christie*, 795 F. App'x 878, 878–80 (3d Cir. 2020) (a multifactor risk estimation model for a pretrial release program); *Trishan Air, Inc. v. Dassault Falcon Jet Corp.*, No. CV 08–7294, 2011 WL 13186258, at *2 (C.D. Cal. May 17, 2011) (training materials and an aircraft flight simulator); *Isham v. Padi Worldwide Corp.*, No. CV06–00382, 2007 WL 2460776, at *5–9 (D. Haw. Aug. 23, 2007) (a diving program consisting of instructions, lessons, and training); *Gorran v. Atkins Nutr., Inc.*, 464 F. Supp. 2d 315, 323–25 (S.D.N.Y. 2006) (a diet book recommending a high-fat, high-protein diet); *Torres v. City of Madera*, No. CIVFF02-6385, 2005 WL 1683736, at *13–14 (E.D. Cal. July 11, 2005) (training manuals and instructions in slide presentations, a test, and handouts); *Snyder,* 772 F. Supp. at 251 (technical drawings, services, and information); *Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1216–18 (D. Md. 1988) (a medical textbook describing a constipation remedy); *Herceg v. Hustler Mag., Inc.*, 565 F. Supp. 802, 803–04 (S.D. Tex. 1983) (a magazine article describing autoerotic asphyxiation); *Birmingham v. Fodor's Travel Publ'ns, Inc.*, 833 P.2d 70, 73, 79 (Haw. 1992) (a book identifying a Hawaiian beach to visit); *Garcia v. Kusan, Inc.*, 655 N.E.2d 1290, 1293–94 (Mass. App. Ct. 1995) (the concept of, and instructions for, a floor-hockey game); *Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 232, 238–39 (Tex. App. 1993) (a supplement on shooting sports in a magazine for boys); *Smith v. Linn*, 563 A.2d 123, 124, 126 (Pa. Super. Ct. 1989) (a book recommending a liquid protein diet).

Likewise, courts applying state law incorporating § 402A or similar law hold that strict liability claims cannot proceed based on defects in ideas, images, words, pictures, thoughts, and expressions in games, video games, music, movies, and websites. *See, e.g.*, *James*, 300 F.3d at 700–01 (video games, movies, and websites); *Watters v. TSR, Inc.*, 904 F.2d 378, 381 (6th Cir. 1990) ("Dungeons & Dragons" game);

39

*Est. of B.H. v. Netflix, Inc.*, No. 4:21-cv-06561, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022) (Netflix show); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 172–74 (D. Conn. 2002) ("Mortal Kombat" videogame); *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1277–79 (D. Colo. 2002) (videogames and movies); *Davidson v. Time Warner, Inc.*, No. CIV.A. V–94–006, 1997 WL 405907, at *1, *14 (S.D. Tex. Mar. 31, 1997) (Tupac Shakur's record *2Pacalypse Now*).

Most analogous to T.V.'s claim, some courts applying § 402A or similar law hold that strict liability claims cannot proceed based on defects in virtual platforms or apps. *See Jacobs v. Meta Platforms, Inc.*, No. 22CV005233, 2023 WL 2655586, at *4 (Cal. Super. Mar. 10, 2023) (Facebook); *Ziencik v. Snap, Inc.*, No. CV 21-7292, 2023 WL 2638314, at *4 (C.D. Cal. Feb. 3, 2023) (Snapchat); *Jackson v. Airbnb, Inc.*, 639 F. Supp. 3d 994, 1010–11 (C.D. Cal. 2022) (Airbnb); *Intellect Art Multimedia, Inc. v. Milewski*, No. 117024/08, 2009 WL 2915273, at *7 (N.Y. Sup. Ct. Sept. 11, 2009) (a website used as "a forum for third-party expression"); *see also Jane Doe No. 1 v. Uber Techs., Inc.*, 79 Cal. App. 5th 410, 419 (Cal. Ct. App. 2022) (observing that the court below held "the Uber app was not a product").

Some courts hold otherwise. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, No. 4:22-md-03047, 2023 WL 7524912, at *29–34 (N.D. Cal. Nov. 14, 2023) (to be published), *motion to certify appeal denied*, No. 4:22-md-03047, 2024 WL 1205486 (N.D. Cal. Feb. 2, 2024) (functionalities of social media platforms); *Brookes v. Lyft Inc.*, No. 50-2019-CA004782, 2022 WL 19799628, at *2 (Fla. Cir. Ct. Sept. 30, 2022) (Lyft); *see also Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091–94 (9th Cir. 2021) (observing that the plaintiffs' negligent design claim treats Snapchat as a product but not analyzing the issue of whether Snapchat is a product); *A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814, 819–21 (D. Or. 2022) (holding that § 230(c)(1) does not bar a products liability suit against an online chatroom that connected a minor to an adult

who sexually abused her online but not analyzing the issue of whether the chatroom is a product).

Of the cases holding that apps and similar platforms can be subject to strict liability based on design defects, *Brookes* is the only one analyzing Florida law. And *In re Social Media Adolescent Addiction*, which relies on *Brookes*, provides the most recent and comprehensive analysis of the issue.

In *Brookes*, the plaintiff sued Lyft after being struck by a vehicle driven by a driver using the Lyft app. 2022 WL 19799628, at *1. She brought a strict liability claim, contending that the Lyft app had distracted the driver. *Id*. Applying the Florida Supreme Court's decision in *West* and other Florida cases, the court ruled that the Lyft app is a product, rejecting Lyft's argument that the Lyft app is a service. *Id*. at *2–5.

The court observed that the "question of whether the Lyft app[] is a product or a service for purposes of product liability law[] is purely a legal question," "[t]here is no Florida precedent that has directly addressed" the issue, and "the case law in other jurisdictions is sparse and is inconclusive[.]" *Id*. at *2.

The court emphasized that "changes [are] rippling through our society as a result of the technology at issue" and explained how a Florida appellate court had recently described Uber as "a multi-faceted product of new technology" and questioned whether Uber "should be fixed into either the old square hole or the old round hole of existing legal categories[] when neither is a perfect fit." *Id*. at *1 (quoting *McGillis v. Dep't of Econ. Opportunity*, 210 So. 3d 220, 223 (Fla. 3d DCA 2017)).

The court observed that "[t]he principles … in *West* have been 'applied for almost four decades to cases involving a variety of products and contexts.'" *Id*. at *3 (quoting *Aubin*, 177 So. 3d at 503). The court continued, "There is no generally accepted definition of 'product' that prevails in the reported cases," and "[t]he

definition of 'product' should be fluid to accommodate developments in technology and is not susceptible to a 'crabbed' definition." *Id.* Rather, the court stated, "Decisions regarding what constitutes a 'product' are reached in light of public policy behind the imposition of strict product liability." *Id.*

The court explained that its "review of Florida case law leads … to the conclusion that the Lyft app[] … is a product for purposes of Florida product liability law." *Id.* at *2; *see also id.* at *3 ("This [conclusion] is consistent with the Florida Supreme Court precedent in *West* and its progeny."). The court observed that, under Florida law, "strict liability should be imposed only when a product the manufacturer places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." *Id.* at *2 (citing *West*, 336 So. 2d at 86–87) (internal quotation marks omitted). The court further observed, "In setting forth the public policy rationale for the imposition of strict liability, the Florida Supreme Court in *West* found that 'the cost of injuries or damages, either to persons or property, resulting from defective products should be borne by the makers of the products who put them into the channels of trade, rather than by the injured or damaged persons who are ordinarily powerless to protect themselves.'" *Id.* (quoting *West*, 336 So. 2d at 92).

The court explained that, under Florida law, the Lyft app is a product for purposes of strict liability because Lyft designed the app for its business, made the design choices for the app, solely distributed the app into the marketplace, placed the app into the stream of commerce, mass-marketed the app, generated revenue and profits from the app, and had "the ability to control any risk or harm the design of the Lyft app[] might cause once put into the stream of commerce." *Id.* at *2–3. The court emphasized, "As set forth by the Florida Supreme Court in *West* and its progeny, products liability shifts the burden to ensure a safe, non-defective product on the party

who is most able to protect against the harm and bear the cost." *Id.* at *3 (citing *Aubin*, 177 So. 3d at 502–03).

The court found instructive the explanation of the distinction between a "product" and "service" in the Restatement (Third) of Torts. *Id.* at *5. The court observed that "strict liability does not extend to professionally provided services such as medical or legal assistance" or "to individuals who install or repair things" because these "service providers provide an individualized service for customers, and have not designed, or marketed the product." *Id.* (citing Restatement (Third) of Torts, § 19, reporter's note to cmt. f). "Unlike these services," the court continued, "Lyft's app[] is designed, distributed, and mass marketed by Lyft." *Id.*

The court rejected Lyft's reliance on *Porter v. Rosenberg*, 650 So. 2d 79 (Fla. 4th DCA 1995). *Id.* at *3. In *Porter*, the court held a doctor who had performed breast implant surgery was not strictly liable because he had merely supplied the implant to the patient while performing a medical service and had been in no position to deter the production and distribution of the implants, having neither designed nor distributed them. 650 So. 2d at 82–83. In rejecting Lyft's reliance on *Porter*, the court explained that Lyft had not merely used the app to provide a service; instead, Lyft had designed and distributed the app, making its role different from a doctor exercising professional medical judgment and expertise in selecting the implant and conducting the surgery. *Brookes*, 2022 WL 19799628, at *3. Lyft, the court concluded, "should be responsible for any harm caused by its digital app[] in the same way the designer of any defective physical product is held accountable." *Id.* The court emphasized that the plaintiff's claims "arise from the alleged defective design choices and the negligent design in conjunction with Lyft's business practices" and "Lyft was in the best position to control the risk of harm associated with its digital app[]." *Id.*

The court also rejected Lyft's reliance on *Quinteros v. InnoGames*, No. C19-1402, 2022 WL 898560, at *1, *7 (W.D. Wash. Mar. 28, 2022), which held the online video game platform "Forge of Empires" was not a product under Washington law. *Id.* at *4; *see also Quinteros v. InnoGames*, No. 22-35333, 2024 WL 132241, at *3 (9th Cir. Jan. 8, 2024) (affirming the district court's dismissal of the strict liability claim but on a ground different from the district court's ruling that the platform is a service, not a product). The court found the district court opinion in *Quinteros* unpersuasive because that court had applied a state statutory definition of "product" and had relied on a case focusing on "whether thoughts, ideas, and messages contained in a movie, video game, or website material constitute a product for purposes of strict product liability law." *Brookes*, 2022 WL 19799628, at *4. The court observed that "[p]roduct liability law is not geared toward intangible thoughts, expressions, messages or ideas, whereas the tangible properties of websites can be subject to product liability law" and explained that, in those cases, "it was not the design of the video game or website that caused the alleged harm[,] it was the thoughts, expressions, and ideas contained within the video games or website that caused the harm." *Id.* The court continued:

> The distinction between tangible and intangible properties is also covered in the Restatement (Third) of Torts Section 19 … comment d to Section 19(a). The comments section … notes that courts have appropriately refused to impose strict product liability in cases where the plaintiff's grievances were 'with the information, not with the tangible medium.' However, the tangible medium itself which delivers the information is 'clearly a product.' *Id.* at comment d. The Reporter's notes comments also reflect that 'computer software might be considered a product for purposes of strict liability in tort.' *Id.* at Reporter's Notes, comment d.

*Id.* (emphasis omitted). The court reasoned that the plaintiff's claim is "not based on expressions or ideas transmitted by the Lyft app[]"; instead, the claim is "based on the design of the app[] itself that was designed and distributed by Lyft into the stream of commerce." *Id.* The claim, the court found, "is based on defects in Lyft's mass produced technically designed app[]," and the plaintiff "presented … evidence that Lyft made design choices when it decided how, when and with what frequency the

44

Lyft app[] requires … the driver's attention," putting Lyft "in the best position to protect against any alleged risk of harm caused by those design choices." *Id*. The court emphasized that the claim "arises from the defect in Lyft's app[], not from the idea or expressions in the Lyft app[]." *Id*.

The court rejected other non-Florida cases on which Lyft relied because the cases did not address "Florida case law in product liability claims," did not provide persuasive reasoning, "did not address or mention Lyft's role as a designer and distributor of the Lyft app[]," and "did not address or mention Lyft's generation of revenue as a result of its distribution of the Lyft app[]." *Id*.

The court concluded:

> The Florida Supreme Court has made clear that the policy for imposing strict products liability on the designer or manufacturer of a product is to protect the user and innocent bystanders from unreasonably dangerous products or products fraught with unexpected dangers. *West*…, 336 So. 2d 86–87. If Lyft had designed commercial laundry machines and mass distributed them to laundromats operated by third-parties to provide a laundry service, Lyft could not credibly argue that the laundry machine was a service and not a product under a product liability claim for a design defect with the laundry machine. There is no rational basis to distinguish this Lyft app[] just because it involves enhanced technology from a laundry machine or any tangible object designed and distributed by an entity that causes harm due to a defective design. In both cases, the designer of the hypothetical Lyft laundry machine and the Lyft app[] placed into the stream of commerce to derive a profit, is in the best position to protect the user and innocent bystander against the risk of harm associated with any design defect.

*Id*. at *5.

The district court in *In re Social Media* relied on *Brookes*. *See In re Soc. Media*, 2023 WL 7524912, at *27. *In re Social Media* is pending multi-district litigation brought on behalf of children and adolescents against Facebook, Instagram, TikTok, Snapchat, and YouTube. *Id*. at *1. The plaintiffs contend that the defendants "target children as a core market," "designed their platforms to appeal to and addict them," have "created

45

a youth mental health crisis through the defective design of their platforms," and have created platforms facilitating and contributing "to the sexual exploitation and sextortion of children, as well as the ongoing production and spread of child sex abuse materials ... online." *Id.* at *2 (internal footnotes, record citations, and quotation marks omitted).

Addressing whether the platforms are products for strict liability purposes, the court criticized as "overly simplistic" and "misguided" the parties' "all or nothing" approach. *Id.* at *19–20 (internal quotation marks omitted). The court explained:

> While acknowledging that these proceedings implicate novel questions of law, including the applicability of products liability torts to the digital world, the parties repeatedly downplay nuances in the caselaw and the facts. The Court declines to adopt either party's desired approach. Cases exist on both sides of the questions posed by this litigation precisely because it is the *functionalities* of the alleged products that must be analyzed. This is borne out in the cases relied upon by all parties. The cases generally concern a specific product defect and the determination of whether a specific technology is a product hinges on the specifics of that defect. The same applies here. The Court determines it is necessary to analyze each defect pled by plaintiffs to determine whether they have adequately alleged the existence of a product (or products).

*Id.* at *20 (internal footnote omitted).

Based on the definition of "product" in § 19(a) of the Restatement (Third) of Torts, the court described "three circumstances" involving intangibles in the context of strict liability. *Id.* at *22–23. "First, intangible things can be products when analogized to 'tangible personal property' based on 'the context of [its] distribution and use.'" *Id.* at *23. (quoting Restatement (Third) of Torts § 19(a)) (alteration in original). "Second, strict products liability has been imposed in unique circumstances where harm is caused by ... the distribution of objectively false information [in maps and navigational charts] or ... electricity." *Id.* (internal quotation marks and quoted authority omitted). And "[t]hird ... ideas, content, and free expression have consistently been held *not* to support a products liability claim." *Id.*

46

Analyzing the allegedly defective functionalities of the platforms and drawing on conclusions about whether they are analogous to tangible personal property and the design of tangible personal property or to ideas, content, and free expression, the court ruled the following functionalities are products subject to strict liability: (1) the failure "to implement robust age verification processes[,] … effective parental controls[,] … and effective parental notifications" (analogous to parental locks on medicine bottles and televisions); (2) the failure to "implement opt-in restrictions on the length and frequency of use" and "implement default protective limits to the length and frequency of use" (analogous to physical timers and alarms); (3) the use of "needlessly complicated" processes to deactivate and delete accounts; (4) the failure "to label images and videos [made with filters] as edited content"; (5) the design of filters permitting users to "'blur imperfections' and otherwise enhance their appearance in order to 'create the perfect selfie'" (tools or analogous to tools); (6) the implementation of a filter enabling "users to overlay the speed they are traveling in real life onto a photo or video" (a tool or analogous to a tool); and (7) the failure "to design [] platforms to include 'reporting protocols … allow[ing] users or visitors' 'to report [child sexual abuse materials] and adult predator accounts'" without logging in. *Id.* at *29–34.

Like the parties in *In re Social Media*, Grindr and T.V. take an "all or nothing" approach, directing their arguments not to the functionalities about which T.V. complains but to the Grindr app as a whole. *See* D22 at 27–29; D32 at 17–19; D41 at 3; D42 at 22–23. As in *In re Social Media*, the parties' approach may be "overly simplistic." *See In re Soc. Media*, 2023 WL 7524912, at *20 (quoted).

