## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

T.V. AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF A.V.,

                Plaintiff,

v.                                CASE NO.: 3:22-cv-864-MMH-PDB

GRINDR, LLC,

                Defendant.

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## GRINDR'S FRCP 72(b)(2) OBJECTIONS

      Plaintiff, T.V. as Personal Representative of the Estate of A.V. ("T.V."), files this Response to Defendant, Grindr, LLC's ("Grindr") FRCP 72(b)(2) Objections (Doc. 65) to the Magistrate's Report and Recommendation on Motion to Dismiss (Doc. 62), and states as follows:

## INTRODUCTION

      Grindr claims that "uniform authority, including in the Eleventh Circuit" requires this Court to find that the Communications Decency Act, 47 U.S.C. § 230(c)(1) ("Section 230") bars T.V.'s claims. (Doc. 65 at 1). Not so. The "uniform authority" that Grindr cites pre-dates the Supreme Court's opinion in *Moody v. NetChoice, LLC*, ---U.S.----, 144 S.Ct. 2383 (2024). As the Third Circuit recently recognized, *NetChoice* significantly narrows the scope of Section 230 protection for social-media companies when it comes to liability claims based upon the social-media company's "expressive product" itself, as opposed to liability for merely

publishing the speech of a third-party. *Anderson v. TikTok, Inc.*, 116 F.4th 180, 184 (3d Cir. 2024) (citing *Doe ex rel. Roe v. Snap, Inc.*, ---U.S.----, 144 S. Ct. 2493, 2494 (2024) (Thomas, J., dissenting from denial of certiorari)). Section 230 was never intended to provide social-media companies with the near universal immunity that pre-*NetChoice* cases afforded them. Cases like *Anderson* restore Section 230 to its proper scope by applying the statute as written. As recognized by Magistrate Judge Barksdale, T.V.'s claims fall outside the scope of Section 230's protection.

Grindr's additional arguments fail because each argument fails to accept the allegations in the Complaint as true, improperly attempting to raise the pleading standards set forth by *Twombly* and *Iqbal*, or both. Thus, this Court should deny Grindr's objections.

## ARGUMENT

### I.   SECTION 230 IS INAPPLICABLE TO T.V.'S CLAIMS

#### a. The history, purpose, text, and pre-*NetChoice* interpretation of Section 230.

"Like any man-made law, § 230 did not appear in a vacuum, and 'some context is key to understanding Congress's aim' and the precise language it selected." *Anderson*, 116 F.4th at 187 (Matey, J., concurring in the judgment in part and dissenting in part) (quoting *Ol Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 166 (3d Cir. 2023); and citing 1 William Blackstone, Commentaries *61, *87). At common law, liability for an entity that published or

distributed defamatory material was determined by a framework wherein the entity would be classified as a publisher, distributor, or common carrier depending on the amount of control the entity retained over the defamatory material. Matthew G. Jeweler, *The Communications Decency Act of 1996: Why § 230 is Outdated and Publisher Liability for Defamation Should be Reinstated Against Internet Service Providers*, 8 U. PITT. J. TECH. L. & POL'Y 3 (Fall 2007) [hereinafter, "*The CDA of 1996*"].

The least culpable is the common carrier. *See* Jay M. Zitter, *Liability of Internet Service Provider for Internet or E-mail Defamation*, 84 A.L.R.5th 169, at §2(a) (2000) [hereinafter, "*Zitter*"]. Common carriers have no editorial control over the information they convey. Thus, common carriers are not liable for the information they transmit from one party to another. *Id.* The most common example of a common carrier is a telephone company. *See id*; *The CDA of 1996*.

Publishers, like newspapers fall on the other end of the spectrum. *See The CDA of 1996*. *Id.* That's because publishers actively select the content they publish and therefore have the ability to notice potentially defamatory material. *Id.* At common law, publishers could be held liable under normal defamation standards. *Id.*

Distributors fall in the middle. *Id.* Public libraries and bookstores are often cited as examples of distributors. Distributors do not merely act as a conduit and retain some control over the content they carry, but they do not have ultimate say over the content they convey to the same extent a newspaper does. *See id.* At

3

common law, a plaintiff needed to show that the material was defamatory and that the distributor knew or should have known of the defamatory nature of the content. *Id.*; *Zitter*, at § 2(a) (citation omitted).