For now, taking the approach the parties offer, T.V. alleges sufficient facts for product liability. Like Lyft in *Brookes*, Grindr designed the Grindr app for its business, *see* D9 ¶¶10, 11; made design choices for the Grindr app, *id.* ¶¶10, 13; placed the Grindr app into the stream of commerce, *id.* ¶¶10, 11; distributed the Grindr app in the global

47

marketplace, *id*. ¶¶10–12; marketed the Grindr app, *id*. ¶14; and generated revenue and profits from the Grindr app, *id*. ¶41. *See Brookes*, 2022 WL 19799628, at *2–3. "As set forth by the Florida Supreme Court in *West* and its progeny, product liability shifts the burden to ensure a safe, non-defective product on the party who is most able to protect against the harm and bear the cost." *Id*. at *3 (citing *Aubin*, 177 So. 3d at 502–03).

Grindr argues that its "platform is not a tangible item but an app[] that enables its users to communicate—that is, it provides a ***service*** to which product liability law is inapplicable." D22 at 28–29. Grindr's argument is unpersuasive because T.V. alleges not merely that Grindr offers the Grindr app as a service but also that Grindr designed and distributed the Grindr app, making Grindr's role different from a mere service provider, putting Grindr in the best position to control the risk of harm associated with the Grindr app, and rendering Grindr responsible for any harm caused by its design choices in the same way designers of physically defective products are responsible. *See Brookes*, 2022 WL 19799628, at *3 (using the same rationale to reject that Lyft merely provides a service). The reasons for distinguishing services from products (i.e., services are not widely marketed to the general public and parties injured by poor services are thus positioned to find the tortfeasors and identify the defects, *see Snyder*, 772 F. Supp. at 251, and the caliber of services depends on providers' skill, judgment, training, knowledge, and experience, *see Pierson*, 216 Cal. App. at 345) do not apply.

Grindr argues that "by trying to hold Grindr liable for users' communications, [T.V.] seeks to apply the law of product liability to ideas and expressions, in contravention of Florida law." D22 at 29. Grindr's argument is unpersuasive because T.V. is not trying to hold Grindr liable for "users' communications," *see* D22 at 29 (quoted), about which the pleading says nothing. *See* D9. T.V. is trying to hold Grindr liable for Grindr's design choices, like Grindr's choice to forego age detection tools, *id*. ¶20 (akin to a design choice to forego an effective safety cap on a medicine bottle),

48

and Grindr's choice to provide an interface displaying the nearest users first, *id*. ¶ 13 (akin to a design choice to make a dangerous feature prominent).

The undersigned recommends rejecting Grindr's argument that, under the facts alleged, the Grindr app is not a product.

(c)     <u>"Unreasonably Dangerous"</u>

Under Florida law, "[a] product is defective because of a design defect if it is in a condition unreasonably dangerous to the user [or] a person in the vicinity of the product and the product is expected to and does reach the user without substantial change affecting that condition." Fla. Std. Jury Instr. in Civ. Cases, § 403.7(b) (brackets in original omitted); *see* footnote 20, *supra* (explaining that Florida's standard jury instructions are not legal adjudications of their correctness but are used in this report and recommendation as a "shortcut" for an explanation of the law). "A product is unreasonably dangerous because of its design if the product fails to perform as safely as an ordinary consumer would expect when used as intended **or** when used in a manner reasonably foreseeable by the manufacturer **or** [when] the risk of danger in the design outweighs the benefits." Instr. § 403.7(b) (brackets in original omitted; emphasis added).

The "unreasonably dangerous" standard "balances the likelihood and gravity of potential injury against the utility of the product, the availability of other, safer products to meet the same need, the obviousness of the danger, public knowledge and expectation of the danger, the adequacy of instructions and warnings on safe use, and the ability to eliminate or minimize the danger without seriously impairing the product or making it unduly expensive." *Radiation Tech., Inc. v. Ware Const. Co.*, 445 So. 2d 329, 331 (Fla. 1983). A comment to § 402A explains:

> The rule … applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot

possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous[.]" … The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fuel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.

Restatement (Second) of Torts § 402A, cmt. i.

Considering the balancing required by Florida law, T.V. alleges sufficient facts for unreasonable dangerousness. Those allegations and all reasonable inferences drawn in T.V.'s favor, *see Karantsalis*, 17 F.4th at 1319, include that Grindr designed its app so anyone using it can determine who is nearby and communicate with them, D9 ¶¶13, 48(a); to allow the narrowing of results to users who are minors, *id.* ¶¶31, 33; and to forego age detection tools, *id.* ¶20, in favor of a minor-based niche market and resultant increased market share and profitability, *id.* ¶36, despite the publicized danger, risk of harm, and actual harm to minors, *id.* ¶¶28, 28(a)–(h), 29, 29(a)–(h), 30, 30(a). At a minimum, those allegations make it plausible that the risk of danger in the design outweighs the benefits.

Grindr argues that "the alleged danger to A.V.—that he would meet adult users—was not merely well-known, but one of the core purposes of Grindr, and indeed a reason why Grindr forbids minors from using the app." D22 at 29. Grindr contends, "Like alcoholic beverages and tobacco, the alleged dangers of the app cannot constitute a design defect under Florida law." *Id.* at 29–30. Grindr relies on two cases: *Gibbs v. Republic Tobacco, L.P.*, 119 F. Supp. 2d 1288, 1295 (M.D. Fla. 2000), in which

this Court held that loose-leaf tobacco is not unreasonably dangerous considering "widespread public knowledge and acceptance of the dangers associated with tobacco use"; and *Cook v. MillerCoors, LLC*, 829 F. Supp. 2d 1208, 1216–18 (M.D. Fla. 2011), in which this Court held alcoholic beverages with caffeine and other stimulants are not unreasonably dangerous because, according to Florida courts, "the dangers associated with alcohol are well known." *Id.* at 29. Grindr fails to offer convincing reasons why this Court should liken the Grindr app to alcohol and tobacco—products used for thousands of years—and rule that, as a matter of Florida law, there is widespread public knowledge and acceptance of the dangers associated with the Grindr app or that the benefits of the Grindr app outweigh the risk to minors.

The undersigned recommends rejecting Grindr's argument that T.V. fails to allege sufficient facts for unreasonable danger.

4.    *Duty (Counts Three through Five)*

Under Florida law, "a claim of negligence requires the establishment of four elements[.]" *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007). One element is duty: "the defendant owed a duty, or obligation, recognized by the law, requiring the defendant to conform to a certain standard of conduct, for the protection of others against unreasonable risks." *Id.* (internal quotation marks, quoted authority, and alterations omitted). The elements apply to general negligence claims, *see Williams*, 974 So. 2d at 1056 (a car crash), and to product liability claims based on negligence, *see Grieco*, 344 So. 3d at 22 (compressed-gas dusting spray).

For her wrongful death claim based on negligence and "negligence per se product design defect" (count three), T.V. contends that Grindr "owed a duty of care … to A.V. … to prevent foreseeable and known harms including … the online sexual grooming of children." D9 ¶88. T.V. contends that Grindr "owed a duty of care (negligence per se) to A.V. not to violate laws, such as the TVRPA, and to exercise

reasonable care to prevent foreseeable and known harms including … the online sexual grooming of children." *Id.* ¶89. And T.V. contends that Grindr "breached the duties by providing defectively designed services, tools, and products to A.V. that rendered no protection from the known and reasonably foreseeable harms."[23] *Id.* ¶90.

For her wrongful death claim based on negligence (count four), and her alternative survival claim based on negligence (count five), T.V. contends that Grindr "owed a duty of care (negligence) to A.V. to exercise reasonable care to prevent foreseeable and known harms resulting from Grindr Services including … the online sexual grooming of children." *Id.* ¶¶97, 110. T.V. contends that Grindr undertook duties "to ensure that persons under … eighteen … do not access, download, use, purchase, and/or subscribe to Grindr Services," "to remove harmful content from Grindr Services," and "to ensure that Grindr Services [were] safe for users of Grindr Services—including persons under eighteen … accessing, downloading, using, purchasing, and/or subscribing to Grindr Services." *Id.* ¶¶98–100; *see also id.* ¶¶111–113. T.V. contends that Grindr breached these duties by:

(a)     violating the TVPRA;

(b)     "knowingly, intentionally, and negligently allow[ing] persons under … eighteen … to access, download, use, purchase, and/or subscribe to Grindr Services";

(c)     "knowingly, intentionally, and negligently allow[ing] persons under … eighteen … to access Grindr Services and engage in sexual relationships and activity with adult users of Grindr Services";

---

[23]T.V. explains the "negligence per se product design defect" claim (count three) differs from the strict liability claim (count two) because the strict liability claim "relates only to the defective design of the product, the Grindr app[]," while the negligence per se claim "is a claim for negligence which relates to the duty of care owed to A.V. and not solely limited to the design of the product, the Grindr app[]," and this claim "incorporates defectively designed services and tools, as opposed to just the product/app[] described" in the strict liability claim. D41 at 2–3.

(d)     "fail[ing] to undertake adequate precaution—if any—to prevent person under … eighteen … from accessing, downloading, using, purchasing, and/or subscribing to Grindr Services";

(e)     "fail[ing] to undertake adequate precaution—if any—to prevent person under … eighteen … from accessing Grindr Services to engage in sexual activity with adult users of Grindr Services";

(f)     "knowingly, intentionally, and negligently allow[ing] adult users of Grindr Services to engage in or attempt to engage in sexual relationships and activity with persons under … eighteen … accessing, downloading, using, purchasing, and/or subscribing to Grindr Services";

(g)     "fail[ing] to undertake adequate precaution—if any—to prevent adult users of Grindr Services from engaging in or attempting to engage in sexual relationships and activity with persons under … eighteen … accessing, downloading, using, purchasing, and/or subscribing to Grindr Services";

(h)     "knowingly, intentionally, and negligently mispresent[ing] that Grindr Services are safe"; and

(i)     "knowingly, intentionally, and negligently mispresent[ing] that [Grindr] monitors Grindr Services to remove harmful User Content[.]"

*Id.* ¶¶101(a)–(i), 114(a)–(i). And T.V. contends that the acts and omissions "were caused or allowed to exist by" Grindr, "were known to" Grindr, "or had existed for a sufficient length of time that [Grindr] should have known of the negligent actions, omissions, and conditions." *Id.* ¶¶102, 115.

Grindr argues that the Court must dismiss the claims "sounding in negligence" because, under the facts alleged, Grindr owed A.V. no duty to prevent the misconduct of Grindr's adult users or A.V.'s suicide.[24] D22 at 30–31 & 31 n.5; D42 at 19–22. T.V.

_____

[24]In the reply, Grindr argues for the first time that a platform owner like itself owes no duty of care to users. *Compare* D22 at 30–31 (motion providing two reasons to find no duty of

disagrees, emphasizing pleading allegations and arguing they establish that (1) Grindr's acts and omissions created foreseeable risks and (2) contractual and special relationships between Grindr and users of Grindr Services exist to create a duty. D32 at 12–14 (citing D9 ¶¶17–24, 27, 29, 42, 44, 46).

Duty is a "threshold" issue. *Jenkins v. W.L. Roberts, Inc.*, 851 So. 2d 781, 783 (Fla. 1st DCA 2003). The existence of a duty is usually a question of law. *Goldberg*, 899 So. 2d at 1110; *but see Johnson v. Howard Mark Prods., Inc.*, 608 So. 2d 937, 939 (Fla. 2d DCA 1992) (reversing summary judgment for the operator of a teenage night club and against the estate of a teenager killed while trying to cross a highway to patronize the night club and explaining that in cases involving certain dangerous conditions, "the case-specific standard of care can be a question for the jury to decide.").

Under Florida law, "the duty of care arises from four potential sources: (1) legislative enactments or administrative regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case." *Dorsey v. Reider*, 139 So. 3d 860, 863 (Fla. 2014) (emphasis omitted). "The statute books and case law … are not required to catalog and expressly proscribe every conceivable risk … to give rise to a duty of care." *McCain*, 593 So. 2d at 503.

T.V. asserts Grindr's duty of care arises from the TVPRA, unspecified laws, and the general facts of the case. *See* D9 ¶¶88–90, 97, 110. The undersigned addresses only a duty of care arising from the general facts of the case because the undersigned recommends dismissing the TVPRA claim, *see* section IV.A.1, *supra*, and T.V. does not identify other laws establishing a duty of care. *See* D32.

---

care), *with* D42 at 19–22 (reply providing three reasons to find no duty of care). The undersigned does not address this argument. *See* footnote 7, *supra* (explaining why the undersigned does not address arguments made for the first time in the reply).

"[T]he determination of the existence of a common law duty … from the general facts of the case depends upon an evaluation and application of the concept of foreseeability of harm to the circumstances alleged[.]"[25] *U.S. v. Stevens*, 994 So. 2d 1062, 1066–67 (Fla. 2008). "[W]here a person's conduct is such that it creates a 'foreseeable zone of risk' posing a general threat of harm to others, a legal duty will ordinarily be recognized to ensure that the underlying threatening conduct is carried out reasonably." *Id.* at 1067 (quoting *McCain*, 593 So. 2d at 503). "[A]s a general proposition[,] the greater the risk of harm to others that is created by a person's chosen activity, the greater the burden or duty to avoid injury to others becomes." *Id.* "Thus, as the risk grows greater, so does the duty, because the risk to be perceived defines the duty that must be undertaken." *Id.* (quoted authority omitted).

The "foreseeable zone of risk" test "is the test to be applied under Florida law to determine whether a duty exists under [Florida] negligence law." *Id.*; *see also McCain*, 593 So. 2d at 503 ("[E]ach defendant who creates a risk is required to exercise prudent foresight whenever others may be injured as a result. This requirement of reasonable, general foresight is the core of the duty element. … Duty is the standard of conduct given to the jury for gauging the defendant's factual conduct. … [C]ourts cannot find a lack of duty if a foreseeable zone of risk more likely than not was created by the

---

[25]Both duty and proximate causation rely on foreseeability. *See* section IV.A.2, *supra* (explaining Florida law on causation and analyzing Grindr's causation argument). The Florida Supreme Court has explained the difference between duty and proximate causation:

> The duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader "zone of risk" that poses a general threat of harm to others. The proximate causation element, on the other hand, is concerned with whether and to what extent the defendant's conduct foreseeably and substantially caused the specific injury that actually occurred. In other words, the former is a minimal threshold legal requirement for opening the courthouse doors, whereas the latter is part of the much more specific factual requirement that must be proved to win the case once the courthouse doors are open. As is obvious, a defendant might be under a legal duty of care to a specific plaintiff, but still not be liable for negligence because proximate causation cannot be proven.

*McCain*, 593 So. 2d at 502–03 (internal authority, footnote, and emphasis omitted).

defendant."); *Whitt v. Silverman,* 788 So. 2d 210, 217 (Fla. 2001) ("Foreseeability clearly is crucial in defining the scope of the general duty placed on every person to avoid negligent acts or omissions. Florida … recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others.") (quoting *McCain*, 593 So. 2d at 503); *Demelus v. King Motor Co. of Ft. Lauderdale*, 24 So. 3d 759, 763 (Fla. 4th DCA 2009) ("Since *McCain*, the Florida Supreme Court has significantly expanded the concept of duty in Florida negligence law and made foreseeability the sole determinant of whether a duty exists."); *Johnson v. Wal-Mart Stores E., LP,* No. 5D23-0201, 2024 WL 1595245, at *3 (Fla. 5th DCA Apr. 12, 2024) (to be published) ("Importantly, to establish a duty, the zone of risk created by a defendant's conduct must have been reasonably foreseeable, not just possible." (internal quotation marks and quoted authority omitted)).

In applying the "foreseeable zone of risk" test, the Florida Supreme Court has "looked for guidance in sections 302, 302A, and 302B" of the Restatement (Second) of Torts because "[those] sections largely mirror [the] 'foreseeable zone of risk' analysis[.]" *Stevens*, 994 So. 2d at 1067. The duties described in those sections "attach to acts of commission, which historically generate a broader umbrella of tort liability than acts of omission[.]" *Id.* (quoted authority and emphasis omitted).

Section 302 ("Risk of Direct or Indirect Harm") provides, "A negligent act or omission may be one which involves an unreasonable risk of harm to another through either (a) the continuous operation of a force started or continued by the act or omission, or (b) the foreseeable action of the other, a third person, an animal, or a force of nature." Restatement (Second) of Torts § 302.

Section 302A ("Risk of Negligence or Recklessness of Others") provides, "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the negligent or reckless conduct of the other or a third person." *Id.* § 302A.

56

Section 302B ("Risk of Intentional or Criminal Conduct") provides, "An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." *Id.* § 302B. A comment to § 302B provides an example involving children: "A leaves dynamite caps in an open box next to a playground in which small children are playing. B, a child too young to understand the risk involved, finds the caps, hammers one of them with a rock, and is injured by the explosion. A may be found to be negligent toward B." *Id.* § 302B, cmt. c.

"Most negligence claims involve a negligent actor (one who owes a legal duty and breaches that duty) directly causing injury for which a plaintiff seeks to recover damages." *Barnett v. Dep't of Fin. Servs.*, 303 So. 3d 508, 514 (Fla. 2020). "This is because generally, one has no duty to control the conduct of another to prevent harm, and no duty to warn those who may be endangered by harmful conduct, including the criminal acts of a third person." *Id.* (internal quotation marks, quoted authority, and alteration omitted). A comment to § 302B explains:

> Normally the actor has much less reason to anticipate intentional misconduct than he has to anticipate negligence. In the ordinary case he may reasonably proceed upon the assumption that others will not interfere in a manner intended to cause harm to anyone. This is true particularly where the intentional conduct is a crime, since under ordinary circumstances it may reasonably be assumed that no one will violate the criminal law. Even where there is a recognizable possibility of the intentional interference, the possibility may be so slight, or there may be so slight a risk of foreseeable harm to another as a result of the interference, that a reasonable man in the position of the actor would disregard it.