Then came the internet. Americans started experiencing the internet in the 1990s through large commercial service providers (or "ICSs")[1] like AOL and CompuServe. Lawrence Lessig, THE FUTURE OF IDEAS 147 (2001). In the beginning, these providers supplied users with content they generated themselves, *id.* at 148; however, they quickly moved to provide forums such as chat rooms and bulletin boards whereby users could create content to be consumed by other users, Jeff Kosseff, THE TWENTY-SIX WORDS THAT CREATED THE INTERNET 37 (2019). Courts would thereafter be asked to decide where ICSs fit on the common law defamation liability spectrum.

In *Cubby, Inc. v. CompuServe, Inc.*, CompuServe was sued for defamation for the content of a message board post. 776 F.Supp. 135, 138 (S.D.N.Y. 1991). CompuServe argued that it was a distributor, and therefore could only be liable if it knew or should have known of the defamatory nature of the post. *Id.* The court agreed in light of the nature of the service offered by CompuServe, holding it was "in essence an electronic, for-profit library" that permits users to access a wide range of publications in exchange for a membership fee. *Id.* at 140. Accordingly, "the appropriate standard of liability to be applied to CompuServe is whether it

---

[1] Interactive Computer Service. *See* note 2, *infra*.

knew or had reason to know of the allegedly defamatory [message board] statements." *Id.* at 140-41. The *Cubby* opinion gave rise to concerns about the court's application of a test which could vary depending upon the level of editorial control exercised by the defendant. *See, e.g.*, *Anderson*, 116 F.4th at 189 (Matey, J., concurring in the judgment in part and dissenting in part) (citation omitted).

These fears were validated when another ICS, Prodigy, was held liable as a publisher in *Stratton Oakmont, Inc. v. Prodigy Servs. Co.* because Prodigy exercised more control over the content posted on its message boards. 1995 WL 323710, at *1 (N.Y. Sup. Ct. May 25, 1995). Prodigy differed from other ICSs in that it was "the only major commercial [message board] operator that monitor[ed] all public messages by screening them before they [were] posted." David J. Conner, Note, *Cubby v. CompuServe, Defamation Law on the Electronic Frontier*, 2 GEO. MASON INDEP. L. REV. 227, 240 (1993). Accordingly, when Prodigy was sued for hosting allegedly defamatory statements on its message boards, the court concluded that Prodigy "exercised sufficient editorial control over its computer bulletin boards to render it a publisher with the same responsibilities as a newspaper." *Stratton Oakmont*, 1995 WL 323710 at *3. If *Stratton Oakmont*'s reasoning were widely adopted, it would mean that ICSs who screened obscene and offensive content from their sites would face significant liability for the rest of the material they hosted.

Recognizing that *Stratton Oakmont* would likely restrain the growth of the internet and preclude ICSs from providing tools that would allow parents to

prevent children from viewing inappropriate content, Congress enacted Section 230. *The CDA of 1996*. Congress made plain that its goal was to "remove disincentives for ... blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b). In order to do so, Congress included what is known as the "Good Samaritan" provision which states that "[n]o provider or user of an interactive computer service[2] shall be treated as the publisher or speaker of any information provided by another information content provider[3]." 47 U.S.C. § 230(c)(1). Congress gave ICSs this limited immunity for the purpose of overruling *Stratton Oakmont* and prohibiting liability on the basis of ICSs being considered the **publisher** of content that was not their own. *The CDA of 1996* (citing AM. JUR. 2D. *Computers and the Internet* §§ 62-63 (2006)). Congress did not (and did not intend to) bar ICSs from being sued under a distributor theory.

Alas, courts immediately read Section 230 too broadly. In *Zeran v. Am. Online, Inc.*, the Fourth Circuit held that Section 230 barred claims against ICSs based on **publisher** liability, and **distributor** liability. 129 F.3d 327, 331-34 (4th Cir. 1997). Nearly all courts followed suit. Until recently, Section 230 was

---

[2] For purposes of Section 230, the term "interactive computer service" refers to "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server...." 47 U.S.C. § 230(f)(2).