Restatement (Second) of Torts § 302B, cmt. d.

But comment e to § 302B adds:

> There are … situations in which the actor, as a reasonable man, is required to anticipate and guard against the intentional, or even criminal, misconduct of

others. In general, these situations arise where the actor is under a special responsibility toward the one who suffers the harm, which includes the duty to protect him against such intentional misconduct; or where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account. The following are examples of such situations. The list is not an exclusive one, and there may be other situations in which the actor is required to take precautions.

*Id.* § 302B, cmt. e. The comment provides these examples:

A. Where, by contract or otherwise, the actor has undertaken a duty to protect the other against such misconduct. Normally such a duty arises out of a contract between the parties, in which such protection is an express or an implied term of the agreement.

…

B. Where the actor stands in such a relation to the other that he is under a duty to protect him against such misconduct. Among such relations are those of carrier and passenger, innkeeper and guest, employer and employee, possessor of land and invitee, and bailee and bailor.[26]

…

C. Where the actor's affirmative act is intended or likely to defeat a protection which the other has placed around his person or property for the purpose of guarding them from intentional interference. This includes a situation where the actor is privileged to remove such a protection, but fails to take reasonable steps to replace it or to provide a substitute.

---

[26]Florida courts recognize that "[a] defendant's liability for the criminal act[] of [a] third part[y] is often linked to a 'special relationship' with the plaintiff." *Knight v. Merhige*, 133 So. 3d 1140, 1145 (Fla. 4th DCA 2014). The existence of a special relationship imposes a duty on those who fail to act. *U.S. v. Stevens*, 994 So. 2d 1062, 1068 (Fla. 2008). "These relationships are protective by nature, requiring the defendant to guard his charge against harm from others." *Id.* (quoted authority omitted). "For example, a common carrier has a legal duty toward its passengers to exercise reasonable care to prevent physical attacks by third persons," and a "landlord has a duty to protect a tenant from reasonably foreseeable criminal conduct." *Id.* (internal quotation marks and quoted authority omitted). "Other examples … include businesses toward their customers, employers toward their employees, jailers toward their prisoners, hospitals toward their patients, and schools toward their pupils." *Id.* (internal footnotes omitted).

…

D. Where the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct.

…

E. Where the actor entrusts an instrumentality capable of doing serious harm if misused, to one whom he knows, or has strong reason to believe, to intend or to be likely to misuse it to inflict intentional harm.

…

F. Where the actor has taken charge or assumed control of a person whom he knows to be peculiarly likely to inflict intentional harm upon others.

…

G. Where property of which the actor has possession or control affords a peculiar temptation or opportunity for intentional interference likely to cause harm.

…

H. Where the actor acts with knowledge of peculiar conditions which create a high degree of risk of intentional misconduct.

*Id.*

The Florida Supreme Court explains, "Comment 'e' to § 302B … provides that there are two situations where an actor 'is required to anticipate and guard against the intentional, or even criminal, misconduct of others': (1) 'where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable man would take into account,' or (2) where the actor is under a special responsibility to the victim." *Stevens*, 994 So. 2d at 1067 (quoting Restatement (Second) of Torts § 302B, cmt. e).

Section 449, Restatement (Second) of Torts ("Tortious or Criminal Acts the Probability of Which Makes Actor's Conduct Negligent") adds, "If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby." Restatement (Second) of Torts § 449. A comment to § 449 explains, "This Section should be read together with § 302B, and the Comments to that Section, which deal with the foreseeable likelihood of the intentional or even criminal misconduct of a third person as a hazard which makes the actor's conduct negligent." *Id*. § 449, cmt. a. Another comment to § 449 explains:

> The happening of the very event the likelihood of which makes the actor's conduct negligent and so subjects the actor to liability cannot relieve him from liability. The duty to refrain from the act committed or to do the act omitted is imposed to protect the other from this very danger. To deny recovery because the other's exposure to the very risk from which it was the purpose of the duty to protect him resulted in harm to him, would be to deprive the other of all protection and to make the duty a nullity.

*Id*. § 449, cmt. b.

"The Third Restatement has … expounded upon the impact of Comment e. when taken in conjunction with the "special relationship" exceptions outlined in section 315. *Knight v. Merhige*, 133 So. 3d 1140, 1147 (Fla. 4th DCA 2014). Specifically:

> Section 315 … contributed to frequent judicial pronouncements … that absent a special relationship an actor owes no duty to control third parties. *Section 315, however, must be understood to address only an affirmative duty to control third parties. It did not address the ordinary duty of reasonable care with regard to conduct that might provide an occasion for a third party to cause harm.* [Section] 302B, Comment e, provides for a duty of care when "the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such [third-party] misconduct." Section 449 … also contemplated liability, without regard to any special relationship, for acts that are negligent because of the risk of the third party's conduct.

*Id.* at 1147–48 (quoting Restatement (Third) of Torts § 37, cmt. d). "Thus, since section 302B is 'concerned only with the negligent character of the actor's conduct, and *not with his duty to avoid the unreasonable risk*,' a defendant who creates an 'unreasonable risk' through his or her own misfeasance is still 'under a duty to others to exercise the care of a reasonable man to protect them against an unreasonable risk of harm to them arising out of the act.'" *Id.* (quoting Restatement (Second) of Torts § 302, cmt. a). "Florida case law precedent clearly recogniz[es] that negligence liability may be imposed on the basis of affirmative acts which create an unreasonable risk of harm by creating a foreseeable opportunity for third party criminal conduct, even though there is no 'special relationship' between the parties that independently imposes a duty to warn or guard against that misconduct." *Stevens*, 994 So. 2d at 1068 (quoted authority omitted).

For example, the Florida Supreme Court ruled the following allegations were sufficient "to establish a duty of care under Section 302B" owed by an anthrax laboratory to a person who died from inhaling stolen anthrax mailed to his employer: the laboratory "knew or should have known about the risk of bioterrorism associated with anthrax under the laboratory's ownership and control," especially considering "its history of missing laboratory specimens"; "a reasonable medical research and testing laboratory operator in possession of those facts would understand that the public would be exposed to an unreasonable risk of harm unless it implemented adequate security procedures to guard against the risk of unauthorized interception of toxic materials from its laboratory"; and the death "was a foreseeable consequence of the [laboratory]'s failure to use reasonable care in adopting and implementing security measures reasonably necessary to protect against the possibility of unauthorized interception and release of the biohazards under its control." *Id*. at 1069 (quoting the trial court order).

As another example, a Florida appellate court ruled the following allegations suffced to establish under § 302B that a rental car company owed a duty of care to a British tourist "accosted by unknown criminals" while she was traveling in Miami in a rental car: the car "bore a license plate designation" easily recognized as a rental car; the company should have realized that criminals were targeting tourist car renters in certain areas of Miami; and a reasonable company would have understood that its customers would be exposed to an unreasonable risk of harm if not protected against this risk. *Shurben v. Dollar Rent-A-Car*, 676 So. 2d 467, 468 (Fla. 3d DCA 1996).

In contrast, a Florida appellate court ruled the following facts failed to establish that a car dealership owed a duty of care to a man injured in an accident involving one of three vehicles stolen from the dealership by a juvenile gang: to obtain the keys, the gang smashed hurricane-proof windows on the showroom's exterior and office windows on the showroom's interior, kicked-in doors, ransacked cubicles, and opened locked drawers; to leave, the gang rammed open a chained, locked gate and rammed or moved a vehicle blocking the gate; at night, the showroom was well lit and a guard patrolled the property; and none of the dealership's three dozen break-ins and vehicle thefts during the six previous years involved the gang's methods. *Demelus*, 24 So. 3d at 760–61. The court explained, "[T]his particular form of theft was unforeseeable to [the dealership], given its prior history of vehicle theft. Questions of foreseeability are fact-dependent. Because [the dealership] had not experienced similar thefts in the past, the vehicle theft … was unforeseeable as a matter of law. Furthermore, [the dealership]'s conduct did not *create* a risk." *Id*. at 766.

As another example, a Florida appellate court ruled the following allegations failed to establish that a baseball tournament organizer owed a duty of care to an umpire who was pushed and punched by a batter after the umpire called a third strike: the organizer specialized in player development and the placement of high school athletes into college programs; the organizer selected the umpire; no one came to the

umpire's aid in the two minutes between when the umpire made the call and when the batter hit him; and the organizer had adopted game rules prohibiting players from having physical contact with umpires. *Saunders v. Baseball Factory, Inc.*, 361 So. 3d 365, 367–68 (Fla. 4th DCA 2023). The court explained that the "mere operation of a baseball tournament did not give rise to a duty to protect the umpire from a battery committed by a player, absent some additional risk factor that would have placed the [organizer] on notice of the potential for violence." *Id.* at 367. The court elaborated: "The question is whether it was objectively reasonable to expect the danger causing [the] injury, not whether it was within the realm of any conceivable possibility. … While emotions run high at a competitive youth baseball tournament, a player sucker punching the home plate umpire is more of a unicorn event than a perfect game." *Id.* at 371.

> Comment f to § 302B cautions:

> It is not possible to state definite rules as to when the actor is required to take precautions against intentional or criminal misconduct. As in other cases of negligence …, it is a matter of balancing the magnitude of the risk against the utility of the actor's conduct. Factors to be considered are the known character, past conduct, and tendencies of the person whose intentional conduct causes the harm, the temptation or opportunity which the situation may afford him for such misconduct, the gravity of the harm which may result, and the possibility that some other person will assume the responsibility for preventing the conduct or the harm, together with the burden of the precautions which the actor would be required to take. Where the risk is relatively slight in comparison with the utility of the actor's conduct, he may be under no obligation to protect the other against it.

Restatement (Second) of Torts § 302B, cmt. f.; *see also Saunders*, 361 So. 3d at 370 (quoting the factors in comment f).

"A court's decision as to whether a legal duty in negligence exists necessarily involves questions of public policy." *Knight*, 133 So. 3d at 1149. "[T]he duty inquiry in a negligence case involves weighing the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Id.*

(internal quotation marks and quoted authority omitted). "Finding that a legal duty exists in a negligence case involves the public policy decision that a defendant should bear a given loss, as opposed to distributing the loss among the general public." *Id.* (internal quotation marks and quoted authority omitted); *see also id.* at 1149–51 (ruling that even if the parents of a murderer who shot and killed family members at a holiday gathering had a duty of care under § 302B, no duty of care exists for public policy reasons related to familial relationships).

T.V. alleges sufficient facts to establish that Grindr owed A.V. a duty of care "from the general facts of the case." *See Dorsey*, 139 So. 3d at 863. Applying the "foreseeable zone of risk" test as the Florida Supreme Court instructs, *see Stevens*, 994 So. 2d at 1067, Grindr's alleged conduct created a foreseeable zone of risk of harm to A.V. and other minors. That alleged conduct, some affirmative in nature, includes launching the Grindr app "designed to facilitate the coupling of gay and bisexual men in their geographic area," D9 ¶¶10, 11; publicizing users' geographic locations, *id.* ¶48(a); displaying the image of the geographically nearest users first, *id.* ¶13; representing itself as a "safe space," *id.* ¶42(a); introducing the "Daddy" "Tribe," as well as the "Twink" "Tribe," allowing users to "more efficiently identify" users who are minors, *id.* ¶¶31–33; knowing through publications that minors are exposed to danger from using the Grindr app, *id.* ¶¶28, 28(a)–(h), 29, 29(a)–(h), 30, 30(a); and having the ability to prevent minors from using Grindr Services but failing to take action to prevent minors from using Grindr Services, *id.* ¶20. These allegations describe a situation in which "the actor"—Grindr—"as a reasonable [entity], is required to anticipate and guard against the intentional, or even criminal, misconduct of others." *See* Restatement (Second) of Torts § 302B, cmt. e. (quoted); *see also id.* § 302B, cmt. f (requiring consideration of the "known character, past conduct, and tendencies of the person whose intentional conduct causes the harm"; "the temptation or opportunity" that the situation may give that person for the misconduct; "the gravity" of the possible harm; the possibility that another person "will assume the

responsibility for preventing the conduct or the harm"; and "the burden of the precautions" the actor would have to take). Unlike in the car dealership case, *see Demelus*, 24 So. 3d at 766, or the baseball game case, *see Saunders*, 361 So. 3d at 367–71, Grindr, according to T.V., was placed on notice and knew of the dangers at hand. *See* D9 ¶¶28, 28(a)–(h), 29, 29(a)–(h), 30, 30(a).

Moreover, considering the vulnerabilities of the potential victims, the ubiquitousness of smartphones and apps, and the potential for extreme mental and physical suffering of minors from the abuse of sexual predators, the Florida Supreme Court likely would rule that public policy "lead[s] the law to say that [A.V. was] entitled to protection," and that Grindr "should bear [the] given loss, as opposed to distributing the loss among the general public." *See Knight*, 133 So. 3d at 1149 (quoted); *see also Rupp v. Bryant*, 417 So. 2d 658, 667–68 (Fla. 1982) (explaining a "pragmatic[]" and "socially oriented" approach "assesses the interests of each party and society to determine whether a duty should be imposed"). Were Grindr a physical place people could enter to find others to initiate contact for sexual or other mature relationships, the answer to the question of duty of care would be obvious. That Grindr is a virtual place does not make the answer less so.

Grindr argues, "[T]he Complaint does not allege Grindr had the right or ability to control the conduct of adult users, and A.V.'s mere use of Grindr's platform does not give rise to a 'special relationship.' … The 'special relationship' exception is inapplicable." D22 at 30–31. Grindr relies on *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 598–99 (S.D.N.Y. 2018), in which the Southern District of New York held that the plaintiff—a former Grindr user whose ex-boyfriend impersonated him on Grindr— failed to allege sufficient facts of a special relationship of trust or confidence required for a duty to provide correct information and give rise to a negligent misrepresentation claim under New York law. *Id.* at 31. Grindr also relies on *Dyroff v. Ultimate Software Grp., Inc.*, No. 17-cv-05359-LB, 2017 WL 5665670, at *13–15 (N.D. Cal. Nov. 26,

2017), *aff'd* 934 F.3d 1093, 1101 (9th Cir. 2019), in which the Northern District of California held that the plaintiff—the mother of an adult who died from an overdose of heroin laced with fentanyl bought from a dealer he had met online through social networking posts on the defendant's website—failed to allege sufficient facts of a special relationship required for a duty to warn under California law. *Id.*

Grindr's argument does not warrant dismissal. Assuming without deciding that T.V. fails to allege sufficient facts showing a special relationship giving rise to a duty of care to guard against the misconduct of Grindr's adult users, "Florida case law precedent clearly recogniz[es] that negligence liability may be imposed on the basis of affirmative acts" creating "an unreasonable risk of harm by creating a foreseeable opportunity for third party criminal conduct, even though there is no 'special relationship' between the parties that independently imposes a duty to warn or guard against that misconduct." *Stevens*, 994 So. 2d at 1068 (quoted). Grindr fails to address this alternative basis for a duty of care or its alleged affirmative acts that include introducing the "Tribes." *See* D22 at 30–31; D42 at 19–21.

In a footnote, Grindr observes, "A duty to protect the plaintiff from third-party conduct may also arise if the defendant controls the instrumentality of the harm, the premises upon which the tort is committed, or the person who committed the tort. … The Complaint does not allege Grindr controlled the adult users with whom A.V. had sexual interactions, nor identify the premises on which those interactions occurred or the instrumentality through which they were accomplished, let alone that Grindr controlled either." D22 at 31 n.5. Grindr cites *Waves of Hialeah, Inc. v. Machado*, 300 So. 3d 739, 743 (Fla. 3d DCA 2020), in which a Florida appellate court held that a hotel guest who left his friend behind at a hotel after he had locked his key in his room did not owe his friend a duty of protection from third-party misconduct because he did not control the instrumentality, premises, or person associated with the harm. *Id.* Grindr's observation is for naught; Florida's "foreseeable zone of risk" test does not

require control over the instrumentality, premises, or person. *See Stevens*, 994 So. 2d at 1067–69 (quoted).

Grindr argues, "[T]he only injury that the Complaint identifies with specificity is A.V.'s suicide. While this was tragic, '[g]enerally no liability exists for another's suicide in the absence of a specific duty of care.' … Plaintiff points to no facts supporting such a duty here." D22 at 31 (quoting *Surloff v. Regions Bank*, 179 So. 3d 472, 475 (Fla. 4th DCA 2015)) (alteration in motion); *see also* D42 at 20–21 (Grindr's reply).