[3] "Information content provider" "means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

interpreted to immunize ICSs for virtually any claim loosely related to content posted by a third party, regardless of the cause of action and regardless of the ICSs' actions. *See, e.g.*, *Gonzalez v. Google LLC*, 2 F.4th 871, 892-98 (9th Cir. 2021), *vacated*, 598 U.S. 617 (2023); *Force v. Facebook, Inc.*, 934 F.3d 53, 65-71 (2d Cir. 2019). **"But this conception of § 230 immunity departs from the best ordinary meaning of the text and ignores the context of congressional action."** *Anderson*, 116 F.4th at 191 (Matey, J., concurring in the judgment in part and dissenting in part) (emphasis added); *see also Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, ---U.S.----, 141 S. Ct. 13, 15-18 (2020) (Thomas, J., statement respecting denial of certiorari); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 746-47 (9th Cir. 2024) (Nelson, J., concurring) "Section 230 was passed to address an old problem arising in a then-unique context, not to 'create a lawless no-man's-land' of legal liability." *Id.* (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1164 (9th Cir. 2008) (en banc)).

### b. *NetChoice* and *Anderson* chart a new path.

The Supreme Court and lower courts have rectified *Zeran*'s missteps. In *NetChoice*, the Supreme Court determined whether the choices made by an ICS with respect to the content that is shown to its users is the expressive activity of the ICS and therefore entitled to protection under the First Amendment. 144 S. Ct. at 2393. Texas and Florida had attempted to regulate the manner in which certain ICSs moderated their content and fora and the ICSs sought a pre-enforcement injunction. *Id.* The Supreme Court held that an "entity **'exercis[ing] editorial**

discretion in the selection and presentation' of content is 'engage[d] in speech activity.'" *Id.* at 2402 (quoting *Arkansas Ed. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998)) (alterations in original) (emphasis added). The Court clarified that this is the case **whether "the content comes from third parties [or] it does not." *Id.*** (emphasis added).

Following *NetChoice*, the Third Circuit decided whether Section 230 barred a products liability suit against an ICS. *Anderson*, 116 F.4th at 181. In *Anderson*, a ten-year-old child unintentionally hung herself after viewing a video on the popular ICS TikTok. *Id.* The video depicted the "Blackout Challenge," a "trend" which encouraged viewers to record themselves engaging in acts of self-asphyxiation. *Id.* The minor's estate sued TikTok for, *inter alia*, strict products liability and negligence. *Id.* at 182. The complaint alleged TikTok: "(1) was aware of the Blackout Challenge; (2) allowed users to post videos of themselves participating in the Blackout Challenge; and (3) recommended and promoted Blackout Challenge videos to minors' FYPs[4] through its algorithm...." *Id.*

The district court, relying on some of the same authorities Grindr cites here, dismissed the complaint, finding the claims were barred by Section 230. *Compare Anderson v. TikTok, Inc.*, 637 F.Supp.3d 276 (E.D. Pa. 2022), *reversed and remanded*, 116 F.4th 180 (3d Cir. 2024) (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009); and citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th

---

[4] "FYP" is an abbreviation for TikTok's "For You Page," a section of the TikTok app that displays user-created videos to individual users.

Cir. 2008)), *with* (Doc. 65 at 3-4) (citing *Barnes* and *MySpace*). The Third Circuit reversed. *Anderson*, 116 F.4th 180.

Focusing on the text of Section 230, the court observed that "ICSs are immunized **only** if they are sued for **someone else's expressive activity or content** (i.e., **third-party speech**), but they are **not** immunized if they are sued for **their own expressive activity** or **content** (i.e., **first-party speech**)." *Id.* at 183 (emphasis added). Turning back to the complaint, the court found that the plaintiff sued TikTok for defects in the algorithm through which videos are recommended to users. In other words, the plaintiff sued TikTok for the choices it made with respect to what content it recommend to users—TikTok's own expressive activity. Accordingly, Section 230 was inapplicable. While the court acknowledged that its holding was in tension with numerous published opinions of the other circuit courts (and even one of its own published opinions), the Third Circuit distinguished all of these cases as being "pre-*NetChoice*." *Id.* at 184 n. 13 (citations omitted).