Grindr is correct that, under Florida law, a person has no duty of care to prevent the suicide of another person unless the suicide is foreseeable and the person has taken custody and control over the other person such that the person is in a position to control the risk. *Andreasen v. Klein, Glasser, Park & Lowe, P.L.*, 342 So. 3d 732, 734 (Fla. 3d DCA 2022); *see, e.g., id.* (affirming the dismissal of a wrongful death action alleging that attorneys' malpractice caused a lapse in insurance coverage leading to suicide but not that the attorneys had known the client was suicidal or had possessed a duty to exercise supervision over the client's daily activities; unlike in the medical provider context where a duty to prevent suicide may arise, "no state court has extended a similar duty to attorneys"); *Surloff*, 179 So. 3d at 475–76 (affirming the dismissal of a wrongful death action alleging a bank caused the decedent's overdose death by informing him of a loan denial despite knowing he could not process negative information because the bank had no special relationship with the decedent that would enable the bank to supervise his daily activities or protect him against suicide); *see also Paddock v. Chacko*, 522 So. 2d 410, 415–16 (Fla. 5th DCA 1988) (explaining that a psychiatric facility may owe a duty of care "to safeguard and protect a psychiatric patient with suicidal tendencies" when the patients are committed to the facility's custody such that the facility can take measures to prevent suicide).

67

Still, Grindr's argument fails for two reasons. First, A.V.'s suicide is not the only injury T.V. alleges; T.V. brings alternative survival claims based on injuries to A.V. shy of suicide. *See* D9 ¶¶106–61 (survival claims); *see also* footnote 13, *supra* (explaining Florida's survival law and pleading in the alternative). Second, T.V. does not contend Grindr owed A.V. a duty to prevent A.V.'s suicide. *See* D9 ¶¶88–90, 97–100, 110–113. "Although a duty analysis considers some general facts of the case, it does so only to determine whether a general, foreseeable zone of risk was created, without delving into the specific injury that occurred or whether such injury was foreseeable." *Chirillo*, 199 So. 3d at 249. As the Florida Supreme Court has explained, "the nonexistence of one specific type of duty does not mean that [the defendant] owe[s] the decedent no duty at all." *See id.* at 251 (quoted). Grindr's liability for A.V.'s suicide turns instead on proximate causation, addressed in section IV.A.2, *supra*. *See id.* at 251–52 ("We disapprove [the lower court's decision] on two grounds: (1) the [lower court] evaluated that case under a duty it had already determined did not apply … —the duty to prevent suicide—and (2) the [lower court] should have assessed the foreseeability of the decedent's specific injury (suicide) as part of a proximate cause analysis, granting summary judgment on that ground only if the evidence was undisputed that the suicide was not foreseeable.").

The undersigned recommends rejecting Grindr's argument that, under the facts alleged, Grindr owed A.V. no duty of care.

5.   *Intentional Infliction of Emotional Distress (Count Six)*

(a)   <u>General</u>

For the claim of intentional infliction of emotional distress, the Florida Supreme Court has adopted § 46 of the Restatement (Second) of Torts (1965). *E. Airlines, Inc. v. King*, 557 So. 2d 574, 575–76 (Fla. 1990). The claim has four elements: (1) "[t]he wrongdoer's conduct was intentional or reckless"; (2) "the conduct was outrageous";

(3) "the conduct caused emotional distress"; and (4) "the emotional distress was severe." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 954–55 (Fla. 3d DCA 2017).

For her survival claim of intentional infliction of emotional distress (count six), T.V. contends that Grindr's "actions and omissions that allowed A.V. to access, download, use, purchase, and/or subscribe to Grindr Services before reaching the age of eighteen … were extreme and outrageous, and beyond all possible bounds of decency, and utterly intolerable in a civilized community." D9 ¶124. T.V. contends that Grindr "was intentional and reckless in the actions and omissions that ignored and allowed A.V. and other [minors] to access, download, use, purchase, and/or subscribe to Grindr Services." *Id*. ¶125. T.V. contends that Grindr "intended to cause or disregarded the substantial probability of causing A.V. severe emotional distress." *Id*. ¶126. T.V. contends that "A.V. experienced emotional distress as a result of [Grindr]'s actions and omissions" and Grindr's "actions and omissions directly caused A.V.'s emotional distress." *Id*. ¶¶127, 128. And T.V. contends that Grindr "was in the exclusive position to stop the harm A.V. experienced but refused to do so." *Id*. ¶129.

Grindr argues that the Court must dismiss the claim for intentional infliction of emotional distress because, under the facts alleged, Grindr's conduct or behavior was neither sufficiently outrageous nor directed at A.V. D22 at 31–32; D42 at 23–24. T.V. disagrees, emphasizing pleading allegations and arguing that, taking the pleading "as a whole," she adequately pleads that Grindr's "behavior was outrageous and directed at A.V." D32 at 15–16 (citing D9 ¶¶23, 35, 37, 40, 124, 132).

(b)   Outrageous Conduct

"Outrageous conduct" is conduct that exceeds "all bounds of decency" and is "regarded as odious and utterly intolerable in a civilized community[.]" *Deauville*, 219 So. 3d at 954. Under comment d of § 46, outrageous conduct involves facts that, if

recited "to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Gallogly v. Rodriguez*, 970 So. 2d 470, 472 (Fla. 2d DCA 2007) (quoting Restatement (Second) of Torts § 46, cmt. d).

"The subjective response of the person affected by the conduct does not control. Rather, the conduct must be evaluated on an objective basis[.]" *Matsumoto v. Am. Burial & Cremation Servs., Inc.*, 949 So. 2d 1054, 1056 (Fla. 2d DCA 2006); *see Mellette v. Trinity Mem'l Cemetery, Inc.*, 95 So. 3d 1043, 1049 (Fla. 2d DCA 2012) ("[B]ecause the outrageousness test is objective, it is of no moment that [the plaintiff] testified that she did not believe [the defendant] meant to hurt her.").

"The standard for 'outrageous conduct' is particularly high in Florida." *Clemente v. Horne*, 707 So. 2d 865, 867 (Fla. 3d DCA 1998) (quoted authority omitted); *see also Diamond v. Rosenfeld*, 511 So. 2d 1031, 1035 (Fla. 4th DCA 1987) ("All of the appellate decisions in this State addressing the tort … have clearly suggested that it be narrowly construed and applied only when the facts would be sufficient to arouse such overwhelming aversion in the average person that he or she would exclaim, 'Outrageous!'").

Cases involving death and intentional infliction of harm are more apt than others to present sufficiently outrageous conduct. *See Deauville*, 219 So. 3d at 955–56 (distinguishing cases involving outrageous conduct by explaining that the cases "dealt with matters of life-and-death" and "[t]he defendants in those cases caused the death of another, and intentionally inflicted harm").

Cases involving a disregard for human life and the high probability of causing severe emotional distress are also more apt than others to present sufficiently outrageous conduct. *See Kirkpatrick v. Zitz*, 401 So. 2d 850, 851 (Fla. 1st DCA 1981) (holding that the standard is met by conduct that "is outrageous and extreme in that it intolerably evinces a disregard for human life and the high probability that severe

70

emotional distress would follow"), *dismissed sub nom. Transam. Ins. Co. v. Kirkpatrick*, 411 So. 2d 385 (Fla. 1981).

And cases involving the defendant's knowledge that the plaintiff is especially sensitive, susceptible, or vulnerable to injury caused by mental distress are more apt than others to present sufficiently outrageous conduct. *Dependable Life Ins. Co. v. Harris*, 510 So. 2d 985, 988 (Fla. 5th DCA 1987) ("[A]nother factor recognized as enhancing the outrageousness of a defendant's conduct is the defendant's knowledge that the plaintiff is especially sensitive, susceptible, or vulnerable to injury caused by mental distress.").[27]

"Whether the conduct is outrageous enough to rise to the level required by the tort may be decided as a question of law when the facts of a case can under no conceivable interpretation support the tort[.]" *Williams v. City of Minneola*, 575 So. 2d 683, 692 (Fla. 5th DCA 1991); *see also Glegg v. Van Den Hurk*, 379 So. 3d 1171, 1174 (Fla. 4th DCA 2024) ("The question of whether conduct is sufficiently outrageous enough to support a[]claim is a question of law, not a question of fact."). "[B]ut where significant facts are disputed, or where differing inferences could reasonably be derived

---

[27]Other circumstances favoring a finding of outrageousness include conduct against a corpse, *see Winter Haven Hosp., Inc. v. Liles*, 148 So. 3d 507, 516 (Fla. 2d DCA 2014); *Williams v. City of Minneola*, 575 So. 2d 683, 691 (Fla. 5th DCA 1991); *Smith v. Telophase Nat'l Cremation Soc'y, Inc.*, 471 So. 2d 163, 166 (Fla. 2d DCA 1985); conduct by someone with actual or apparent authority over the plaintiff, *see Gallogly*, 970 So. 2d at 472; *Lashley v. Bowman*, 561 So. 2d 406, 409–10 (Fla. 5th DCA 1990); and circumstances involving the unequal position of parties in a relationship, *see Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 596 (Fla. 2d DCA 2007); *Dependable Life*, 510 So. 2d at 988; *Dominguez v. Equitable Life Assurance Soc'y of the U.S.*, 438 So. 2d 58, 61–62 (Fla. 3d DCA 1983), *approved sub nom. Crawford & Co. v. Dominguez*, 467 So. 2d 281, 281 (Fla. 1985). T.V.'s claim does not involve these circumstances. *See* D9.

Circumstances disfavoring a finding of outrageousness include conduct against a person involved in an event of public interest, *see Cape Publ'ns, Inc. v. Bridges*, 423 So. 2d 426, 427–28 (Fla. 5th DCA 1982); and conduct in the workplace for which statutory or administrative remedies are available, *see Williams v. Worldwide Flight SVCS., Inc.*, 877 So. 2d 869, 871 (Fla. 3d DCA 2004); *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210, 1212–13 (Fla. 5th DCA 1995). T.V.'s claim does not involve these circumstances. *See* D9.

from undisputed facts, the question of outrageousness is for the jury to decide." *Williams*, 575 So. 2d at 692. "The appropriateness of factfinders determining what is 'outrageous' is supported by … the standard of outrageousness set out in comment d to [§] 46 of the Restatement[, which] is almost impossible to apply in any consistent way essentially because outrageousness is a not only highly subjective, but also an extremely mutable trait." *Id.*; *see also Ponton v. Scarfone*, 468 So. 2d 1009, 1011 (Fla. 2d DCA 1985) ("Determining the boundaries of th[e] conduct which give meaning to the tort … is not without some difficulty.").

Florida courts have found the following conduct insufficiently outrageous as a matter of law: a hotel's switching a wedding reception venue from a ballroom to a cramped, loud, public lobby without informing the bride and groom in advance, *Deauville*, 219 So. 3d at 951–952, 956; parishioners' accusing a Baptist minister at a church meeting of using church money to buy a Mercedes, *LeGrande v. Emmanuel*, 889 So. 2d 991, 993, 995 (Fla. 3d DCA 2004); landlords' knowingly maintaining rental property below flood level, causing continuous standing water, and failing to remedy termite infestation, resulting in an order to terminate electricity to the property and constructive eviction, *Clemente*, 707 So. 2d at 866–67; a person's initiating and continuing for months "a campaign of telephonic harassment in the aftermath of a verbal conflict," *Kent v. Harrison*, 467 So. 2d 1114, 1114–15 (Fla. 2d DCA 1985); and defendants' threatening to shoot their neighbors' dog, repeatedly complaining about noise from their neighbors' apartment, making anti-Semitic remarks about the neighbors, alienating others from the neighbors, repeatedly making threatening and harassing telephone calls to the neighbors, cursing the neighbors and their children, directing prayers for the dead at the neighbors and the neighbors' children and grandchildren, calling one of the neighbors a cripple and a criminal, accusing one of the neighbors of trying to rape one of the defendants, and generally trying to make the neighbors' lives as miserable as possible, *Diamond*, 511 So. 2d at 1033–35.

72

In contrast, Florida courts have found the following conduct sufficiently outrageous: a hospital's engaging in a "cover-up" after a patient died from negligent medical care and informing the patient's family the patient had died of natural causes despite knowing otherwise, *Thomas v. Hosp. Bd. of Dirs. of Lee Cnty.*, 41 So. 3d 246, 248–49, 256 (Fla. 2d DCA 2010); students' producing and distributing a newsletter in which an author threatened to rape the teacher and her children and kill the teacher, *Nims v. Harrison*, 768 So. 2d 1198, 1199 (Fla. 1st DCA 2000); a creditor's trying to locate a debtor by falsely representing to the debtor's mother that the debtor's children had been involved in a serious automobile accident, *Ford Motor Credit Co. v. Sheehan*, 373 So. 2d 956, 958 (Fla. 1st DCA 1979); and an insurer's directing its insured—a pet store—to keep from a patron bitten by a skunk that the insured had sold the skunk and the skunk was lost before the incubation period necessary to determine whether the skunk had rabies, *Kirkpatrick*, 401 So. 2d at 851.

Under the facts alleged, construed in the light most favorable to T.V., and with all reasonable inferences drawn in her favor, *see Karantsalis*, 17 F.4th at 1319, Grindr's conduct is sufficiently outrageous to survive a motion to dismiss. T.V. alleges Grindr designed a way for users to find nearby users for sexual relationships, D9 ¶¶10, 13, 48(a); Grindr uses "Tribes" making minors feel welcome ("Twink") and suggesting relationships between minors and adults ("Daddy"), which allowed adult users to identify nearby minors more efficiently and allowed Grindr to separate itself from its competitors as a platform with minors and increase its market share and profitability, *id*. ¶¶31–33, 36; Grindr knew minors were being exposed to danger because of their ability to use Grindr Services, *id*. ¶30; and Grindr could have prevented minors' exposure by using age detection tools but did not, *id*. ¶20. In short, says T.V., Grindr "knowingly and intentionally allowed users under … eighteen … to [use] Grindr Services. In turn, [Grindr] served them up on a silver platter to the adult users of Grindr Services intentionally seeking to sexually groom or engage in sexual activity with persons under … eighteen[.]" *Id*. ¶35. The allegations involve a high probability of

causing severe emotional distress, *see Williams*, 575 So. 2d at 692–93, to sensitive, susceptible, and vulnerable persons, *see Dependable Life*, 510 So. 2d at 988, and suffice to "arouse" the "resentment" of "an average member of the community" against Grindr and lead them "to exclaim, 'Outrageous!,'" *see Gallogly*, 970 So. 2d at 472 (quoted) (quoted authority omitted). To the extent this issue presents a close call, discovering facts might make the call less so.

Grindr describes the conduct T.V. alleges as the "operation of an app that allows users to interact" and argues that the allegation falls far short of the extremely high standard for outrageousness. D22 at 32. Grindr's argument is unpersuasive because, like other arguments Grindr makes, it depends on an unreasonably narrow reading of the allegations and disregards that, at this early stage of the litigation, all reasonable inferences from the allegations are drawn in T.V.'s favor. *See Karantsalis*, 17 F.4th at 1319.

The undersigned recommends rejecting Grindr's argument that, under the facts alleged, Grindr's conduct is insufficiently outrageous as a matter of law.

(c)     <u>Directed At</u>

Section 46 of the Restatement (Second) of Torts provides:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

74

(b) to any other person who is present at the time, if such distress results in bodily harm.

Commentary explains the "directed at" language in § 46(2):

> *l. Conduct directed at a third person.* Where the extreme and outrageous conduct is directed at a third person, as where, for example, a husband is murdered in the presence of his wife, the actor may know that it is substantially certain, or at least highly probable, that it will cause severe emotional distress to the plaintiff. In such cases the rule of this Section applies. The cases thus far decided, however, have limited such liability to plaintiffs who were present at the time, as distinguished from those who discover later what has occurred. The limitation may be justified by the practical necessity of drawing the line somewhere, since the number of persons who may suffer emotional distress at the news of an assassination of the President is virtually unlimited, and the distress of a woman who is informed of her husband's murder ten years afterward may lack the guarantee of genuineness which her presence on the spot would afford. The Caveat is intended, however, to leave open the possibility of situations in which presence at the time may not be required.
>
> Furthermore, the decided cases in which recovery has been allowed have been those in which the plaintiffs have been near relatives, or at least close associates, of the person attacked. The language of the cases is not, however, limited to such plaintiffs, and there appears to be no essential reason why a stranger who is asked for a match on the street should not recover when the man who asks for it is shot down before his eyes, at least where his emotional distress results in bodily harm.

*Id*. § 46, cmt. l; *see also M.M. v. M.P.S.*, 556 So. 2d 1140, 1140–41 (Fla. 3d DCA 1989) ("If courts were to allow relatives of tort victims compensation for the distress they suffer when they receive bad news about family members when there is no attendant intentional or reckless conduct directed toward them, an avalanche of litigation would ensue. Compensation is available for actual harm to the victim; only in carefully prescribed circumstances is compensation permitted for relatives who suffer emotional distress.").

A claim for intentional infliction of emotional distress, therefore, is generally available only to the person at whom the outrageous conduct is directed. *Baker v. Fitzgerald*, 573 So. 2d 873, 873 (Fla. 3d DCA 1990). Thus, for example, Florida courts

75

have held a mother cannot recover for emotional distress arising from the death of her adult son, *id.*; parents cannot recover for emotional distress arising from the defendant's disclosing he had sexually abused their daughter throughout her childhood, *M.M.*, 556 So. 2d at 1140–41; and a wife cannot recover for emotional distress directed at her husband, *Habelow v. Travelers Ins. Co.*, 389 So. 2d 218, 220 (Fla. 5th DCA 1980).