### c. T.V.'s claims are based on Grindr's product, not the speech of others, and therefore are not barred by Section 230.

Like *Anderson*, and as the R&R found, T.V.'s claims are based on the functions of Grindr's product (its first-party speech), not the speech of third-parties. Like *Anderson*, T.V. alleges that Grindr: (1) knew or should have known that A.V. was a minor and that adults were using Grindr's platform to sexually exploit minors; (2) allowed A.V. to create a profile of himself containing pictures

and information; and (3) **Grindr's app promoted** A.V.'s profile to adults, by using "Tribes" like "Daddys" and "Twinks" that Grindr knew or should have known would connect minors to adults. These allegations are indistinguishable from those found in *Anderson* and properly allege a claim for product liability. Thus, Section 230 is inapplicable.

Grindr's arguments to the contrary fail. First, Grindr only cites pre-*NetCoice* cases. These cases were decided at a time when courts permitted ICSs like Grindr to claim users' content as their own First Amendment speech in order to avoid regulation, but when they came to be sued for that same content, ICSs could claim the opposite and seek shelter under Section 230. As *NetChoice* and *Anderson* make clear, ICSs can be held liable for the content *they themselves create*, including the manner in which their product promotes or displays content to its users (*i.e.*, their own expressive conduct/first-party speech).

Second, Grindr's argument that T.V.'s claims seek to hold Grindr accountable for "publishing activity" is not supported by the complaint's allegations. T.V. alleges that Grindr is liable for offering an application designed to allow the user to engage in sexual encounters without sufficient age verification. T.V.'s claims are analogous to a plaintiff seeking to hold an adult sex shop liable for permitting minors to enter its premises. The sex shop's liability would not be based on the adult videos and magazines it sells. Rather, the store's liability is rooted in the store's failure to prevent minors from entering.

Grindr's argument to the contrary relies entirely on pre-*NetChoice* authorities that apply an overly-expansive and textual reading of Section 230 immunity. *See Anderson*, 116 F.4th at 183-84, 184 n. 13, 190; *Doe Through Roe v. Snap, Inc.*, 144 S. Ct. 2493, 2493-94 (2024) (Thomas, J., dissenting from the denial of certiorari); *Malwarebytes*, 141 S. Ct. at 14 (Thomas, J., statement respecting denial of certiorari). Further, none of the authorities cited by Grindr are published Eleventh Circuit opinions. The R&R correctly concluded that there is no binding caselaw on the issues raised by Grindr's motion to dismiss. Undeterred, Grindr argues that the R&R's "refusal" to follow *persuasive* authorities "is error." (Doc. 65 at 5). Grindr's wrong. Absent binding authority, the R&R was free to reject the reasoning and interpretations of courts in other jurisdictions and instead conduct a thorough and thoughtful analysis of the actual text of Section 230.

Regardless, even if the authorities cited by Grindr were still good law and were found to be persuasive by this Court, T.V.'s claims are still not directed towards Grindr's publishing activities. Grindr argues that T.V.'s "claims—which would hold Grindr liable for failing to stop A.V. from posting a profile and communicating with adults—are inextricably tied to Grindr's role as a publisher because they would require Grindr to screen voluminous third-party content and remove anything harmful." (Doc. 65 at 4) (internal citation omitted). But avoiding liability for T.V.'s claims would not, in fact, require *any* monitoring of third-party content on Grindr's part. Instead, Grindr could have avoided each and every claim in the complaint by: (1) implementing a reasonable age verification system (that,