T.V. brings the claim as a survival claim not for her own emotional distress but for A.V.'s emotional distress before he died. *See* D9 ¶¶118–32; *see also* footnote 13, *supra* (explaining Florida's survival law). T.V. sufficiently alleges that Grindr directed actions toward A.V. as a minor. Those allegations include that Grindr's "Twink" "Tribe" made minors feel welcome to use Grindr Services, D9 ¶32, and that the presence of minors on Grindr Services created a "niche market" increasing Grindr's market share and making it more profitable, *id.* ¶36.

Grindr cites *Dunkel v. Hamilton*, No. 3:15-cv-949-J-34PDB, 2016 WL 4844662, at *9 (M.D. Fla. Aug. 8, 2016), and argues that the operative pleading "contains no nonconclusory allegations that Grindr directed any conduct at A.V." D22 at 31–32. *Dunkel* merely relies on Florida cases holding a claim for intentional infliction of emotional distress is generally available only to the person at whom the outrageous conduct is directed. *See Dunkel*, 2016 WL 4844662, at *9 (citing *Baker*, 573 So. 2d at 873; *M.M.*, 556 So. 2d at 1140–41; and *Habelow*, 389 So. 2d at 220). *Dunkel* is unhelpful to Grindr because T.V. alleges Grindr's conduct was directed at A.V.

The undersigned recommends rejecting Grindr's argument that T.V. fails to allege conduct directed at A.V.

6.      *Negligent Infliction of Emotional Distress (Count Seven)*

Florida recognizes the tort of negligent infliction of emotional distress. *See* Fla. Std. Jury Instr. (Civ.) No. 420.2; *see* footnote 20, *supra* (explaining that Florida's standard jury instructions are not legal adjudications of their correctness but are used in this report and recommendation as a "shortcut" for an explanation of the law). "[T]he prerequisites for recovery for negligent infliction of emotional distress differ depending on whether the plaintiff has or has not suffered a physical impact from an external force." *Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846, 850 (Fla. 2007) (quoted authority omitted). "If the plaintiff has suffered an impact, Florida courts permit recovery for emotional distress stemming from the incident during which the impact occurred, and not merely the impact itself."[28] *Id.*

For the claim for negligent infliction of emotional distress (count seven), T.V. incorporates the factual allegation that "A.V. accessed, downloaded, used, purchased, and/or subscribed to Grindr Services … resulting in A.V. being exposed to and engaged in sexual relationships and activities with adult users of Grindr Services." D9 ¶135 (incorporating *id.* ¶18). T.V. contends that Grindr "owed a duty of care to A.V. to abide by its own terms of use and to prevent A.V. and other [minors] from accessing, downloading, using, purchasing, and/or subscribing Grindr Services" and "breached this duty of care to A.V." *Id.* ¶¶137, 138. T.V. contends that Grindr "was negligent in the actions and omissions that ignored A.V. and other [minors] accessing, downloading, using, purchasing, and/or subscribing Grindr Services." *Id.* ¶139. T.V. contends that "A.V. experienced severe emotional distress as a direct result of

---

[28]If a "plaintiff has not suffered an impact, the complained-of mental distress must be manifested by physical injury, the plaintiff must be involved in the incident by seeing, hearing, or arriving on the scene as the traumatizing event occurs, and the plaintiff must suffer the complained-of mental distress and accompanying physical impairment within a short time of the incident." *Willis*, 967 So. 2d at 850 (internal quotation marks and quoted authority omitted). As Grindr observes, D22 at 33 n.6, T.V. does not attempt to make this type of claim, *see* D9.

[Grindr]'s breached duties, actions, and omissions" and Grindr's "actions and omissions that allowed A.V. to access, download, use, purchase, and/or subscribe to Grindr Services before reaching the age of eighteen … were extreme and outrageous, and beyond all possible bounds of decency, and utterly intolerable in a civilized community." *Id.* ¶¶140–41. And T.V. contends that Grindr "was in the exclusive position to stop the harm A.V. experienced but refused to do so." *Id.* ¶143.

Grindr argues that the claim fails because, under the facts alleged, A.V. suffered no physical impact. D22 at 32; D42 at 24. T.V. disagrees, emphasizing pleading allegations that A.V. had contact with men due to using Grindr Services and contending that "[t]he sheer act of sexual relationships involves physical touch and physical impact." D41 at 2 (citing D9 ¶¶18, 22).

"[F]or a plaintiff to have endured an [actionable] impact or contact," the plaintiff need only "meet rather slight requirements." *Willis*, 967 So. 2d at 890 (internal quotation marks and quoted authority omitted). "The essence of impact … is that the outside force or substance, no matter how large or small, visible or invisible, and no matter that the effects are not immediately deleterious, touch or enter into the plaintiff's body." *Id.* (quoted authority omitted); *see also City of Boynton Beach v. Weiss*, 120 So. 3d 606, 612 (Fla. 4th DCA 2013) (holding that recovery for negligent infliction of emotional distress is permitted when "the jury found that the plaintiff had been battered"). The outside force need not be applied by the defendant; for example, in an action against a hotel owner, the Florida Supreme Court held that a hotel guest who was robbed by an unknown assailant across the street from the hotel satisfied the physical impact requirement. *See Willis*, 967 So. 2d at 848–51.

T.V. alleges sufficient facts that A.V. suffered a physical impact. By alleging that A.V.'s use of Grindr Services resulted in A.V.'s exposure to, and engagement in, sexual relationships and activities with adults, D9 ¶135 (incorporating *id.* ¶18), T.V. alleges an "outside force" touched A.V.'s body. *See Willis*, 967 So. 2d at 850 (quoted).

Grindr argues that the claim "is based on Grindr having allegedly 'allowed A.V. to access, download, use, purchase, and/or subscribe to Grindr Services.'" D22 at 32 (quoting D9 ¶141). Grindr continues, "But [T.V.] does not allege A.V.'s use of Grindr had a physical impact on him, much less that his emotional distress resulted from injuries sustained in that impact." *Id*. at 32–33 (internal footnote omitted). Grindr's argument fails because the argument disregards Florida law permitting the claim against a defendant when another actor applied the outside force and disregards T.V.'s factual allegations of sexual relationships and activities between A.V. and adult users of Grindr. *See Willis*, 967 So. 2d at 848–51.

The undersigned recommends rejecting Grindr's argument that T.V. fails to allege that A.V. suffered a physical impact.

7.    *Negligent Misrepresentation (Count Eight)*

(a)    <u>General</u>

For the claim of negligent misrepresentation, the Florida Supreme Court has adopted § 552 of the Restatement (Second) of Torts. *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 339 (Fla. 1997). The claim has four elements: (1) "misrepresentation of a material fact";[29] (2) the defendant knew the representation was false, had no knowledge of its truth or falsity, or should have known it was false; (3)

---

[29]"A fact is material if, but for the alleged … misrepresentation, the complaining party would not have entered into the transaction." *Atl. Nat'l Bank of Fla. v. Vest*, 480 So. 2d 1328, 1332 (Fla. 2d DCA 1985). A misrepresentation claim "is not actionable if premised on mere opinion, rather than a material fact." *MDVIP, Inc. v. Beber*, 222 So. 3d 555, 561 (Fla. 4th DCA 2017) (internal quotation marks and quoted authority omitted). "But this rule has significant qualifications[.]" *Vokes v. Arthur Murray, Inc.*, 212 So. 2d 906, 908 (Fla. 2d DCA 1968). The rule "does not apply where there is a fiduciary relationship between the parties, or where there has been some artifice or trick employed by the representor, or where the parties do not in general deal at 'arm's length[,]' … or where the representee does not have equal opportunity to become apprised of the truth or falsity of the fact represented." *Id*. at 908–09. Grindr does not argue that T.V. fails to allege sufficient facts for materiality. *See* D22 at 33–34; D42 at 24–25.

in making the statement, the defendant intended to induce the plaintiff's reliance; (4) injury resulted when the plaintiff "act[ed] in justifiable reliance on the misrepresentation." *Wallerstein v. Hosp. Corp. of Am.*, 573 So. 2d 9, 10 (Fla. 4th DCA 1990) (quoted authority omitted); *see also Dziegielewski v. Scalero*, 352 So. 3d 931, 934 (Fla. 5th DCA 2022) (listing the same elements). The "heightened pleading standard applies to negligent misrepresentation claims asserted under Florida law because such claims sound in fraud." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1127 (11th Cir. 2019) (internal quotation marks and quoted authority omitted); *see* Fed. R. Civ. P. 9(b) ("In alleging fraud …, a party must state with particularity the circumstances constituting fraud[.]").

For her negligent misrepresentation claim (count eight), T.V. alleges that Grindr represents in its Privacy and Cookie Policy that Grindr "provides a safe space where users can discover, navigate, and interact with others in the Grindr Community." D9 ¶42(a). T.V. alleges that Grindr's "Terms and Conditions of Service Agreement reserves for [Grindr] the right to remove content." *Id.* ¶42(b). T.V. contends that Grindr "was aware that the statements … were to be used for a particular purpose—to create a purported agreement with the users and assure the users that [Grindr] applied community standards to make Grindr Services safe." *Id.* ¶151. T.V. contends that A.V. relied on Grindr's assurances that Grindr Services were safe and Grindr would enforce its policies. *Id.* ¶152. T.V. contends that Grindr negligently or without diligence "exaggerated or misstated facts relating to the oversight of its products and safety of its users" insofar as Grindr does not enforce safety measures to prevent A.V. and other minors from "accessing, downloading, using, purchasing, and/or subscribing Grindr Services." *Id.* ¶¶153, 154. T.V. contends that Grindr "was bound to A.V. by a relation or duty of care beyond a purported contract between the parties"; "was in a special position of confidence and trust in relation to A.V."; and was in the unique and exclusive position to stop the injuries and damages to A.V. but failed to do so." *Id.* ¶¶155–57. And T.V. contends that "A.V. relied on [Grindr]'s misstatements,"

and had he "known that Grindr Services were not safe, and [Grindr] did not enforce its policies, A.V. never would have accessed, downloaded, used, purchased, and/or subscribed to Grindr Services." *Id.* ¶158.

Grindr argues that T.V. fails to state a claim for negligent misrepresentation because, under the facts alleged, Grindr's statement or statements are nothing more than non-actionable "puffery," A.V.'s reliance on the statement or statements was not justifiable, and the amended complaint fails to satisfy the heightened pleading standard by failing to identify the section in the terms where the alleged statement or statements were found or when A.V. saw them. D22 at 33–34 & 34 n.7; D42 at 24–25. T.V. disagrees, emphasizing pleading allegations about Grindr's representations of safety and arguing, "Reliance on those statements was reasonable considering the circumstances." D32 at 16–17 (citing D9 ¶¶42, 151, 153).

(b)   Puffery

A claim for negligent misrepresentation cannot survive if based on an alleged misrepresentation of fact that is "more in the nature of 'puffing,' is patently incredible, or is obviously false[.]" *Upledger v. Vilanor, Inc.*, 369 So. 2d 427, 430 (Fla. 2d DCA 1979); *cf. Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1319 (11th Cir. 2019) ("There are some kinds of talk which no sensible man takes seriously, and if he does he suffers from his credulity. Think, for example, Disneyland's claim to be 'The Happiest Place on Earth.' Or Avis's boast, 'We Just Try Harder.' Or Dunkin Donuts's assertion that 'America runs on Dunkin.' Or (for our teenage readers) Sony's statement that its PlayStation 3 'Only Does Everything.' These boasts and others like them are widely regarded as 'puff'—big claims with little substance." (internal quotation marks, citation, and alteration omitted)).

Determining whether an alleged misrepresentation is non-actionable puffery requires consideration of the "peculiar circumstances" involved. *Upledger*, 369 So. 2d

at 430; *see, e.g., Hernandez v. Radio Sys. Corp.*, No. EDCV22-1861, 2023 WL 2629020, at *5 (C.D. Cal. Mar. 9, 2023) (holding that the word "safe" was not puffery and explaining that "context is critical when evaluating whether a specific representation is puffery"); *TocMail Inc. v. Microsoft Corp.*, No. 20-60416-CIV, 2020 WL 9210739, at *4 (S.D. Fla. Nov. 6, 2020) (holding that the word "safe" was puffery and explaining that "whether the use of the word 'safe' is mere puffery is contingent on the context in which it is used"); *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, No. CIV 08-1101, 2011 WL 1336473, at *7 (D.N.M. Mar. 31, 2011) (observing that context matters "[i]n analyzing a statement to determine if it is puffery or an assertion of fact," including the relative expertise of the speaker and listener and the size of the audience (quoted authority omitted)).

"'[S]tate and federal courts are united in the principle that the determination as to whether a statement is … puffery is a question of fact to be resolved by the finder of fact except in the unusual case where the answer is so clear that it may be decided as a matter of law.'" *Williams v. Amazon, Inc.*, 573 F. Supp. 3d 971, 975 (E.D. Pa. 2021) (quoting *Commonwealth ex rel. Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 626 (2018)); *see also Bietsch v. Sergeant's Pet Care Prods., Inc.*, No. 15 C 5432, 2016 WL 1011512, at *3 (N.D. Ill. Mar. 15, 2016) ("Whether a statement is puffery or actionable is generally a factual question.").

For example, in an action against a company selling memberships in a personalized healthcare program, some statements constituted non-actionable puffery as a matter of law (the member "would be seen by the finest national specialists with advanced treatment"; the program is "associated with the best hospitals and doctors nationwide"; the program was "a network fraternity of some of the nation's finest physicians"; and an "exceptional doctor" is one with "excellent credentials, bedside manner, reputation, and diagnostic skills"), while other statements were actionable (a particular doctor "would actively coordinate" the plaintiff's care; the program selected

doctors based on their medical expertise and relationships with patients; the program has a relationship with certain facilities; and data showed members had sixty-five percent fewer hospitalizations than patients in traditional practices). *MDVIP, Inc. v. Beber*, 222 So. 3d 555, 561–62 (Fla. 4th DCA 2017) (internal quotation marks and alterations omitted); *see also Williams*, 573 F. Supp. 3d at 973, 975 (declining to rule as a matter of law that statements describing a tattoo kit as "safe," "safe for its intended use," and "free from defects" are puffery); *Johnson v. Glock, Inc.*, No. 3:20-cv-08807, 2021 WL 6804234, at *9 (N.D. Cal. Sept. 22, 2021) (declining to rule as a matter of law that statements describing guns as "Safe Action®" and "Safe. Simple. Fast. = Confidence," and a representation that the gun company "delivers on [its] promise of safety, reliability, and simplicity" are puffery).

Contrary to Grindr's argument, Grindr's alleged statement in its Privacy and Cookie Policy (Grindr "provides a safe space where users can discover, navigate, and interact with others in the Grindr Community," D9 ¶42(a)), especially considered with the Terms and Conditions of Service Agreement (reserving for Grindr "the right to remove content," *id*. ¶42(b)), is not puffery as a matter of law. The statement, read in context, is not so clearly hyperbolic as to take the issue from the factfinder.

Grindr relies on *Gibson v. NCL (Bahamas) Ltd.*, No. 11-24343-CIV, 2012 WL 1952667, at *6 (S.D. Fla. May 30, 2012), and *Sanlu Zhang v. Royal Caribbean Cruises, Ltd.*, No. 19-20773-Civ, 2019 WL 8895223, at *6 (S.D. Fla. Nov. 15, 2019). D22 at 33. The cases offer little persuasive value in deciding the motion to dismiss because they involve different circumstances (statements by cruise companies about shore excursions), and whether a statement is puffery depends on the "particular circumstances," *see Upledger*, 369 So. 2d at 430 (quoted), including the relative experience of the speaker and the listener, *Guidance Endodontics*, 2011 WL 1336473, at *7.

The undersigned recommends rejecting Grindr's argument that the "safe space" statement constitutes non-actionable "puffery" as a matter of law.

(c)    Justifiable Reliance

Justifiable reliance required for a negligent misrepresentation claim "is not the same thing as failure to exercise due diligence." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). An information recipient need not "investigate every piece of information furnished"; instead, the recipient must investigate "information that a reasonable person in the position of the recipient would be expected to investigate" and "cannot hide behind the unintentional negligence of the misrepresenter when the recipient is likewise negligent in failing to discover the error." *Id.* (internal quotation marks and quoted authority omitted).

Grindr argues that "A.V.'s reliance was not justifiable because Grindr's Terms [and Conditions of Service Agreement] explicitly state[s] [Grindr] does not screen users or verify the information they provide."[30] D22 at 34 (citing D9 ¶27).