as the complaint notes, are widely available); (2) providing adequate and reasonable warnings of the dangers posed by the use of Grinder; and/or (3) refraining from misrepresenting the platform as a "safe space." Grindr would not need to monitor, add, remove, or otherwise modify any third-party content. As such, T.V.'s claims do not seek to hold Grindr accountable for "publishing activities" even under pre-*NetChoice* authorities. *See, e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1090 (9th Cir. 2021) (holding Section 230 does not bar plaintiffs' product defect claims since they did not treat the ICS as a "publisher" and noting the fact that "[the ICS] allows its users to transmit user-generated content to one another does not detract from the fact that the [plaintiffs] seek to hold [the ICS] liable for its role in violating its distinct duty to design a reasonably safe product."); *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016) (holding Section 230 did not bar plaintiff's failure to warn claims since they did not treat the defendant as a "publisher" or "speaker"); *M.H. v. Omegle.com, LLC*, No. 21-cv-814, 2022 WL 93575, at *5 (M.D. Fla. Jan. 10, 2022) (appeal pending) (citation omitted) (noting that "Section 230 shields websites from liability against 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online.'").

Third, Grindr mistakenly claims that T.V.'s claims target Grindr's publication of third-party content. (Doc. 65 at 6). T.V.'s claims seek to hold Grindr liable for its own first-party speech—defects in the functions and design of the app itself. The R&R found three categories of allegations fell outside of Section 230's

12

immunity: (1) Tribes and the filtering code; (2) the "safe space" language; and (3) the geolocation interface. Contrary to Grinder's assertions, all three constitute Grindr's own expressive conduct, not content created by a third-party.

Even before *NetChoice*, courts often looked to whether the defendant would have to alter the content posted by its users in order to meet the obligations the plaintiff sought to impose to determine whether claims were seeking to impose liability for the publication of third-party content. *See Airbnb, Inc. v. City & Cnty. of San Francisco*, 217 F.Supp.3d 1066 (N.D. Cal. 2016); *HomeAway.com v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019); *A.M. v. Omegle.com, LLC*, 614 F.Supp.3d 814, 820 (D. Or. 2022) (holding Section 230 immunity inapplicable since "[i]n order to meet the obligation A.M. seeks to impose on Omegle, Omegle would not have to alter the content posted by its users—it would only have to change its design and warnings."). Since *no* user content would have to be modified (or even reviewed) in order to implement a reasonable age verification system, Section 230 isn't implicated.

Even parsing the individual allegations does not compel a different result. As to the Tribes, Judge Barksdale simply took *T.V.'s allegations*, *see, e.g.*, (Doc. 9 at ¶¶ 31-36), as true. In doing so, the R&R correctly determines that these tribes were *Grindr's creation* and *Grindr's expressive activity*. Liability based on Grindr's promotion of A.V.'s profile as a "Twink" to Grindr's adult users is not liability based on third-party content just as in *Anderson* where TikTok's promotion of the Blackout Challenge video was not third-party content either.

Even pre-*NetChoice* precedent supports this conclusion. In *Lemmon*, parents of deceased minors filed suit against Snap, Inc. which produced the popular ICS Snapchat. Snap had created a "filter" for the Snapchat app that allowed users to superimpose the speed they were traveling over video footage the user created in real-time. Three boys using the filter died when the car they were in crashed into a tree and burst into flames. As here, the parents sued under product defect theories. The Ninth Circuit reversed a district court dismissal, finding that Section 230:

> cuts off liability only when a plaintiff's claim faults the defendant for information provided by third parties. Thus, internet companies remain on the hook when they create or develop their own internet content. And they also may face liability to the extent they are "'responsible ... in part, for the creation or the development of' the offending content" on the internet.

*Id.* at 1093 (citing *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc)) (additional internal citations omitted). Like in *Lemmon*, T.V. seeks to hold Grindr liable for, *inter alia*, its creation of the tribes and not the content published on Grindr. As such, Section 230 does not apply.

This reasoning is equally applicable to Grindr's geolocation technology. The complaint alleges that Grindr's platform promotes a user's location information to other users using this technology. (Doc. 9 at ¶48). As in *Anderson* and *Lemmon*, T.V. seeks to hold Grindr accountable not for the actual location information that

was published, but rather the geolocation technology itself which failed to adequately protect A.V.