"[P]rinciples of comparative negligence … apply to negligent misrepresentation claims." *Butler*, 44 So. 3d at 105. Thus, "the question of a party's justifiable reliance is an issue of comparative negligence that should be resolved by a jury." *Newbern v. Mansbach*, 777 So. 2d 1044, 1046 (Fla. 1st DCA 2001); *see also Lorber v. Passick as Tr. of Sylvia Passick Revocable Tr.*, 327 So. 3d 297, 307 (Fla. 4th DCA 2021) ("[T]he failure to exercise diligent attention did not preclude recovery and instead presented a situation in which comparative negligence applied."). A negligent misrepresentation claim does

---

[30]In the reply, Grindr argues for the first time that T.V. fails to allege sufficient facts for reliance, as opposed to *justifiable* reliance. *Compare* D22 at 34 (arguing that A.V.'s "reliance was not justifiable"), *with* D42 at 25 ("Plaintiff does not identify any allegations showing A.V. read or relied on Grindr's supposed representations, nor explain how such reliance could be justified."). The undersigned does not address the arguably stronger argument about the sufficiency of the allegations for reliance. *See* footnote 7, *supra* (explaining why the undersigned does not address arguments made for the first time in the reply).

not fail as a matter of law merely because the recipient of the false information undertook an investigation, *Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 311 (Fla. 1st DCA 2011), or could have discovered the information, *Newbern*, 777 So. 2d at 1046.

Grindr's argument fails because the question of A.V.'s justifiable reliance "is an issue of comparative negligence that should be resolved by a jury," not an issue that should be decided on a motion to dismiss. *See id.* (quoted). Even assuming a reasonable person in A.V.'s position could learn from the absence of screening that Grindr is an unsafe space despite Grindr's statement that it is a safe space, Grindr's argument is unpersuasive because a negligent misrepresentation claim does not fail merely because the recipient could have discovered the information. *See id.*

Grindr relies on *Trinidad & Tobago Unit Tr. Corp. v. CB Richard Ellis, Inc.*, 280 F.R.D. 676, 679 (S.D. Fla. 2012). D22 at 34. *Trinidad* does not help Grindr. In *Trinidad*, unlike in this action, the information on which the plaintiff relied (information in a property appraisal) was accompanied by a disclaimer explaining the information was not verified and the defendants "make no guarantee, warranty, or representation about" the information. *Trinidad*, 280 F.R.D. at 677, 679. And in *Trinidad*, unlike in this action, the ruling on justifiable reliance depended on the sophistication of the plaintiff (a financial institution), a characteristic that cannot be attributed to A.V. or other minors. *Id.* at 679.

The undersigned recommends rejecting Grindr's argument that dismissal of the negligent misrepresentation claim is warranted because of an alleged absence of facts concerning justifiable reliance.

(d)      Heightened Pleading Standard

The heightened pleading standard is satisfied if a pleading states "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Young v. Grand Canyon Univ., Inc.*, 57 F.4th 861, 875–76 (11th Cir. 2023) (quoted authority omitted).

The particularity requirement "serves two purposes: alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *Gose v. Native Am. Servs. Corp.*, No. 23-10600, 2024 WL 3533041, at *14 (11th Cir. July 25, 2024) (to be published) (internal quotation marks and quoted authority omitted). "[A] court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of [the heightened pleading standard] with the broader policy of notice pleading." *Id.* (quoted authority omitted). "[A] court should hesitate to dismiss a complaint under [the heightened pleading rule] if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which [the defendant] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* (internal quotation marks and quoted authority omitted).

Grindr relegates to a footnote its argument that the amended complaint fails to satisfy the heightened pleading standard, arguing only that the amended complaint "does not indicate what section of the Terms contained the representations on which A.V. allegedly relied, nor when he saw them." D22 at 34 n.7.

Grindr's limited argument is unpersuasive. The standard requires neither a citation to the section of Grindr's own documents nor an exact date of reliance. *See Wilding,* 941 F.3d at 1128. Through her allegations that Grindr represents in its Privacy and Cookie Policy that Grindr "provides a safe space where users can discover, navigate, and interact with others in the Grindr Community," D9 ¶42(a), and in its Terms and Conditions of Service Agreement that Grindr reserves "the right to remove content," *id*. ¶42(b), and through a reasonable inference that the policy and agreement were in effect when A.V. created his Grindr account (a date presumably within Grindr's knowledge), T.V. provides Grindr sufficient notice of the "what" and "when" of the alleged negligent misrepresentation. That T.V. had substantial prediscovery evidence may be assumed based on the relationship between T.V. and A.V. (parent and child) and the tragedy that occurred (the untimely death of a child).

The undersigned recommends rejecting Grindr's limited argument concerning the heightened pleading standard.

**B.   *Whether the § 230(c)(1) Defense Clearly Appears on the Face of the Operative Pleading***

*1.   General*

Under § 230(c)(1), "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

For dismissal of the claims based on Florida common law torts (counts two through eight), Grindr relies on § 230(c)(1), arguing that, to find Grindr liable for those claims, Grindr must be treated as the publisher or speaker of information provided by

another information content provider.[31] D22 at 13–25. T.V. argues that the provision does not benefit Grindr under the facts alleged. D32 at 3–7.

The undersigned asked T.V. to state whether binding precedent exists on the scope of § 230(c)(1). D39 at 2. T.V. responded, "This appears to be an issue of first impression in the Eleventh Circuit[.]" D41 at 3. Grindr does not dispute that response. *See* D42.

If "statutory language is plain," a court "must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). Unless Congress has defined a term, a court will interpret the term "as taking [its] ordinary … meaning … at the time Congress enacted the statute[.]" *Perrin v. U.S.*, 444 U.S. 37, 42 (1979). When the term is a "term of art" with "established meaning" in the law, understanding the "backdrop against which Congress enacted [the statute]" is crucial. *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 487 (2005). Moreover, a statute must be read as a whole because "the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). A court must "consider not only the bare meaning of [each] word" but also the word's "placement and purpose in the statutory scheme." *Bailey v. U.S.*, 516 U.S. 137, 145 (1995); *see also Tyler v. Cain*, 533 U.S. 656, 662 (2001) (observing that the meaning of a statutory term is not construed "in a vacuum").

With these principles of statutory construction in mind, the undersigned turns to the text of § 230, the statutory scheme in which § 230 is included, the backdrop against which Congress passed § 230, how courts have interpreted § 230(c)(1), and an

---

[31]Grindr refers to the § 230(c)(1) defense as "immunity." *See* D22 at 20–34. T.V. does the same. *See* D32 at 2–8, 10, 11, 18. As the Seventh Circuit persuasively explains, the provision does not create "immunity"; rather, it "limits who may be called the publisher of information that appears online[.]" *See G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 566 (7th Cir. 2023) (quoted authority omitted).

analysis of Grindr's argument that § 230(c)(1) precludes all of T.V.'s claims based on Florida common law torts.

2.      *Text of § 230*

Section 230 begins with five congressional findings:

**(a) Findings**

The Congress finds the following:

**(1)** The rapidly developing array of <u>Internet</u> and other <u>interactive computer services</u> available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

**(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

**(3)** The <u>Internet</u> and other <u>interactive computer services</u> offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

**(4)** The <u>Internet</u> and other <u>interactive computer services</u> have flourished, to the benefit of all Americans, with a minimum of government regulation.

**(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

47 U.S.C. § 230(a) (underlying defined terms).

Section 230 continues with five statements of congressional policy:

**(b) Policy**

It is the policy of the United States—

**(1)** to promote the continued development of the <u>Internet</u> and other <u>interactive computer services</u> and other interactive media;

89

**(2)** to preserve the vibrant and competitive free market that presently exists for the <u>Internet</u> and other <u>interactive computer services</u>, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the <u>Internet</u> and other <u>interactive computer services</u>;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

*Id.* § 230(b) (underlining defined terms).

Section 230 continues with the provision on which Grindr relies:

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**
No provider or user of an <u>interactive computer service</u> shall be treated as the publisher or speaker of any information provided by another <u>information content provider</u>.

**(2) Civil liability**

No provider or user of an <u>interactive computer service</u> shall be held liable on account of—

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to <u>information content providers</u> or others the technical means to restrict access to material described in paragraph (1).

*Id.* § 230(c) (underlining defined terms).

Section 230 continues with a provision imposing obligations on interactive computer services:

**(d) Obligations of <u>interactive computer service</u>**
A provider of <u>interactive computer service</u> shall, at the time of entering an agreement with a customer for the provision of <u>interactive computer service</u> and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

*Id.* § 230(d) (underlining defined term).

Section 230 continues with statements of the law's effect on other laws:

**(e) Effect on other laws**

**(1) No effect on criminal law**
Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

**(2) No effect on intellectual property law**
Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

**(3) State law**
Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

**(4) No effect on communications privacy law**
Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

> Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—
>
> **(A)** any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title;
>
> **(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18; or
>
> **(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

*Id.* § 230(e).[32]

Section 230 ends with four definitions:

**(1) <u>Internet</u>**

The term "<u>Internet</u>" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

**(2) <u>Interactive computer service</u>**

The term "<u>interactive computer services</u>" means any information service, system, or <u>access software provider</u> that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the <u>Internet</u> and such systems operated or services offered by libraries or educational institutions.

---

[32]In 2000, Congress passed the Trafficking Victims Protection Act of 2000 to recognize child sex trafficking as a crime. Pub. L. No. 106-386, 114 Stat. 1464. In 2003, Congress passed the TVPRA to allow victims of sex trafficking to bring civil actions against traffickers and other co-defendants. Pub. L. No. 108-193, 117 Stat. 2875; *see* section IV.A.1, *supra* (analyzing T.V.'s wrongful death claim based on the TVPRA). In 2018, Congress passed the Allow States and Victims to Fight Online Sex Trafficking Act of 2017 to clarify that § 230 must not be construed to limit those laws. Pub. L. No. 115-164, 132 Stat. 1253; *see* 47 U.S.C. § 230(e)(5)(A).

**(3) <u>Information content provider</u>**
The term "<u>information content provider</u>" means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the <u>Internet</u> or any other interactive computer service.

**(4) <u>Access software provider</u>**

The term "<u>access software provider</u>" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

**(A)** filter, screen, allow, or disallow content;

**(B)** pick, choose, analyze, or digest content; or

**(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content."

*Id.* § 230(f) (underlining defined terms).

3.    *Statutory Scheme*

The United States Supreme Court has characterized the overarching legislation containing § 230—the Telecommunications Act of 1996—as "an unusually important legislative enactment." *Reno v. ACLU*, 521 U.S. 844, 857 (1997). The statute's "major components … have nothing to do with the Internet; they were designed to promote competition in the local telephone service market, the multichannel video market, and the market for over-the-air broadcasting." *Id.* at 857–58. Indeed, when President Bill Clinton signed the Act in February 1996, today's online world was nonexistent: people were still paying an hourly fee to use America Online, Mark Zuckerberg was a preteen, and years would pass before the release of the first iPhone and the launch of things like Facebook, Instagram, YouTube, Twitter (X), WhatsApp, TikTok, and the defendant in this action, Grindr.

Six of the seven titles in the Telecommunications Act of 1996 "are the product of extensive committee hearings and the subject of discussion in Reports prepared by

Committees of the Senate and the House of Representatives." *Id.* at 858. "By contrast," Title V "contains provisions that were either added in executive committee after the hearings were concluded or as amendments offered during floor debate on the legislation." *Id.*

Title V is titled "Obscenity and Violence," but Congress said it "may be cited as the 'Communications Decency Act of 1996.'" Pub. L. No. 104–104, 110 Stat. 56, § 501. The Communications Decency Act includes sections on "[o]bscene or harassing use of telecommunications facilities under the Communications Act of 1934," "[o]bscene programming on cable television," "[s]crambling of sexually explicit adult video service programming," "[c]larification of current laws regarding communication of obscene materials through the use of computers," "[c]oercion and enticement of minors," and "[p]rotection for private blocking and screening of offensive material." *Id.* at §§ 230, 502, 503, 505, 507, 508, 641.

The Communications Decency Act section at issue in this action—section 509—is titled "Online Family Empowerment." Pub. L. No. 104–104, 110 Stat. 56, § 509. Section 509 added a new section at the end of Title II of the Communications Act of 1934; specifically, at § 230. *Id.*

4. *Backdrop of § 230*

As Congress was drafting the Communications Decency Act, the state court in *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), addressed whether Prodigy—the company behind a virtual bulletin board—could be held liable for libel as a publisher based on statements posted by an unidentified user.

In *Stratton Oakmont*, an unidentified user of Prodigy's "Money Talk" virtual bulletin board posted statements that an investment banking firm and its president had

committed criminal and fraudulent acts related to a public stock offering. 1995 WL 323710, at *1. The firm and the president sued Prodigy for libel. *Id.* The court explained the "critical issue" was whether Prodigy was a publisher or akin to a publisher ("one who repeats or otherwise republishes a libel") subject to liability for libel or whether Prodigy was a distributor (like a library or bookstore) and thus not subject to liability for libel unless Prodigy knew or had reason to know about the libel. *Id.* at *3. The court observed that a newspaper is a publisher because a newspaper exercises editorial control through the selection of content, making it "more than a passive receptacle or conduit for news, comment and advertising." *Id.* Likening Prodigy to a newspaper, the Court held Prodigy is a publisher, not a distributor, because Prodigy exercised editorial control by holding itself out "as controlling the content" of the virtual bulletin boards and implementing control through an "automatic software screening program," content guidelines enforced by board leaders, and tools allowing the deletion of statements considered offensive. *Id.* at *4. The court emphasized that virtual bulletin boards "should generally be regarded in the same context as bookstores, libraries and network affiliates," but Prodigy's bulletin boards should not because its "own policies, technology and staffing decisions" to gain editorial control opened it up to liability. *Id.* at *5. The court observed "that the issues … may ultimately be preempted by federal law if the Communications Decency Act of 1995, several versions of which are pending in Congress, is enacted." *Id.*

The court in *Stratton Oakmont* distinguished *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135 (S.D.N.Y. 1991). *Id.* at *4–5. In *Cubby*, the court entered summary judgment for CompuServe on libel and other claims based on user postings, holding that CompuServe was "the functional equivalent of a more traditional news vendor, and the inconsistent application of a lower standard of liability to an electronic news distributor such as CompuServe than that which is applied to a public library, book store, or newsstand would impose an undue burden on the free flow of information." *Id.* at *4. The court in *Stratton Oakmont* emphasized two differences between Prodigy

and CompuServe: first, Prodigy "held itself out to the public and its members as controlling the content of its computer bulletin boards"; and second, Prodigy "implemented control through its automatic software screening program" and other means. *Id*. "By actively utilizing technology and manpower to delete notes from its computer bulletin boards on the basis of offensiveness and 'bad taste,'" the court explained, Prodigy "is clearly making decisions as to content …, and such decisions constitute editorial control." *Id*.

*Stratton Oakmont* is the "backdrop" against Congress's adoption of the ultimate version of § 230, *see Stewart*, 543 U.S. at 487 (quoted). As one judge explained:

> What is now … § 230 was added as an amendment to the Telecommunications Act of 1996, a statute designed to deregulate and encourage innovation in the telecommunications industry. Congress devoted much committee attention to traditional telephone and broadcast media; by contrast, the Internet was an afterthought, addressed only through floor amendments or in conference. Of the myriad issues the emerging Internet implicated, Congress tackled only one: the ease with which the Internet delivers indecent or offensive material, especially to minors. And § 230 provided one of two alternative ways of handling this problem.
>
> The action began in the Senate. Senator James J. Exon introduced the [Communications Decency Act] on February 1, 1995. He presented a revised bill on June 9, 1995, "[t]he heart and the soul" of which was "its protection for families and children." The Exon Amendment sought to reduce the proliferation of pornography and other obscene material online by subjecting to civil and criminal penalties those who use interactive computer services to make, solicit, or transmit offensive material.
>
> The House of Representatives had the same goal—to protect children from inappropriate online material—but a very different sense of how to achieve it. Congressmen Christopher Cox … and Ron Wyden … introduced an amendment to the Telecommunications Act, entitled "Online Family Empowerment," about two months after the revised [Communications Decency Act] appeared in the Senate. Making the argument for their amendment during the House floor debate, Congressman Cox stated:
>
>> We want to make sure that everyone in America has an open invitation and feels welcome to participate in the Internet. But as you know, there is some reason for people to be wary because,

as a Time Magazine cover story recently highlighted, there is in this vast world of computer information, a literal computer library, some offensive material, some things in the bookstore, if you will, that our children ought not to see.

As the parent of two, I want to make sure that my children have access to this future and that I do not have to worry about what they might be running into on line. I would like to keep that out of my house and off my computer.

Likewise, Congressman Wyden said: "We are all against smut and pornography, and, as the parents of two small computer-literate children, my wife and I have seen our kids find their way into these chat rooms that make their middle-aged parents cringe."

As both sponsors noted, the debate between the House and the Senate was not over the [Communications Decency Act]'s primary purpose but rather over the best means to that shared end. ([S]tatement of Rep. Cox[:] "How should we do this? ... Mr. Chairman, what we want are results. We want to make sure we do something that actually works."); ([S]tatement of Rep. Wyden[:] "So let us all stipulate right at the outset the importance of protecting our kids and going to the issue of the best way to do it."). While the Exon Amendment would have the FCC regulate online obscene materials, the sponsors of the House proposal "believe[d] that parents and families are better suited to guard the portals of cyberspace and protect our children than our Government bureaucrats." They also feared the effects the Senate's approach might have on the Internet itself. ([S]tatement of Rep. Cox[:] "[The amendment] will establish as the policy of the United States that we do not wish to have content regulation by the Federal Government of what is on the Internet, that we do not wish to have a Federal Computer Commission with an army of bureaucrats regulating the Internet ...."). The Cox-Wyden Amendment therefore sought to empower interactive computer service providers to self-regulate, and to provide tools for parents to regulate, children's access to inappropriate material.