With respect to the "safe space" description, this is inarguably Grindr's speech. Indeed, Grindr does not even appear to argue otherwise, instead electing to argue that its "safe space" statements "do[] not make Grindr a provider of the content Plaintiff claims harmed him." (Doc. 65 at 9). The "safe space" statements specifically support liability under Count VIII of the Complaint—T.V.'s claim for negligent misrepresentation. (Doc. 9 at ¶¶146-161). A claim for negligent misrepresentation must be based upon a representation of the defendant. T.V.'s claims regarding the "safe space" statements attempt to impose liability based on Grindr's own expressive conduct and content creation. Once again, even pre-*NetChoice*, these types of claims were permissible. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1106-08 (9th Cir. 2009) (promissory estoppel claim based on statements of ICS not barred by Section 230).

*Finally*, the R&R's plain language interpretation of Section 230's text best serves Congress's intent. The best indication of Congressional intent is the text of the statute. *E.g.*, *In re Cumbess*, 960 F.3d 1325, 1335 (11th Cir. 2020) (citing *Shotz v. Am. Airlines, Inc.*, 420 F.3d 1332, 1336 (11th Cir. 2005)) (additional citations omitted) ("Following the Supreme Court, we have consistently held that **the enacted text is the best (and often the only relevant) indication of legislative intent.**") (emphasis added). The R&R's thorough analysis of the text and history of Section 230 clearly demonstrate that it was Congress's intent to bar

claims that treat ICSs as the *publisher* or *speaker* of information provided by *another party*. It was never intended to prohibit claims that treat ICSs as a *distributor*. This conclusion is further supported by the authorities discussed *supra*. Since T.V.'s claims: (a) treat Grindr as a distributor, not a publisher or speaker; and (b) allege liability based on Grindr's own expressive conduct, the R&R correctly determined it was never Congress's intent to bar T.V.'s claims. "[T]o the extent that [Grindr] asserts than an unarticulated 'inten[t]' can prevail over a statute's enacted text, it is just wrong." *Id.* (first alteration added, second in original).

Finally, in the alternative, since T.V.'s claims attempt to hold Grindr liable as a *distributor*, not a *publisher*, even if the Court disagrees with the R&R and finds that the allegations regarding Tribes, geolocation activities, and the "safe space" description were the speech of third-parties, *and* found that T.V.'s claims were directed at Grindr's publishing activities, Grindr could still be held liable if T.V. can show that Grindr knew or had reason to know of the harmful nature of the content at issue. Since these allegations are contained in the complaint, Grindr's objections should be dismissed.

## II.     GRINDR'S REMAINING ARGUMENTS FAIL AS WELL

### a.  The Complaint alleges causation.

The R&R correctly disposed of Grindr's claim that the complaint fails to allege proximate causation. As Grindr sees it, the R&R finds proximate causation because the complaint merely alleges: (i) news reports show harm to other minors

who used Grindr; and (ii) Grindr "served as the meeting place" for A.V. and his rapists. Of course, the complaint alleges far more.

In reality, the complaint alleges that Grindr knowingly and intentionally allowed minors to access its app, despite knowing this would endanger the health, safety, and wellbeing of said minors. (Doc. 9 at ¶¶27, 35). Indeed, Grindr created a market for itself based on the presence of minors. (*Id.* at ¶36). A.V. used Grindr "resulting in A.V. being exposed to and engaged in sexual relationships and activities with adult users of Grindr Services." (*Id.* at ¶18). Finally, A.V.'s use of Grindr "resulted in severe emotional distress and bodily injuries culminating in A.V.'s death from a self-inflicted gunshot wound." (*Id.* at ¶19). The complaint alleges proximate causation.

Grinder's argument to the contrary seeks to impose a heightened pleading standard unsupported by federal law. But, as the R&R points out, "harm is 'proximate' in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question." *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992). Further, the act in question does not have to be the sole cause of the injury; rather, it must only be a *substantial* cause of the injury. *Ruiz v. Tenet Hialeah Healthsystem, Inc.*, 260 So. 3d 977, 982 (Fla. 2018). No crystal ball would be required to predict that Grindr's negligent failure to properly implement age verification would lead to children being raped. Indeed, the complaint contains citations to *many* news reports of just that happening. (Doc. 9 at ¶29). Further, one need not be omniscient

to predict that a teenager who has been raped may suffer from significant mental health problems as a result, or even, harm himself. Grindr's objection falls short.