There was only one problem with this approach, as the House sponsors saw it. A New York State trial court had recently ruled that the online service Prodigy, by deciding to remove certain indecent material from its site, had become a "publisher" and thus was liable for defamation when it failed to remove other objectionable content. The authors of § 230 saw the *Stratton-Oakmont* decision as indicative of a "legal system [that] provides a massive disincentive for the people who might best help us control the Internet to do so." Cox-Wyden was designed, in large part, to remove that disincentive.

The House having passed the Cox-Wyden Amendment and the Senate the Exon Amendment, the conference committee had before it two alternative visions for countering the spread of indecent online material to minors. The

committee chose not to choose. Congress instead adopted both amendments as part of a final Communications Decency Act. The Supreme Court promptly struck down two major provisions of the Exon Amendment as unconstitutionally overbroad under the First Amendment, leaving the new § 230 as the dominant force for securing decency on the Internet.[33]

Section 230 overruled *Stratton-Oakmont* through two interlocking provisions, both of which survived the legislative process unscathed. The first … states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." The second provision eliminates liability for interactive computer service providers and users for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be … objectionable," or "any action taken to enable or make available to … others the technical means to restrict access to [objectionable] material." These two subsections tackle, in overlapping fashion, the two jurisprudential moves of the *Stratton-Oakmont* court: first, that Prodigy's decision to screen posts for offensiveness rendered it "a publisher rather than a distributor," 1995 WL 323710, at *4; and second, that by making good-faith efforts to remove offensive material Prodigy became liable for any actionable material it did not remove.

The legislative history illustrates that in passing § 230 Congress was focused squarely on protecting minors from offensive online material, and that it sought to do so by "empowering parents to determine the content of communications their children receive through interactive computer services." The "policy" section of § 230's text reflects this goal. It is not surprising, then, that Congress emphasized the narrow civil liability shield that became § 230(c)(2), rather than the broad rule of construction laid out in § 230(c)(1). Indeed, the conference committee summarized § 230 by stating that it "provides 'Good Samaritan' protections from civil liability for providers or users of an interactive computer service for actions to restrict or to enable restriction of access to objectionable online material"—a description that could just as easily have applied to § 230(c)(2) alone. Congress also titled the entirety of § 230(c) "Protection for 'Good Samaritan' blocking and screening of offensive material," suggesting that the definitional rule outlined in § 230(c)(1) may have been envisioned as supporting or working in tandem with the civil liability shield in § 230(c)(2).

---

[33]Shortly after the enactment of the Telecommunications Act of 1996 and within it the Communications Decency Act, the United States Supreme Court struck down as facially overbroad under the First Amendment two Communications Decency Act prohibitions: prohibiting the knowing transmission of obscene or indecent messages to a minor and prohibiting the knowing sending or displaying of patently offensive messages in a manner that is available to a minor. *Reno*, 521 U.S. at 859–60, 874.

*Force v. Facebook, Inc.*, 934 F.3d 53, 77–81 (2d Cir. 2019) (Katzmann, C.J., concurring in part and dissenting in part) (internal authority and footnotes omitted; some alterations in original).

5.      *Interpretation of § 230(c)(1)*

The Fourth Circuit in *Zeran v. American Online*, 129 F.3d 327 (4th Cir. 1997), was the first federal appellate court to interpret § 230(c)(1). The plaintiff sued AOL after someone posted messages on an AOL message board offering shirts displaying offensive language about the Oklahoma City bombing and instructing interested buyers to call the plaintiff's home phone number. 129 F.3d at 329. The plaintiff received multiple calls at day at his home, received death threats, and feared for his safety. *Id.* The plaintiff sued AOL for negligence, contending "AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter." *Id.* at 328.

In affirming the district court's judgment on the pleadings for AOL, the Fourth Circuit held that § 230(c)(1) "plainly immunizes computer service providers like AOL from liability for information that originates with third parties." *Id.* "By its plain language," the court ruled, the provision "creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Id.* at 330. The court explained that the provision "precludes courts from entertaining claims that would place a computer service provider in a publisher's role." *Id.* "Thus," the court concluded, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Id.*

The Fourth Circuit observed that congressional purposes underlying § 230 supported immunity. *Id.* at 330–31. According to the court, "Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium." *Id.* at 330. The court continued, "Interactive computer services have millions of users. … It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect." *Id.* at 331. Moreover, the court emphasized, Congress enacted § 230 "to encourage service providers to self-regulate the dissemination of offensive material over their services." *Id.* The court found that, to uphold those purposes, "§ 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions." *Id.*

According to the Fourth Circuit, while the plaintiff attempted to "artfully plead his claims as ones of negligence," his claims were "indistinguishable from a garden variety defamation action." *Id.* at 332. The court rejected the plaintiff's argument that AOL could be subject to distributor liability, concluding that distributor liability is "merely a subset … of publisher liability, and is therefore also foreclosed by § 230." *Id.* The court explained that publication is not only "the choice by an author to include certain information" but also "the negligent communication of a defamatory statement and the failure to remove such a statement when first communicated by another party[.]" *Id.* The court concluded that "AOL falls squarely within [the] traditional definition of a publisher and, therefore, is clearly protected by § 230's immunity." *Id.*

After the Fourth Circuit's decision in *Zeran*, other circuits relied on the decision, seized on the Fourth Circuit's characterization of the pleading as "artful," relied on broad language in the decision, or cited the decision (as well as other cases citing the

decision) in holding that § 230(c)(1), construed broadly in favor of internet freedom and self-policing, "immunized" interactive computer service providers from liability in a variety of contexts.[34]

In recent years, however, disagreement with how courts have interpreted § 230(c)(1) has grown. *See, e.g.*, *Doe v. Facebook, Inc.*, 142 S. Ct. 1087 (2022) (statement by Thomas, J.); *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13 (2020) (same); *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021) (majority and dissenting opinions); *Force*, 934 F.3d 53 (same); *see also* Adam Candeub, *Reading Section 230 as Written*, 1 J. Free Speech L. 139 (2021); Mary Graw Leary, *The Indecency and Injustice of Section 230 of the Communications Decency Act*, 41 Harv. J.L. & Pub. Pol'y 553

---

[34] *See, e.g.*, *Ben Ezra, Weinstein, & Co. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (affirming summary judgment for AOL on claims based on inaccurate stock information on AOL because AOL did not create the information); *Green v. Am. Online (AOL)*, 318 F.3d 465, 470–71 (3d Cir. 2003) (affirming the dismissal of claims against AOL based on wrongdoers' malware, impersonation, and defamation because holding AOL liable for failing to police wrongdoing would treat AOL as the "publisher" or "speaker" of the wrongdoers' content); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122–25 (9th Cir. 2003) (affirming summary judgment for a dating website and related parties on claims based on a false profile of the plaintiff because someone else provided the profile's content); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 415–16, 418–22 (1st Cir. 2007) (affirming the dismissal of claims against an internet message board operator based on false and defamatory postings because others had made the postings and no amount of "artful pleading" could avoid that fact); *Johnson v. Arden*, 614 F.3d 785, 790–92 (8th Cir. 2010) (affirming the dismissal of a defamation claim against an internet service provider because the provider did not "originate" the allegedly defamatory material, did not design "its website to be a portal for defamatory material," and did not "do anything to induce defamatory postings"); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1355, 1357–59 (D.C. Cir. 2014) (affirming the dismissal of negligence and assault claims against Mark Zuckerberg and Facebook based on a Facebook page calling for Muslims to rise up and kill Jewish people because the defendants merely provided a neutral means for others to post information of their own independent choosing); *Jones v. Dirty World Ent. Recordings LLC*, 755 F.3d 398, 408–16 (6th Cir. 2014) (ordering the entry of judgment as a matter of law for TheDirty.com and related defendants on defamation claims based on anonymous comments and one defendant's comments to the comments because the defendants did not materially contribute to the defamatory material); *Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015) (affirming the dismissal of a defamation claim against GoDaddy service because others drafted and distributed the allegedly defamatory material).

(2018); Danielle Keats Citron & Benjamin Wittes, *The Internet Will Not Break: Denying Bad Samaritans § 230 Immunity*, 86 Fordham L. Rev. 401 (2017).

Last term, the United States Supreme Court expressly declined to address § 230(c)(1)'s application because "much (if not all) of [the] plaintiffs' complaint seems to fail under" the "unchallenged holdings below" or under another case decided the same day, *Twitter, Inc., v. Taamneh*, 598 U.S. 471 (May 18, 2023) (holding that the plaintiffs failed to sufficiently allege the defendants consciously and culpably participated in terrorist attacks required for liability under federal terrorism law). *See Gonzalez v. Google LLC*, 598 U.S. 617, 622 (May 18, 2023).

Years ago, the Eleventh Circuit observed in dictum that "[t]he majority of federal circuits have interpreted the [Communications Decency Act] to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service,'" but declined to "reach any of [the appellant]'s challenges to the district court's application of [§ 230.]" *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321, 1324 (11th Cir. 2006) (quoting *Zeran*, 129 F.3d at 330).

More recently, in an unpublished opinion, the Eleventh Circuit relied on § 230(c)(1) in affirming the dismissal of a defamation complaint by pro se plaintiffs against Amazon.com based on a customer review claiming a scarf sold by the plaintiffs was not "authentic Burberry." *McCall v. Zotos*, No. 22-11725, 2023 WL 3946827, at *1 (11th Cir. June 12, 2023). The court reasoned, "The plaintiffs seek to hold Amazon liable for failing to take down [the customer]'s review, which is exactly the kind of claim that is immunized by [the provision]—one that treats Amazon as the publisher of that information." *Id.* at *3.

In another unpublished opinion, the Eleventh Circuit relied on § 230(c)(1) in affirming the dismissal of an artist's defamation claim against Google, explaining, "It

is uncontested that Google is an interactive computer service provider, and the article in question indicates that it was authored and posted by an 'information content provider': two anonymous bloggers." *Dowbenko v. Google*, 582 F. App'x 801, 805 (11th Cir. 2014). Relying on a quotation from a non-binding case, the court, without elaboration, added, "Nor does the allegation that Google manipulated its search results to prominently feature the article at issue change this result." *Id.* (citing *Zeran*, 129 F.3d at 330, for its statement that "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred.").

At least two cases raising issues regarding § 230 are pending before the Eleventh Circuit, both from this Court. *See Mother Doe on Behalf of Doe v. Grindr, LLC*, No. 5:23-CV-193-JA-PRL, 2023 WL 7053471 (M.D. Fla. Oct. 26, 2023), Appeal No. 23-13874 (11th Cir.); *M.H. v. Omegle.com, LLC*, No. 8:21-CV-814-VMC-TGW, 2022 WL 93575 (M.D. Fla. Jan. 10, 2022), Appeal No. 22-10338 (11th Cir.).

In *Mother Doe*, the Court dismissed tort claims against Grindr by a mother on behalf of her son. 2023 WL 7053471, at *1, *4. The mother alleged that "Grindr is a website and smartphone … app … that facilitates sex between its users"; "Grindr is an 'adults only' app and requires users to enter their birthdate before they are permitted to create an account"; when her son "was a minor, he created an account on the app, apparently by providing a false birthdate"; when her son was 13 years old, he and an adult man "used the Grindr app to arrange a time to meet"; the man "drove to [her son's] home using Grindr's geolocation features"; the man and her son "engaged in sexual activity in [the man's] car"; and a "resident was alerted to suspicious activity outside of her home and called the police, who arrested" the man. *Id.* at *1. Relying on non-binding cases, the Court held Grindr has "immunity" under § 230(c)(1) and the claims are "barred." *Id.* at *3.

103

The mother raises two issues on appeal: (1) "Whether Grindr is immune pursuant to [§ 230(c)(1)] when it negligently operated its app by maintaining a weak age verification system, misrepresenting minors' ability to create an account on the app, and failing to warn of the known risk of sexual abuse to minors"; and (2) "Whether … [her] claims are excepted under [§] 230 due to Grindr's material contribution resulting in [her son]'s sexual abuse." Appeal No. 23-13874, D25 at 12. She filed her reply brief on May 28, 2024. *Id.* D41.

In *M.H.*, the Court dismissed TVPRA, tort, and other claims against Omegle by parents on behalf of their child. 2022 WL 93575, at *2, *7. The parents alleged their eleven-year-old child visited Omegle's website, where she was placed in a chatroom with an anonymous user who informed her "he knew where she lived," gave her details to prove his knowledge, "threatened to hack [her] and her family's … devices if she did not disrobe and comply with his demands," and recorded her compliance with his demands. *Id.* at *1. The parents alleged Omegle "allows users to communicate with other users randomly and anonymously in real time by text, audio, and video"; "[i]nterested users are placed in a chatroom hosted by Omegle and can begin communicating immediately"; Omegle does not require the provision of identifying information to begin a chatroom session; Omegle "allows users to narrow possible matches based on 'similarities in conversations and subjects'"; "[u]sers are anonymously paired with other users from across the globe and can be paired with a new user in a new chatroom at will"; Omegle's "website is visited millions of times per day"; articles report that "numerous individuals have been charged with sex crimes against children for their use of Omegle and similar websites"; "Omegle does not have a screening or verification process to ensure that minor children only use the site with parental guidance or consent—anonymity appears to be a primary appeal of the Omegle platform"; Omegle "is susceptible to hacking"; "sexual predators have taken advantage of the anonymity that Omegle offers to prey on other users, including children"; and "[a]mong these predators are 'cappers,' who trick children into

committing sexual acts over live web feeds while simultaneously recording the encounters." *Id.*. Relying on non-binding cases, the Court held the parents failed to allege sufficient facts to support a TVPRA claim and Omegle has "immunity" under § 230(c)(1) for the other claims. *Id.* at *2–7.

The parents raise two issues on appeal: (1) "Whether [§] 230 … applies to 18 U.S.C. § 2255"; and (2) "Whether the actual knowledge or the constructive knowledge standard applies to civil liability claims under 18 U.S.C. § 1595." Appeal No. 22-10338, D23 at 11. Twenty amici have appeared. *Id.* (docket heading). The Eleventh Circuit has stayed the appeal based on Omegle's bankruptcy. *Id.* D72-2. On April 2, 2024, the parents observed that counsel no longer represents Omegle, emphasized that Omegle has not complied with orders to provide status reports, and asked the court to issue a decision. *Id.* D78. On July 28, 2024, the parents asked the court to judicially notice a decision by the bankruptcy court granting relief from the stay and to issue a decision. *Id.* D81.

6.    *Analysis*

With no binding precedent, the Court must apply the ordinary rules of statutory interpretation to interpret § 230(c)(1): "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider" (i.e., by another "person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service"). 47 U.S.C. § 230(c)(1), (f)(3).

The meaning of § 230(c)(1) is plain. The provision, therefore, must be enforced according to its terms. *See Jimenez*, 555 U.S. at 118. The ordinary meaning of "publisher" and "speaker" are, respectively, "one that makes public" and "one that speaks." *Webster's Third New Int'l Dictionary* (1986). "Publication" also has meaning in

the defamation context, the backdrop of § 230. *See Force*, 934 F.3d at 77–81. "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." Restatement (Second) of Torts § 577(1). A person who "repeats or republishes" a defamatory statement to a third party may be liable for defamation "as if he had originally published it." *Id.* § 578; *accord Stratton Oakmont*, 1995 WL 323710, at *3. And "[o]ne who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication." Restatement (Second) of Torts § 577(2).

The plain meaning of § 230(c)(1) is not changed by consideration of the provision "as a whole," *King*, 502 U.S. at 221, and the "statutory scheme" in which the provision is placed, *Bailey*, 516 U.S. at 145. Congress sought to promote internet development and preserve the absence of government internet regulation, as evidenced by the § 230 findings, 47 U.S.C. § 230(a), and policy statements, *id.* § 230(b)(1)–(2), suggesting a broad reading of the provision to effectuate those purposes, as courts have consistently ruled, originally outside the context of the online sexual abuse of minors. *See*, *e.g.*, *Zeran*, 129 F.3d at 330–31; footnote 34, *supra* (describing appellate cases interpreting § 230(c)(1) after *Zeran*). But Congress also sought to protect minors and other users from offensive content and internet-based crimes, as evidenced by the title and content of the Act ("The Communications Decency Act"), the title and content of the section ("Online Family Empowerment Act"), the title and content of § 230 ("Protection for private blocking and screening of offensive material"), the title and content of the provision on which Grindr relies ("Protection for 'Good Samaritan' Blocking and Screening of Offensive Material," *id.* § 230(c)(1)), and other § 230 policy statements, *id.* § 230(b)(3)–(5), suggesting a narrow reading of the provision to effectuate those purposes. To avoid the predominance of some congressional purposes over others, the provision should be interpreted neither broadly nor narrowly. The provision should just be interpreted according to its plain meaning.

To obtain dismissal, Grindr must convince the Court that the § 230(c)(1) defense "clearly appears on the face of the complaint." *See Fortner*, 983 F.2d at 1028 (quoted). In other words, Grindr must convince the Court that all seven claims based on Florida common law torts (counts two through eight) are "inconsistent with" § 230(c)(1), *see* 47 U.S.C. § 230(e)(3) (quoted), because all seven claims treat Grindr as *the publisher* or *the speaker* of information provided by *another* information content provider. *See id*. § 230(c)(1), (f)(3). Under the governing standard for dismissal, Grindr falls short.