### b. The Complaint alleges that Grindr is a product and is unreasonably dangerous.

Grindr's claim that its app is not a product fares no better. While Grindr scolds Judge Barksdale for using a Florida trial court opinion, *Brookes v. Lyft Inc.*, 2022 WL 19799628 (Fla. Cir. Ct. 2022), to predict the Florida Supreme Court's view on whether its app can be a product, it does not offer any Florida precedent to the contrary. Instead, Grindr attempts to use out of circuit precedent that does not interpret Florida law.

 Grindr also fails in its attempt to distinguish *Brookes*. According to Grindr, the claim in that case was that the app's "physical" operation distracted drivers and not that the app's content was harmful. Problem being, as in *Brookes*, T.V.'s claims are based not on the content contained within Grindr, but on the operations of the app itself (namely its defective failure to provide adequate age verification). Grindr's attempt to distinguish *In re Social Media Addiction*, 702 F.Supp.3d 809 (N.D. Cal. 2023) fails for the same reason. Under Florida law, Grindr is a product.

Grindr next claims that its product is not "unreasonably dangerous." (Doc. 65 at 13). As Grindr recites, a danger isn't unreasonable if it is an obvious risk associated with the use of a product. (*Id.*) (citations omitted). Being raped is not an obvious risk of using Grindr. Even if that weren't the case, the risk of being raped far outweighs whatever benefit is gained from not having an age verification

18

system. Grindr's claim that the Florida Supreme Court "disfavors" the risk/utility test rings hollow in light of the fact that the risk/utility test is **included in Florida's standard jury instructions as adopted by the Florida Supreme Court.** Fla. Std. Jury Instr. In Civ. Cases, § 403.7(b) ("A product is unreasonably dangerous because of its design if … the risk of danger in the design outweighs the benefits.").

### c. The Complaint alleges Grindr owed a duty of care.

The R&R was also correct in concluding that Grindr owed A.V. a duty of care as a result of Grindr's own conduct. Grindr argues otherwise by stating that "Florida courts have never imposed such a duty, and other courts have rejected it, holding that where a communications provider's 'services are put to lawful use by the great majority of its customers,' the provider has no obligation to monitor the services for misuse." (Doc. 65 at 14) (citations omitted).

Aside from again relying on authority outside the Eleventh Circuit, this argument fails because, as before, Grindr mischaracterizes T.V.'s claims. T.V. does not allege Grindr was negligent in failing to monitor its services. Rather, T.V. alleges that Grindr was negligent in failing to implement age verification in its app—a design defect. Thus, for much the same reason as Grindr's argument under Section 230 fails, its argument regarding duty fails as well. Further, even if Grindr's own acts didn't create a duty, the complaint alleges a special relationship between Grindr and A.V. that is sufficient to form a duty.

19

### d. The Complaint alleges IIED.

Grindr seeks to avoid the IIED claim by claiming that the R&R engaged in "baseless, uninformed, and biased speculation" by finding the tribes "facilitate relationships between minors and adults." (Doc. 65 at 16). As Grindr sees it, Judge Barksdale conjured up these allegations to find outrageous conduct. (*Id.*). Grindr is mistaken. T.V. alleged that the tribes made minors feel welcomed and then "served them up on a silver platter to the adult users of Grindr Services intentionally seeking to sexually groom or engage in sexual activity with persons under the age of [18]." Judge Barksdale was correct to find these to be sufficient allegations of outrageous conduct.

### e. The Complaint alleges NIED.

Grindr's claims that the R&R erred by failing to dismiss T.V.'s NIED claim because such claims require an allegation of a duty of care. As stated *supra* § II(c), and as found by the R&R, the complaint does allege a duty of care; therefore, Judge Barksdale did not err by denying the motion with respect to T.V.'s NIED claim.