The § 230(c)(1) defense does not clearly appear on the face of the operative pleading because, for the seven claims based on Florida common law torts (counts two through eight), T.V. treats Grindr not as the publisher or speaker of information provided by another information content provider but as a publisher or speaker of information Grindr provided. According to T.V. and the reasonable inferences drawn in her favor, *see Karantsalis*, 17 F.4th at 1319, Grindr is responsible, in whole or in part, for the "Daddy" "Tribe," the "Twink" "Tribe," the filtering code, the "safe space" language, and the geolocation interface. *See* D9 ¶¶27(a), 31–33, 42(a), 68–105. To the extent the responsible persons or entities are unclear, discovery, not dismissal, comes next.

Grindr brings to the Court's attention many cases, *see* D22 at 13–17; D42 at 11–17; D53 at 1–2; D60 at 1–2, including the two cases from this Court pending before the Eleventh Circuit, *see* section IV.B.5 *supra* (describing *Mother Doe*, 2023 WL 7053471, at *3; and *M.H.*, 2022 WL 93575, at *2–7), as well as *Doe v. MySpace, Inc.*, 528 F.3d 413, 416, 418–22 (5th Cir. 2008); *Doe v. Grindr, Inc.*, No. 2:23-cv-2093-ODW-PD, 2023 WL 9066310, at *3–7 (C.D. Cal. Dec. 28, 2023) (to be published), *appeal pending*, No. 24-475 (9th Cir.); *L.H. v. Marriott Int'l, Inc.*, 604 F. Supp. 3d 1346, 1365–66 (S.D. Fla. 2022); *Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1244 (S.D. Fla. 2020); *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 588–89 (S.D.N.Y. 2018), *aff'd* 765

F. App'x 586 (2d Cir. 2019); *Saponaro v. Grindr*, LLC, 93 F. Supp. 3d 319, 323 (D.N.J. 2015); and *In re Facebook, Inc.*, 625 S.W.3d 80, 93 (Tex. 2021).

In each case, a bad actor's or actors' use of the defendant's online platform in the foreground or background appeared to suffice for § 230(c)(1)'s application. For example, in *MySpace*, an adult sexually assaulted a minor he had met through MySpace. 528 F.3d at 416. The minor and her mother sued MySpace for negligence and gross negligence, alleging MySpace markets itself to minors, MySpace is popular because of its underage users, and the minor easily created a MySpace profile despite MySpace's supposed safety features. *Id.* at 417. The Fifth Circuit affirmed judgment on the pleadings for MySpace, ruling that § 230(c)(1) barred the claims and rejecting the argument that the claims were predicated not on the minor-adult communications but on MySpace's failure to implement basic safety measures to protect minors. *Id.* at 418–19. "Their allegations," the Fifth Circuit found, "are merely another way of claiming that MySpace was liable for publishing the communications and they speak to MySpace's role as a publisher of online third-party-generated content." *Id.* at 420; *see also Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir.), *cert. granted sub nom. Free Speech Coal. v. Paxton*, No. 23-1122, 2024 WL 3259690 (U.S. July 2, 2024) (explaining that in *MySpace* the Fifth Circuit "held that § 230 shielded MySpace from negligence liability for publishing communications between a minor and an adult who later sexually assaulted her").

In his statement accompanying the denial of certiorari in an action raising a § 230(c)(1) issue, Justice Thomas detailed criticisms of many of these cases or the cases on which they are based:

> Taken at face value, § 230(c) alters the *Stratton Oakmont* rule in two respects. First, § 230(c)(1) indicates that an Internet provider does not become the publisher of a piece of third-party content—and thus subjected to strict liability—simply by hosting or distributing that content. Second, § 230(c)(2)(A) provides an additional degree of immunity when companies take down or restrict access to objectionable content, so long as the company acts in good

faith. In short, the statute suggests that if a company unknowingly leaves up illegal third-party content, it is protected from publisher liability by § 230(c)(1); and if it takes down certain third-party content in good faith, it is protected by § 230(c)(2)(A).

This modest understanding is a far cry from what has prevailed in court. Adopting the too-common practice of reading extra immunity into statutes where it does not belong, courts have relied on policy and purpose arguments to grant sweeping protection to Internet platforms. …

Courts have discarded the longstanding distinction between "publisher" liability and "distributor" liability. Although the text of § 230(c)(1) grants immunity only from "publisher" or "speaker" liability, the first appellate court to consider the statute held that it eliminates distributor liability too—that is, § 230 confers immunity even when a company distributes content that it knows is illegal. *Zeran* …, 129 F.3d [at] 331–334 …. In reaching this conclusion, the court stressed that permitting distributor liability "would defeat the two primary purposes of the statute," namely, "immuniz[ing] service providers" and encouraging "selfregulation." *Id.*, at 331, 334. And subsequent decisions, citing *Zeran*, have adopted this holding as a categorical rule across all contexts.

To be sure, recognizing some overlap between publishers and distributors is not unheard of. Sources sometimes use language that arguably blurs the distinction between publishers and distributors. One source respectively refers to them as "primary publishers" and "secondary publishers or disseminators," explaining that distributors can be "charged with publication."

Yet there are good reasons to question this interpretation.

First, Congress expressly imposed distributor liability in the very same Act that included § 230. Section 502 of the Communications Decency Act makes it a crime to "knowingly … display" obscene material to children, even if a third party created that content. 110 Stat. 133–134 (codified at 47 U.S.C. § 223(d)). This section is enforceable by civil remedy. 47 U.S.C. § 207. It is odd to hold, as courts have, that Congress implicitly eliminated distributor liability in the very Act in which Congress explicitly imposed it.

Second, Congress enacted § 230 just one year after *Stratton Oakmont* used the terms "publisher" and "distributor," instead of "primary publisher" and "secondary publisher." If, as courts suggest, *Stratton Oakmont* was the legal backdrop on which Congress legislated, one might expect Congress to use the same terms *Stratton Oakmont* used.

Third, had Congress wanted to eliminate both publisher and distributor liability, it could have simply created a categorical immunity in § 230(c)(1): No provider "shall be held liable" for information provided by a third party. After

all, it used that exact categorical language in the very next subsection, which governs removal of content. § 230(c)(2). Where Congress uses a particular phrase in one subsection and a different phrase in another, we ordinarily presume that the difference is meaningful.

…

Courts have also departed from the most natural reading of the text by giving Internet companies immunity for their own content. Section 230(c)(1) protects a company from publisher liability only when content is "provided by *another* information content provider." (Emphasis added.) Nowhere does this provision protect a company that is itself the information content provider. And an information content provider is not just the primary author or creator; it is anyone "responsible, in whole *or in part*, for the creation or development" of the content. § 230(f)(3) (emphasis added).

But from the beginning, courts have held that § 230(c)(1) protects the "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content." *E.g., Zeran*, 129 F.3d at 330 (emphasis added); *cf. id.*, at 332 (stating also that § 230(c)(1) protects the decision to "edit"). Only later did courts wrestle with the language in § 230(f)(3) suggesting providers are liable for content they help develop "in part." To harmonize that text with the interpretation that § 230(c)(1) protects "traditional editorial functions," courts relied on policy arguments to narrowly construe § 230(f)(3) to cover only substantial or material edits and additions. *E.g., Batzel v. Smith*, 333 F.3d 1018, 1031, and n. 18 (CA9 2003) ("[A] central purpose of the Act was to protect from liability service providers and users who take some affirmative steps to edit the material posted").

…

The decisions that broadly interpret § 230(c)(1) to protect traditional publisher functions also eviscerated the narrower liability shield Congress included in the statute. Section 230(c)(2)(A) encourages companies to create content guidelines and protects those companies that "in good faith … restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable." Taken together, both provisions in § 230(c) most naturally read to protect companies when they unknowingly decline to exercise editorial functions to edit or remove third-party content, § 230(c)(1), and when they decide to exercise those editorial functions in good faith, § 230(c)(2)(A).

But by construing § 230(c)(1) to protect any decision to edit or remove content, courts have curtailed the limits Congress placed on decisions to remove content … . With no limits on an Internet company's discretion to take down material, § 230 now apparently protects companies who racially discriminate in

removing content. *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 Fed. Appx. 526 (CA9 2017), *aff'g* 144 F. Supp. 3d 1088, 1094 (ND Cal. 2015) (concluding that "'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune' " under § 230(c)(1)).

…

Courts also have extended § 230 to protect companies from a broad array of traditional product-defect claims. In one case, for example, several victims of human trafficking alleged that an Internet company that allowed users to post classified ads for "Escorts" deliberately structured its website to facilitate illegal human trafficking. Among other things, the company "tailored its posting requirements to make sex trafficking easier," accepted anonymous payments, failed to verify e-mails, and stripped metadata from photographs to make crimes harder to track. *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 16–21 (CA1 2016). Bound by precedent creating a "capacious conception of what it means to treat a website operator as the publisher or speaker," the court held that § 230 protected these website design decisions and thus barred these claims. *Id.*, at 19.

Consider also a recent decision granting full immunity to a company for recommending content by terrorists. *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (CA2 2019), *cert. denied*, … 140 S. Ct. 2761 …. The court first pressed the policy argument that, to pursue "Congress's objectives, ... the text of Section 230(c)(1) should be construed broadly in favor of immunity." 934 F.3d at 64. It then granted immunity, reasoning that recommending content "is an essential result of publishing." *Id.*, at 66. Unconvinced, the dissent noted that, even if all publisher conduct is protected by § 230(c)(1), it "strains the English language to say that in targeting and recommending these writings to users ... Facebook is acting as 'the publisher of ... information provided by another information content provider.' " *Id.*, at 76–77 (Katzmann, C. J., concurring in part and dissenting in part) (quoting § 230(c)(1)).

Other examples abound. One court granted immunity on a design-defect claim concerning a dating app[] that allegedly lacked basic safety features to prevent harassment and impersonation. *Herrick v. Grindr LLC*, 765 Fed.Appx. 586, 591 (CA2 2019), *cert. denied*, … 140 S. Ct. 221, … (2019). Another granted immunity on a claim that a social media company defectively designed its product by creating a feature that encouraged reckless driving. *Lemmon v. Snap, Inc.*, 440 F. Supp. 3d 1103, 1107, 1113 (CD Cal. 2020).

A common thread through all these cases is that the plaintiffs were not necessarily trying to hold the defendants liable "as the publisher or speaker" of third-party content. § 230(c)(1). Nor did their claims seek to hold defendants liable for removing content in good faith. § 230(c)(2). Their claims rested instead on alleged product design flaws—that is, the defendant's own

misconduct. *Cf. Accusearch*, 570 F.3d at 1204 (Tymkovich, J., concurring) (stating that § 230 should not apply when the plaintiff sues over a defendant's "conduct rather than for the content of the information"). Yet courts, filtering their decisions through the policy argument that "Section 230(c)(1) should be construed broadly," *Force*, 934 F.3d at 64, give defendants immunity.

…

Paring back the sweeping immunity courts have read into § 230 would not necessarily render defendants liable for online misconduct. It simply would give plaintiffs a chance to raise their claims in the first place. Plaintiffs still must prove the merits of their cases, and some claims will undoubtedly fail. Moreover, States and the Federal Government are free to update their liability laws to make them more appropriate for an Internet-driven society.

Extending § 230 immunity beyond the natural reading of the text can have serious consequences.

*Malwarebytes, Inc.*, 141 S. Ct. at 14–18 (Thomas, J., statement concurring in decision denying certiorari; some internal citations omitted); *see also Doe*, 142 S. Ct. at 1088 (explaining that § 230(c)(1) can plausibly be read more narrowly by protecting internet companies from strict liability for third-party content, but not from the company's "own acts and omissions.") (Thomas, J., statement concurring in decision denying certiorari) (internal quotation marks and citation omitted); *Force*, 934 F.3d at 76–89 (Katzmann, C.J., concurring in part and dissenting in part; explaining that the plain language of § 230(c)(1) does not protect websites for design choices like "targeting and recommending" content because finding liability does not require the court to treat the site as the publisher of the content);[35] *Gonzalez*, 2 F.4th at 914–24 (Gould, J.,

---

[35]The concurring and dissenting judge in *Force*, an action against Facebook, provided this example:

Suppose that you are a published author. One day, an acquaintance calls. "I've been reading over everything you've ever published," he informs you. "I've also been looking at everything you've ever said on the Internet. I've done the same for this other author. You two have very similar interests; I think you'd get along." The acquaintance then gives you the other author's contact information and photo,

concurring in part and dissenting in part; explaining that "amplify[ing] and direct[ing] content" is "more analogous to the actions of a direct marketer, matchmaker, or recruiter than to those of a publisher" because "publication has never included … suggesting that one reader might like to exchange messages with other readers"); *A.M.*, 614 F. Supp. 3d at 818–821 (explaining that a product liability action based on a defective design that paired minors and adults in video chatrooms is not barred by § 230(c)(1) because designing the site safely would not require the site "to review, edit, or withdraw any third-party content").

*MySpace* and the other cases on which Grindr relies are non-binding and rely on non-binding precedent. They also construe § 230(c)(1) broadly to the benefit of some purposes (internet development and self-policing) and the detriment of others (protection of minors from online content ill-suited for them and from online sexual abuse) and arguably fail to apply the plain language of § 230(c)(1). At a minimum, however, they do not help Grindr obtain dismissal because they involve allegations or facts different from the allegations T.V. includes in the operative pleading, such as Grindr's introduction of the "Tribes," *see* D9 ¶¶31–33.

Grindr argues that its design feature displaying the nearest user first "merely publishes data users themselves share with Grindr." D22 at 19. Grindr relies on *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1269–70 (D.C. Cir. 2019), in which the D.C. Circuit affirmed dismissal based on a concession by the plaintiff and a general understanding of how an internet search engine receives GPS data and transforms the GPS data into a pinpoint on a map. D42 at 16. Grindr's argument fails

---

along with a link to all her published works. He calls back three more times over the next week with more names of writers you should get to know.

Now, you might say your acquaintance fancies himself a matchmaker. But would you say he's acting as the publisher of the other authors' work?

*Force*, 934 F.3d at 76 (Katzmann, C.J., concurring in part and dissenting in part).

under the "clearly appears" standard for deciding a motion to dismiss based on an affirmative defense. *See Fortner*, 983 F.2d at 1028. This Court has no concession, and T.V. alleges nothing about the design feature beyond that Grindr "publicizes the location of users of Grindr Services on its platform," D9 ¶48(a), Grindr's "user interface shows images of men arranged from nearest to farthest away," *id*. ¶13, users "can see profiles of other users by tapping their image," *id.*, and users "can chat with one another on the interface," *id.* Asking the Court to presume or guess additional information about this interface is asking too much.

Grindr also argues that the "geolocation features cannot defeat [§] 230 immunity because [T.V.] does not allege these features caused A.V.'s alleged injuries." D22 at 19. Grindr's argument fails because, as explained in section IV.A.2, *supra*, T.V. alleges sufficient facts to make causation plausible under Florida law.

Grindr argues that it cannot be liable for merely providing "neutral assistance" to good and bad users alike. D22 at 19 & 19 n.2. Neither the plain language of § 230(c)(1) nor any binding precedent includes a "neutral assistance" standard. *See Malwarebytes*, 141 S. Ct. at 14 ("Courts have long emphasized nontextual arguments when interpreting § 230, leaving questionable precedent in their wake.") (Thomas, J., opinion on the denial of certiorari). In any event, T.V. alleges that Grindr did more than merely neutrally assist users. *See* section II.A. (describing T.V.'s factual allegations, including allegations about the "Twink" and "Daddy" "Tribes"). Again, like other arguments Grindr makes, this argument depends on an unreasonably narrow reading of the allegations and disregards that, at this early stage of the litigation, all reasonable inferences from the allegations are drawn in T.V.'s favor. *See Karantsalis*, 17 F.4th at 1319.

The undersigned recommends rejecting Grindr's argument that the § 230(c)(1) defense to the claims based on Florida common law torts (counts two through eight) clearly appears on the face of the operative pleading.

## V.   Recommendations

The undersigned recommends:

(1)   **granting in part and denying in part** Grindr's motion to dismiss, D22, as supplemented, D53, D60;

(2)   **dismissing with prejudice** the claim for wrongful death based on the TVPRA (count one);

(3)   **allowing** the other claims (counts two through eight) to proceed; and

(4)   **ordering** the parties to confer about case management and file a case management report within 14 days of the order on the motion to dismiss, D22.

## VI.   Objections and Responses

"Within 14 days after being served with a copy of [a] recommended disposition, a party may serve and file specific written objections to the proposed … recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served with a copy." *Id*. "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." *Id.* 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A [district judge] shall make a de novo determination of those portions of the report … to which objection is made."). "A party failing to object to … recommendations … waives the right to challenge on appeal the district court's order based on unobjected-to … legal conclusions[.]" 11th Cir. R. 3-1.

Any objection to this report and recommendation must be made by **August 27, 2024**.

**Entered** in Jacksonville, Florida, on August 13, 2024.

_____

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:     The Honorable Marcia Morales Howard
       Counsel of record