### f. The Complaint alleges Negligent Misrepresentation.

The R&R did not err by allowing T.V.'s claim of negligent misrepresentation to proceed. *First*, the R&R correctly determined that "'the question of a party's justifiable reliance is an issue of comparative negligence that should be resolved by a jury.'" (D.E. 62 at 84) (quoting *Newern v. Mansbach*, 777 So. 2d 1044, 1046 (Fla. 1st DCA 2001)) (additional citation omitted). Grindr responds by arguing (without citation to caselaw) that "the Terms state that Grindr is an adults-only

service, rendering A.V.'s alleged reliance unjustified as a matter of law." (D.E. 65 at 18). But the complaint alleges that Grindr *knew or should have known* that minors were using its platform and therefore this is a question of "comparative negligence that should be resolved by a jury." *Newbern*, 777 So. 2d at 1046.

*Second*, the R&R did not err by disregarding Grindr's arguments regarding actual reliance. Grindr argues that it did indeed make the argument in its motion, but Grindr cites to a footnote in which it attempted to raise a *different* argument regarding the heightened pleading standard. (D.E. 22 at 25 n. 7). As such, the argument was waived.

*Third*, the R&R correctly concluded that the "safe space" statement was not puffery. The statement was made in the context of the terms intended to govern use of Grindr's product. Further, when read in context, the statement "is not so clearly hyperbolic as to take the issue from the factfinder." (D.E. 62 at 83).

*Finally*, T.V. satisfied the heightened pleading standard. As the R&R concludes, the complaint alleges the terms A.V. relied upon. Further, the time and place of the reliance is reasonably inferred from the context of the allegations: when A.V. created his Grindr account. *See* (D.E. 62 at 87). T.V. satisfied the pleading requirements.

In the alternative, should the Court disagree with the R&R and/or T.V.'s arguments made herein (in § I, § II, or both), this Court should permit, and T.V. hereby moves, to amend the complaint to address any deficiencies the Court believes present.

Respectfully submitted,

By: /s/ Alexander Brockmeyer
Alexander Brockmeyer, Esq.
Fla. Bar No.: 105758
Boyle, Leonard & Anderson, P.A.
9111 W. College Pointe Drive
Fort Myers, Florida 33919
Telephone: (239) 337-1303
Facsimile: (239) 337-7674
Primary Email:
EService@insurance-counsel.com
Secondary Email:
ABrockmeyer@insurance-counsel.com
Secondary Email:
ADeBouver@insurance-counsel.com
*Counsel for Plaintiff, T.V. as Personal
Representative of the Estate of A.V.*

*[Remainder of Page Intentionally Left Blank]*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 21, 2024, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system with copies served via an automatic email generated by the CM/ECF system to the following parties:

| | |
|---|---|
| Michael L. Beckman, Esq.<br>Andrew H. Barnett, Esq.<br>**Viles & Beckman, LLC**<br>6350 Presidential Court<br>Fort Myers, Florida 33919<br>Telephone: (239) 334-3933<br>Facsimile: (239) 334-7105<br>Michael@vilesandbeckman.com<br>Andrew@vilesandbeckman.com<br>laci@vilesandbeckman.com<br>*Counsel for Plaintiff, T.V. as*<br>*Personal Representative of the*<br>*Estate of A.V.* | Lawrence G. Walters, Esq.<br>**Walters Law Group**<br>195 W. Pine Ave.<br>Longwood, FL 32750-4104<br>Telephone: (407) 957-9150<br>Facsimile: (407) 774-6151<br>larry@firstamendment.com<br>paralegal@firstamendment.com<br>*Counsel for Defendant, Grindr, LLC* |
| Ambika Kumar, Esq. (*pro hac vice*)<br>Sara A. Fairchild, Esq. (*pro hac vice*)<br>**Davis Wright Tremaine LLP**<br>920 Fifth Avenue, Suite 3300<br>Seattle, Washington 98104-1610<br>Telephone: (206) 622-3150<br>Facsimile: (206) 757-7700<br>ambikakumar@dwt.com<br>sarafairchild@dwt.com<br>*Counsel for Defendant, Grindr, LLC* | |

By:   /s/ Alexander Brockmeyer
Alexander Brockmeyer, Esq.
Fla. Bar No.: 105758